AO 440 (Rev. 12/09)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of New York

| | |
|---|---|
| Neil F. Keenan, Individually and as Agent for The Dragon Family, citizens of foreign states, | ) |
| *Plaintiff* | ) |
| v. | ) |
| See Attached Schedule A | ) |
| *Defendant* | ) |

'11 CIV 8500

Civil Action No.

JUDGE HOLWELL

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  SEE ATTACHED SCHEDULE A

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:      William H. Mulligan, Jr.
Bleakley Platt & Schmidt, LLP
One North Lexington Avenue
White Plains, NY  10601
(914) 949-2700

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date:  _23 NOV 2011_
11/22/2011

*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 12/09)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❑ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

❑ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,
on *(date)* _____ , and mailed a copy to the individual's last known address; or

❑ I served the summons on *(name of individual)* _____ , who is
designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

❑ I returned the summons unexecuted because _____ ; or

❑ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.


Date: _____                    _____
                                                         *Server's signature*

                                                   _____
                                                         *Printed name and title*

                                                   _____
                                                         *Server's address*

Additional information regarding attempted service, etc:

## SCHEDULE A – DEFENDANTS

1.    DANIELE DAL BOSCO

2.    THE OFFICE OF INTERNATIONAL TREASURY CONTROL

3.    RAY C. DAM, individually, and as President of OITC

4.    DAVID A. SALE, individually, and as Deputy Chief of the Council for the Cabinet of OITC

6.    THE UNITED NATIONS

7.    BAN KI-moon, individually, and as Secretary General of the UN

8.    H.E. Ambassador CESARE MARIA RAGAGLINI, Individually, and as Permanent Representative of the Italian Mission to the UN in New York

9.    H.E. Ambassador LAURA MIRACHIAN, Individually, and as Permanent Representative of the Italian Mission to the UN in Geneva

11.    ITALIAN REPUBLIC

12.    ITALIAN FINANCIAL POLICE

13.    SILVIO BERLUSCONI, Former Prime Minister of Italy

14.    THE WORLD ECONOMIC FORUM

15.    WORLD ECONOMIC FORUM U.S.A., INC.

16.    GIANCARLO BRUNO, individually, and as Head of the Banking Industry of WEF



William H. Mulligan, Jr. (WM 2945)
Justin M. Gardner (JM 6169)
BLEAKLEY PLATT & SCHMIDT LLP
One North Lexington Avenue
White Plains, New York 10601
(914) 949-2700  Tel.
(914) 683-5956  Fax
wmulligan@bpslaw.com
Attorneys for Plaintiff

'11  CIV  8500

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~X

JUDGE HOLWELL

NEIL F. KEENAN, Individually and as Agent for
THE DRAGON FAMILY, citizens of foreign states,

                    Plaintiff,

          -against-

DANIELE DAL BOSCO, a citizen of a foreign state,
THE OFFICE OF INTERNATIONAL TREASURY
CONTROL, a foreign corporation ("OITC"), RAY C.
DAM ("DAM"), individually, and as President of OITC,
DAVID A. SALE ("SALE"), individually, and as Deputy
Chief of the Council for the Cabinet of OITC, the UNITED
NATIONS, BAN KI-moon, individually, and as Secretary
General of the UN, H.E. Ambassador CESARE MARIA
RAGAGLINI, Individually, and as Permanent
Representative of the Italian Mission to the UN in New
York, H.E. Ambassador LAURA MIRACHIAN,
Individually, and as Permanent Representative of the Italian
Mission to the UN in Geneva, the ITALIAN REPUBLIC,
the ITALIAN FINANCIAL POLICE, Former Prime
Minister of Italy, SILVIO BERLUSCONI, THE WORLD
ECONOMIC FORUM ("WEF") a foreign corporation,
WORLD ECONOMIC FORUM U.S.A., INC.,
GIANCARLO BRUNO, individually, and as Head of the
Banking Industry of WEF, and various unknown individual
co-conspirators, JOHN DOES A-Z,

                    Defendants.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~X

Index No. 11 Civ. ___ (  )

**COMPLAINT**

Plaintiff Demands Trial By Jury
for All Applicable Claims

Plaintiff, NEIL F. KEENAN (hereinafter, "KEENAN"), individually, and as agent and assignee of THE DRAGON FAMILY, citizens of various foreign states, by and through his attorneys, Bleakley Platt & Schmidt, LLP, as and for his complaint herein, alleges as follows:

## NATURE OF THE ACTION AND JURISDICTION

1.    This is a civil claim arising out of the concerted, knowing, malicious scheme and international conspiracy engaged in by the Defendants for the designed purpose of defrauding plaintiff KEENAN, the designated Agent of his Principal, the "Dragon Family," for the express purpose of expropriating, stealing and converting certain negotiable financial instruments lawfully owned by the Dragon Family and entrusted to KEENAN in early 2009. These assets (hereinafter referred to as the "Dragon Family Financial Instruments" or the "DFFI") had been intended for participation in select, registered and authorized Private Placement Investment Programs (or "PPPs") for the benefit of a wide range of global humanitarian purposes. At the time of the criminal and deceitful acts of the Defendants, the approximate face value of the stolen DFFI was One Hundred Forty-Five and One Half Billion ($145,500,000,000.00) United States Dollars with an approximate accrued interest value of One Trillion ($1,000,000,000,000.00) United States Dollars.

2.    The stolen DFFI, which had been entrusted to KEENAN in early 2009 by the Dragon Family, are comprised of the following:

(i)    Two-Hundred Forty-Nine (249) United States 1934 Series Federal Reserve Notes (or "FRNs") which, according to a Federal Reserve System Inventory List (SC1226-71-D004—D45184101 A) prepared at the time of issuance, were contained in "Box No. D 45184101 A" bearing Bond Nos. "D 45184101 A- D 45184350 A" (one sheet No. D 45184349 A missing)

2

each with a face value of $500 Million ($500,000,000.00) United States Dollars in the total amount of One Hundred Twenty-Four Billion Five-Hundred Million United States Dollars ($124,500,000,000.00).

     (a)    KEENAN does not have personal knowledge of the circumstances which gave rise to the original issuance of any of the DFFI. The knowledge he has obtained is based largely upon the representations made by Mr. Akihiko Yamaguchi (hereinafter, "Yamaguchi"), Signatory of the Dragon Family, in various documents Yamaguchi has executed over the years in connection with his attempts to place the DFFI into legitimate PPPs in furtherance of the Dragon Family's objectives to provide humanitarian global assistance when and where needed.

     (b)    Upon information and belief, between 1927 and 1938, as a result of arrangements made between China and the United States, the United States purchased some 50 million ounces of silver and leased vast amounts of gold from the Nationalist Chinese Government, known as Kuomintang. During this period, China was partly occupied by Japanese troops and there was a fear of China being overrun by the Japanese.

     (c)    Upon information and belief, in return for the precious metals delivered by the Chinese, certificates were given pursuant to private agreement made between China and the United States. These certificates became the underlying funds of the Kuomintang.

3

(d)      Upon information and belief, following the promulgation in
1934 of the Gold Reserve Act, the law required all bullion gold
and gold coin to be surrendered to the Federal Reserve, a private
corporation that is chartered to operate as the Central Bank of the
United States and the issuer of the United States Dollar.

(e)      Upon information and belief, domestically owned gold was
purchased.  Foreign Gold held by the Treasury was also
surrendered to and thus leased to the Federal Reserve, which
resulted in the issuance of the series of 1934 Notes by the Federal
Reserve.  These Dragon Family FRNs have never been redeemed
and, upon information and belief, the accrued interest was met by
the subsequent issue of certain 1968 series of Kennedy Bonds (see
¶ 2 (iii), infra) and later further issues of the 1934 series FRNs
which, upon information and belief, were issued through the period
of the Chinese civil war to assist Kuomintang operations in China
and later in Burma.  These 1934 FRNs guarantee the lease
payments and helped to allow the Chinese Government to continue
financially.  KEENAN has no personal knowledge as to whether
the FRNs with which he was entrusted were original or
subsequently issued Notes.

(f)      Upon information and belief, this gold was documented
into accounts through the Union Bank of Switzerland, placed under
protection of the Swiss Attorney General, registered through the

4

Swiss National Bank into the Bank for International Settlements ("BIS") International Collateral Combined accounts and then from within the BIS, blocked to form the Institutional Parent Registration Accounts of the Federal Reserve System.

(g)     Upon information and belief, and in accordance with procedures that would be expected to occur in the event the Note Holder of record wished to redeem it, the Holder would do so by first remitting the number of the Note to the Federal Reserve with a major project or a list of projects for approval.  Once the projects have been approved, the Note would be recognized and the Fedsystem would then make arrangements for the Note to be deposited into a bank which would provide a specific credit line, perhaps of 30% up to 80% of the face value.  The Fedsystem would then provide immunity to the Holder to present the Note at a specific Bank where a Credit Line has been pre-arranged. Attempting to present these Notes outside this system will see the note arbitrarily denied and the illegal presenter incarcerated.

(h)     Upon information and belief, in order to effectuate this process, the Notes were printed to appear as if they were not produced from official origin and bear obvious imperfections, therefore easily deniable.  However, when proper procedures are followed, the number of the Note and other linking identic data allows ultimate authentication and verification through the Federal

5

Reserve System screening process and the presenting of the Note under the immunity shield allows effective use.

(i) As of April 20, 2009, the Dragon Family had calculated the total value of these FRNs alone, with interest accrued since 1934, as approximately Nine-Hundred Sixty-Eight Billion United States Dollars ($968,000,000,000.00).

(ii) Two (2) 57th Series Japanese Government Bearer Bonds, Nos. A 1306 (construction bond) and A 1310 (the "Japanese Bonds"), which were issued on April 30, 1983 by the Ministry of Finance, Government of Japan, each having a face value of Japanese Yen Five Hundred (500) Billion, which is equivalent to an amount in excess of Nine and One-Half (9.5) Billion United States Dollars.  Upon information and belief, these Japanese Bonds are but two (2) of Five Hundred (500) such Bonds owned by the Dragon Family, each having the same face value, according to a statement of Yamaguchi dated April 20, 2009 concerning the Bond History relating to these specific Japanese Bonds.

(iii) One (1) United States Kennedy Bond with a face value of One (1) Billion United States Dollars, bearing registration number APII 024068 A.

(a) As with the FRNs, KEENAN has no personal knowledge of the circumstances which gave rise to the issuance of the Kennedy Bond bearing registration number APII 024068 A, issued in 1998 and which had been entrusted to him by Yamaguchi on May 5, 2009.  The knowledge he has obtained is based largely upon his

6

communications with Yamaguchi including the representations made by Yamaguchi in various documents he has executed over the years in connection with his attempts on behalf of the Dragon Family to place various Kennedy Bonds into legitimate PPPs in furtherance of their objective to provide humanitarian global assistance when and where needed.

(b)     In a sworn statement by Yamaguchi, dated August 4, 2010, entitled "Kennedy Bond History," and which relates to the details of ten (10) other Kennedy Bonds, virtually identical to that entrusted to KEENAN in May 2009 except for the registration numbers, Yamaguchi stated that the "US government borrowed huge amount funds from the Dragon Family many years ago.  The base of the lent funds from the Dragon Family to the US Government were the Gold and Silver.  Therefore the US government was able to issue huge USD as currencies via FRB then."  Yamaguchi proceeded to state:  "We, the Dragon Family, requested some interest to the US Government on 1998 by use of some securities/certificates got expired as same as the 57th Series Japanese Government Bonds.  And, we have received the Kennedy Bonds, issued in 1998, as one of the interest payments from the US Government.  I recognize as my position that the Kennedy Bonds were issued by the US Government as the interest only for the Dragon Family."

7

(c)     Upon information and belief, the Kennedy Bonds represent a series of notes printed for the purpose of creating a settlement fund for the gold and other precious metals transferred to the United States under the terms of the Green Hilton Memorial Agreement (GHMA), November 11, 1963 which was executed by, among others, President John F. Kennedy and President Soekarno, the first President of Indonesia, who had previously been entrusted with the care of the gold.  Upon information and belief, these Bonds were originally issued in 1968 by way of specially denominated 1968 Kennedy Bonds, "Z" series.  These bonds were not commercially negotiable, or cashable, but were redeemable through the Federal Reserve System in what was intended to be an effective, beneficial, and well-aimed program that was intended for better global development.  President Soekarno was deposed in 1967 by General Suharto, thus disrupting the entire program causing a failure to institute the planned development program intended for Indonesia and the Asian region.

(d)     Upon information and belief, few, if any, of the 1968 Kennedy Bonds had been used within the original 30 year period, a fact to which Yamaguchi may have been referring in his above statement.  Thus, theoretically, the gold that had been lent by the Dragon Family had not been paid for and therefore had not fully transferred to the Federal System.  Upon information and belief,

8

this resulted in a situation where the gold was no longer being

purchased at the gold price of 1963 but at the increased 1998 price.

Thus, a new "A" series of bonds, which Yamaguchi may also have

been describing in his statement above, were issued in 1998

reflecting that price and the old "Z" series became defunct and

worthless.

3.      As referenced above, and discussed in more detail below, the DFFI had been

entrusted to KEENAN in early 2009 by the Dragon Family.  Months thereafter, in September

2009, KEENAN was fraudulently induced through the conspiratorial actions and schemes of the

Defendants to transfer and entrust the DFFI for temporary safekeeping and custodianship to

defendant Daniele DAL BOSCO (hereinafter, "DAL BOSCO").

4.      Thereafter, unbeknownst to KEENAN, DAL BOSCO, in a malevolent, conscious

and concerted scheme and enterprise of staggering proportions, plotted and conspired with the

other Defendants in a variety of ways to defraud KEENAN and to convert the DFFI for their

own personal financial gain and to the complete financial detriment of KEENAN and the Dragon

Family, as described in more detail throughout the Complaint below.

5.      In summary, this conspiracy included:  (a) the expropriation, stealth and

conversion by DAL BOSCO of the very same DFFI with which he had been temporarily

entrusted; (b) the repeated and unsuccessful attempts to bribe KEENAN in the total amount of

One Hundred Million ($100,000,000.00) Dollars (half of which was to be kept by DAL

BOSCO), in an effort to obtain KEENAN's consent to release the DFFI to others without

disclosing such theft to the rightful owners of the DFFI, the Dragon Family; (c) a plan whereby

the DFFI would be converted and placed into a so-called "UN Sovereign Program" wholly under

the auspices, protection and umbrella of the "sovereign immunity" allegedly accorded to the defendants by the actions of certain of the defendants, including the UNITED NATIONS and the ITALIAN REPUBLIC; (d) the execution of a written agreement between DAL BOSCO and defendants OITC and SALE, with the full knowledge and authority of DAM, whereby DAL BOSCO openly repudiated his duties as custodian of the DFFI; (e) the issuance of an illegal and utterly baseless Cease and Desist Order under which OITC asserted the thoroughly and knowingly false proposition that the DFFI was, in fact, in the lawful possession of OITC, which has acted for decades with impunity and under the asserted umbrella of protection allegedly accorded by the UNITED NATIONS; (f) the longstanding and unlawful complicity of the UNITED NATIONS in allowing the blatantly false, but to date, unremedied representation to the world at large by OITC that it was organized under a non-confirmable and apparently non-existent UN Charter Code provision; (g) the unlawful, concerted and malicious attempt, through the actions of various of the defendants to utilize not only the stolen DFFI, which are the focal point of this matter, but also numerous various other financial instruments either stolen or seized under color of police authority of the ITALIAN FINANCIAL POLICE or obtained by others, to purchase Banca Commerciale di Lugano, Lugano CH (Switzerland), or some other Swiss registered bank into which they could deposit stolen assets, and to capitalize the bank's assets with profits obtained from such actions.  Upon information and belief, such bank capitalization was to include yet another approximately One-Hundred Thirty-Four Billion, Five-Hundred Million Dollars ($134,500,000,000.00) Dollars of financial instruments also owned by the Dragon Family, including FRNs and Kennedy Bonds virtually identical to the DFFI, which were seized on the Italian/Swiss border in June 2009. (See ¶¶ 63-69 *supra*, "The Chiasso Incident").

**Subject Matter Jurisdiction:**

6.     This Court has "original jurisdiction without regard to amount in controversy" over this action brought against a foreign state as defined in the Foreign Sovereign Immunities Act (hereinafter "FSIA"), 28 U.S.C. § 1603(a), namely defendants the ITALIAN REPUBLIC and the ITALIAN FINANCIAL POLICE, which defendants are not entitled to immunity either under 28 U.S.C. §§ 1605-1607 or under any applicable international agreement. Specifically, defendants the ITALIAN REPUBLIC and the ITALIAN FINANCIAL POLICE and their agents acting on their behalf with actual authority, while actively participating in the conspiracy to defraud KEENAN and convert the DFFI, engaged in inherently commercial activities when said defendants and their agents attempted to bribe KEENAN in the total amount of One Hundred Million ($100,000,000.00) Dollars for the purpose of obtaining the DFFI, from KEENAN, for their own personal profit by and through the investment of the DFFI in a United Nations Sovereign Program largely through actions taken in New York, New York. Said commercial activity further has a direct effect in the United States in that a significant portion of the DFFI, namely the 249 FRNs and the Kennedy Bond, are an obligation of the U.S. Federal Reserve System, and in order to negotiate said financial instruments, the holder of these instruments must work directly with the U.S. Federal Reserve System to have the instruments verified before anticipated placement into an approved PPP. Additionally, and upon information and belief, the actions of the said defendants and their agents, as described in more detail below, constitute an expropriation of the DFFI in clear violation of international law, and said DFFI are currently held by said defendants in New York for investment in a UN Sovereign Program.

7.     This Court also has original jurisdiction over this matter pursuant to 28 U.S.C. § 1331 as federal common law is applicable to the claims asserted herein, which claims involve

11

uniquely federal interests. Specifically, this action involves an international conspiracy to defraud KEENAN and convert (i) Two-Hundred Forty-nine (249) United States 1934 Series Federal Reserve Notes each with a face value of $500 Million ($500,000,000.00) United States Dollars in the total amount of One Hundred Twenty-Four Billion Five-Hundred Million United States Dollars and (ii) One (1) United States Kennedy Bond with a face value of One (1) Billion United States Dollars, bearing registration number APII 024068 A issued by the U.S. Federal Reserve and/or the U.S. Treasury Department to the Dragon Family in exchange for the Dragon Family's extensive gold and other precious metal deposits, which were then placed in the U.S. Federal Reserve System for the benefit and underwriting support of the United States Dollar, which was to become and currently remains the global reserve currency. This international criminal conspiracy involving a sovereign nation and international organizations as co-conspirators, including the ITALIAN REPUBLIC, the ITALIAN FINANCIAL POLICE, BERLUSCONI, BRUNO, the UNITED NATIONS and the WORLD ECONOMIC FORUM, implicates the Dragon Family's right to be compensated for the gold and precious metal deposits it made into the Federal Reserve System pursuant to the original agreements between the United States and the Dragon Family, as well as KEENAN's rights as Agent of the Dragon Family to place the DFFI into the PPPS intended and to be compensated in accordance with his own rights as such Agent. Alternatively, the conspiracy implicates the Dragon Family and its Agent KEENAN's right to the return of the gold and precious metal deposits with interest—a right which clearly implicates the uniquely federal interest of the United States in the U.S. Federal Reserve System, the federally chartered central banking system of the United States. Because this action involves issues that are of such a peculiarly federal concern, namely the obligations of the federally chartered central banking system of the United States, the underwriting support of

the U.S. Dollar and its continued viability as the global reserve currency, this action is governed by federal common law.

8.    The Court also has jurisdiction over any remaining claims under principles of supplemental jurisdiction as such claims "are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy" pursuant to 28 U.S.C. § 1367.

**VENUE**

9.    Venue is proper in this district under 28 U.S.C. § 1391 (b) (2) as a substantial part of the events or omissions giving rise to the claims occurred, or, upon information and belief, a substantial part of the property that is the subject of the action is situated in this district, and under 28 U.S.C. § 1391 (b) (3) as certain defendants, namely the UNITED NATIONS (hereinafter, the "UN"), BAN KI-moon, H.E. Ambassador CESARE MARIA RAGAGLINI (hereinafter, "RAGAGLINI"), GIANCARLO BRUNO, (hereinafter, "BRUNO"), and the WORLD ECONOMIC FORUM USA, INC. (hereinafter "WEF USA") are in the district.  Venue is also proper in this district under 28 U.S.C. § 1391 (d) as certain defendants are foreign aliens, namely DANIELE DAL BOSCO, THE OFFICE OF INTERNATIONAL TREASURY CONTROL (hereinafter, "OITC"), RAY C. DAM (hereinafter "DAM"), DAVID A. SALE (hereinafter "SALE"), the WORLD ECONOMIC FORUM (hereinafter "WEF") and SILVIO BERLUSCONI (hereinafter "BERLUSCONI"), the former Prime Minister of Italy, and as such may be sued in any district.  Lastly, venue is proper in this district under 28 U.S.C. § 1391 (f) (1) as this action is against a foreign state and a political subdivision or agency thereof, namely defendants the ITALIAN REPUBLIC (hereinafter "ITALY") and the ITALIAN FINANCIAL POLICE, and a substantial part of the events or omissions giving rise to the claims occurred, or,

13

upon information and belief, a substantial part of property that is the subject of the action is situated in this district.

## PARTIES

### The Plaintiff Neil Francis Keenan

10.     At all relevant times, plaintiff KEENAN was an individual citizen of the United States, who currently is a resident of Bulgaria.  KEENAN was introduced to Yamaguchi and the Dragon Family in or about August 2008 in connection with their efforts to place certain Japanese Bonds and Kennedy Bonds into a PPP after proper Bank verification.  KEENAN acted as an intermediary in introducing the Dragon Family to the Alpha Bank, located in Cyprus, for which Yamaguchi expressed great appreciation.  On account of the assistance and political connections KEENAN provided at that time, Yamaguchi persistently sought out KEENAN to provide direct services on his behalf related to international banking and trading transactions in furtherance of Dragon Family humanitarian programs.  KEENAN eventually agreed to accept the responsibilities attendant to representing the Dragon Family in numerous transactions in the world of private financing, international banking, and governmental trading.

11.     As a result of the actions of the defendants which gave rise to this action, described in greater detail in the succeeding paragraphs, on October 28, 2010, Yamaguchi executed a certain Special Power of Attorney by which he, with the approval of General Haan, the Head of the Dragon Family, authorized KEENAN to act on his behalf and that of the Dragon Family, for the private placement of or legal return of the DFFI "which were stolen by Daniele Dal Bosco (and others) from you," effectively assigning any cause of action which the Dragon Family might possess as the legal holder of the DFFI.  Any such causes of action would be in addition to KEENAN's personal and representative claims as the Dragon Family's designated

14

Agent under his Special Powers of Attorney, as the victim of the theft and conversion of the DFFI by DAL BOSCO and the various and sundry other conspiratorial and illegal actions of the other defendants.

12.     This Special Power of Attorney explicitly superseded and extended prior Powers of Attorney granted to KEENAN by which KEENAN was authorized to coordinate with the appropriate programs in the United States, Asia and Europe for investment purposes utilizing the DFFI as collateral.  In addition to the wide range of responsibilities granted to KEENAN regarding the negotiation of the DFFI and their investment in proper PPPs in a fully secured investment facility, KEENAN, "and only" KEENAN, was specifically authorized to determine what legal proceedings should be initiated in order to recover the stolen DFFI, how to finance it, and seek all damages arising therefrom.  KEENAN was authorized to coordinate all aspects of the litigation and determine "what to do with any proceeds from any outcome" as "the bonds were stolen from you and you are financing their retrieval and you are taking all the risks."  In effect, Yamaguchi assigned to KEENAN any and all causes of action he or the Dragon Family may have in seeking the recovery of the DFFI or damages arising from their theft "as the legal holder" of the DFFI.  KEENAN was placed "solely in control over the legal recovery of said bonds and all aspects of it."

**Keenan's Disclosed Principal – the Dragon Family**

13.     Upon information and belief, the 1934 FRNs described, supra, at ¶ 2 (i), came under the control of the Kuomintang from whom the gold was received in return for the lease payments, and allowed the Chinese Nationalist Government in Taiwan to continue financially. Many of the FRNs were left in Communist China when the Kuomintang had to flee to Taiwan. Further, upon information and belief, the Gold had been nationalized by the Kuomintang who

15

moved much of the FRNs (but not all) to Taiwan, which allowed for the development of and served as the basis for the underlying wealth of Taiwan.  The FRNs were good for value as they were backed by the gold and other precious metals purchased and leased by the United States government.

14.     Upon information and belief, the Kuomintang appointed guardians of this Gold and the securities issued by the United States who came to be known euphemistically as the Dragon Family.  The Dragon Family is, in fact, a highly secretive and informal organization that operates between old families within China and Taiwan, above the political divide of the two independent Chinese Governments.  The Dragon Family abstains from public view and knowledge, but, upon information and belief, acts for the good and better benefit of the World in constant coordination with higher levels of Global Financial Organizations, in particular, the Federal Reserve System.  During the course of its existence over the last century, the Dragon Family has accumulated great wealth by having provided the Federal Reserve Bank and the United States Government with asset assignments of gold and silver via certain accounts held in Switzerland, for which it has received consideration in the form of a variety of Notes, Bonds and Certificates such as those described in ¶ 2 that are an Obligation of the Federal Reserve System. Upon information and belief, these Bonds have values ranging in the many Thousands of Trillions of United States Dollars, a relatively small portion of which is involved in the claims giving rise to this action.  Each of these currencies, such as the DFFI involved in this action, was and remains duly registered within the Federal Reserve System and are directly verifiable by the Federal Reserve through its efficient verification system and screening process.

## THE DEFENDANTS

**Daniele Dal Bosco**

15.     Defendant DAL BOSCO is an individual who, upon information and belief, has

multiple residences in Divonne-les-Bain, France, London, United Kingdom and Rome, Italy,

although he at all relevant times represented to KEENAN that he resided in Geneva, Switzerland.

His actions, which give rise to this action, were acted upon in various locations in Europe,

including Switzerland and Italy, and involved the direct use of international telephone

communication between Europe and New York City.

### The Office of International Treasury Control ("OITC") and Individual OITC Defendants

16.     Defendant DAL BOSCO, at the relevant times described more fully below, has

acted in concert and conspired with Defendant THE OFFICE OF INTERNATIONAL

TREASURY CONTROL (hereinafter "OITC").  Upon information and belief, OITC has its

principal offices in Singapore and Cambodia, although according to a document OITC produced

in March 2006, it has offices in Malaysia, the Netherlands, the United States, Australia and

Ecuador.  According to its own website, [www.unoitc.org], OITC has a "Due Diligence Division

Only" office located in Washington D.C., and claims to be "an International Financial Institution

Chartered under the United Nations Charter Control No: 10-60847."

17.     Further, OITC identifies itself as a "Sovereign Entity in its own right, as instituted

by the Nations of the World and as provided for under The Treaty of Paris 1886."  It claims to

have "substantial assets in its control."  OITC spokesmen have claimed that the organization has

been chartered by the United Nations under a secret protocol and that it was established as the

Office of His Excellency Dr. Ray C. Dam, changing its name to the Office of International

Treasury Control in 2003.

18.     In the "General Overview" of its History, provided on the website, OITC traces

its roots to The Trilateral Trillenium Tripartite Gold Commission ("TTTGC") purportedly

organized in 1944/5 for a term of fifty (50) years.  OITC represents that during this term, the

TTTGC held the "Mandate, Rights and Authorities over the Combined International Collateral

Accounts of the Global Debt Facility."  At the expiration of the term of 50 years, the so-called

"Nations of the World," disappointed with the biased way The Combined International Collateral

Accounts had been utilized within the 50 Years, agreed not to extend the term of the TTTGC, but

instead appointed a single independent person to the position of International Treasury Controller

with full rights, authority, and legal ownership of the Combined International Collateral

Accounts.

19.     Further, according to the OITC website, on January 20, 1995, defendant Dr. Ray

C. Dam (hereinafter, "DAM") was "appointed International Treasury Controller, and Legal Heir

and Owner of the Combined International Collateral Accounts of the Global Debt Facility, with

full authority and dispositional control of same, under Legal Decadency RCD 1088, executed by

the Nations of the World."  Also purportedly established on January 20, 1995, was "The Office

of International Treasury Control, as the management, administrative and operations

organization for His Excellency, Dr. Ray C. Dam," who claimed to be the authorized

International Treasury Controller.

20.     Defendant DAM is an individual and, upon information and belief, is generally

believed to be a native of Cambodia, although he is also a United States citizen bearing United

States passport number 467832299.  Upon information and belief, DAM's real name is Amijan

18

Khali Abdeb and was born in Kyrgyzstan of a mother who was a Cambodian princess. According to the OITC website, His Excellency Ray C. Dam is a "certified and indemnified International Central Banking financial institution operating as The Office of International Treasury Control." Further, as reported on the website, following the confirmation of his Powers and Authorities by the so-called "Washington Panel" in 1998, the establishment of the Institution – The Office of International Treasury Control – was completed on January 20, 2003, whereby "based upon the content and requirements of numerous International Treaties," the OITC was granted "Sovereign Entity Status under the United Nations Charter Control No: 10-160847." DAM reportedly also claims to have earned a degree from UC Berkeley but, upon information and belief, the University has no record of conferring a degree upon DAM.

21.     Defendant David A. Sale (hereinafter, "SALE") is an individual citizen of the United Kingdom who holds himself out as "Deputy Chief of the Council of the Cabinet" of OITC and signs pertinent correspondence (more fully discussed below) as "D.A. Sale, F. LLA, Special Global Envoy, Senior Commercial Advisor to His Excellency, The Chairman, The Office of International Treasury Control, UN Charter Control No: 10-60847." Upon information and belief, SALE lived and worked from a small apartment in a low cost community in Kumpawapi, Udon Thani Province in Thailand and is not known to have ever met with DAM personally, in their entire eight years of association.

22.     According to its website, OITC "though not generally or publicly known . . . is the largest International Institution of its kind" and "the largest single owner of gold and platinum bullion in the World, in addition to being a major owner of Bank Debenture Securities, International Treasuries, cash and other forms of securities, all of which are recorded as assets of the Combined International Collateral Accounts of the Global Debt Facility, whose accounts are

19

held within the Federal Reserve, The Bank for International Settlements, The US Treasury, Swiss National Bank, Swiss Federal Finance Administration." Further, as represented on its website, since being established, the OITC has become the largest single owner of Home Mortgage Securities in the World today, and "Original assets in the form of gold have been wisely and well utilized to create wealth that creates future wealth."

23.     Upon information and belief, contrary to the representations of OITC, the United States Government has stated that "within the Federal Reserve, there exists no organization or department with the initials OITC, nor anything similar to this." Additionally, the aforesaid Bank for International Settlements ("BIS") – an international organization representing central banks – has also denied any knowledge of the OITC. The BIS was established in 1930, and has its principal office located in Basel, Switzerland with two representative offices in the Hong Kong Special Administrative Region of the People's Republic of China and in Mexico City. The BIS is reportedly the world's oldest international financial organization whose customers are central banks and international organizations. BIS does not accept deposits from, nor provide financial services to, private individuals or corporate entities. According to its website, BIS exists to "foster international monetary and financial cooperation and serves as a bank for central banks." Further, according to OITC's website, OITC claims sovereignty over the Institutional Parent Registration Accounts 984 52700845-34-18 within the Federal Reserve System.

24.     Upon information and belief, the OITC has declined to publish any independent verification of its status, claiming that only individuals with a "level 3" to "level 5" security classification can see "its protocol for verification," which in turn, "can only be undertaken by a senior member of the Government or the Reserve Bank." Further, the UN is allegedly "legally bound to respond to a verification request on the condition that the requisite controls and

20

procedures are followed or no response will be received from the United Nations." Further, the only way a verification request can be made is "through the UN headquarters in New York or Geneva, not via, or by, any sub-office of the UN."

25.     Upon information and belief, the UN has been complicit in the nefarious activities of OITC in that it has never formally denounced or disassociated itself from OITC, and has allowed OITC to hold itself out to the world community as protected by its umbrella of legitimacy and chartered by the UN itself.  It was reported as recently as August 10, 2010 on the internet site of Benjamin Fulford ("Fulford"), a journalist of Canadian descent and citizenship, who currently resides in Japan, and who served as the Asian Bureau Chief for Forbes Magazine from 1998 until 2005, that "The UN never, until the current investigation[1] began, denied its affiliation with the OITC."

26.     On or about December 18, 2010, the Cambodian Phnom Penh Post (the "Post") reported the arrest of "four employees of a shadowy organisation that has been implicated in a series of bizarre scandals in multiple countries, holding the men on suspicion of large-scale fraud and forgery."  Included in the group was "Ray C. Dam, the chairman of ARP-OITC Group Co Ltd."  This followed an October report in the same newspaper that examined the "Office of International Treasury Control," of which ARP-OITC is a subsidiary, and questioned the group's alleged associations with the United States government, the United Nations and HSBC Bank. DAM was accused of "forging documents and using forged documents to claim he has roughly

_____

[1] See discussion of "The Chiasso Incident", infra, at ¶¶ 63-69.

21

$500 million."  Subsequent news reports confirmed the charges by the Phnom Penh Municipal Court on December 20, 2010 and noted the prior Post reports that OITC officials had "previously been implicated in financial scandals in Ecuador, Fiji and the United Kingdom."

**The United Nations and Individual Defendants**

27.     Defendant UNITED NATIONS is an international organization whose stated aims are facilitating cooperation in international law, international security, economic development, social progress, human rights, and achievement of world peace.  It was founded in 1945 after World War II to replace the League of Nations, and its main headquarters are located on international territory in New York, New York.  Upon information and belief, at all relevant times referenced in this complaint, defendant UN and others, including any officials acting on its behalf, were acting outside the scope of their official capacities and are accorded no immunity for such actions.

28.     Defendant BAN KI-moon is a native of South Korea, was the Foreign Minister of the Republic of Korea from January 2004 to November 2006 and was elected in October 2006 to be, and currently is the eighth Secretary-General of the United Nations.

29.     Defendant H.E. Ambassador Cesare Maria RAGAGLINI is the Permanent Representative of the Italian Mission to the UN in New York, New York, and maintains a residence in New York, New York.

30.     Defendant H.E. Ambassador Laura MIRACHIAN is the Permanent Representative of the Italian Mission to the UN in Geneva, Switzerland.

**The Italian Republic, Prime Minister and Related Defendants**

31.     Defendant the ITALIAN REPUBLIC is a democratic nation and is a founding member of what is now known as the European Union.  It is a member of NATO and is a

22

member state of defendant UNITED NATIONS. Defendant SILVIO BERLUSCONI has

recently resigned as the Prime Minister of the ITALIAN REPUBLIC. Upon information and

belief, BERLUSCONI has been a central figure in the plot and scheme to utilize seized or stolen

financial instruments belonging to the Dragon Family for his own personal financial gain and

profit in collusion with various other defendants, as more fully described herein.

32.     Defendant, the ITALIAN FINANCIAL POLICE, or Guardia di Finanza, meaning

"Financial Guard" ("GdF") is a militarized Italian police force under the authority of the Minister

of Economy and Finance of the ITALIAN REPUBLIC and ultimately, at all relevant times

herein, acted under the authority of defendant BERLUSCONI. It is a part of the Italian Armed

Forces and is essentially responsible for dealing with financial crime and smuggling. Its

activities are financial, economic, judiciary and public safety and, among other things under its

jurisdiction are smuggling, money laundering, customs and border checks, and political and

military defense of the Italian borders.

### Giancarlo Bruno and the World Economic Forum Defendants

33.     Upon information and belief, defendant the World Economic Forum (hereinafter,

"WEF") is a Swiss registered non-profit foundation best known for its annual meeting in Davos,

Switzerland, which brings together top business leaders, international political leaders, selected

intellectuals and journalists to discuss the most pressing issues facing the world, including health

and the environment. The WEF was founded in 1971 by Klaus Martin Schwab, a German-born

business professor at the University of Geneva. It was originally named the European

Management Forum, but changed to its present name in 1987 and sought to broaden its vision

further to include providing a platform for resolving international conflicts.

34.     The WEF is headquartered in Cologny, Switzerland, near Geneva.  In 2006 it

opened affiliate offices in Beijing, China and New York, New York.  The WEF purports to strive

to be impartial, and is not tied to any political, partisan or national interests.  In 2009, it opened

an office in Tokyo, Japan.  It is committed to improving the State of the World and has observer

status with the United Nations Economic and Social Council, and is under the supervision of the

Swiss Federal Government.

35.     Upon information and belief, defendant Giancarlo Bruno (hereinafter, "BRUNO")

is an individual who maintains residences in New York, New York, Geneva, Switzerland and

Italy and at all pertinent times has served as Director responsible for the Financial Services

Industry Group of the WEF in its New York City offices at the WORLD ECONOMIC FORUM

USA, Inc. (hereinafter "WEF USA"), which is the WEF affiliate incorporated in Delaware, a

foreign not for profit corporation authorized to do business in the State of New York overseeing

the development and content and the relationships with the WEF's partner companies in the

Banking, Insurance and Asset Management sectors.  Prior to joining the WEF, BRUNO had

extensive experience in banking and corporate finance.  He also had working experience with

defendant UN, at the United Nations Industrial Development Organization ("UNIDO"), where

he carried out research responsibilities in the field of comparative development with the

Governments Funds Unit of the Mobilization and Management of Financial Resources Division.

BRUNO is also a member of the Democratic Party Constituent Assembly, Italy.  BRUNO has

acted as a central figure in concert with other defendants, including principally DAL BOSCO,

the UNITED NATIONS, the ITALIAN REPUBLIC, the ITALIAN FINANCIAL POLICE and

BERLUSCONI in seeking to bribe KEENAN to release the DFFI with which DAL BOSCO had

been entrusted, in order that defendants, including BRUNO, could profit illegally from both the

24

possession and illegal marketing of the DFFI. Upon information and belief, BRUNO's actions took place principally in New York, New York, and involved the use of international telephone communications.

36.    Defendants JOHN DOES are individuals or organizations who may have acted in concert with any or all of the named defendants herein and may be liable to plaintiff for the damages suffered by him.

## PERTINENT FACTUAL BACKGROUND INFORMATION
## COMMON TO ALL CAUSES OF ACTION

A.    **Keenan and the Dragon Family**

37.    The aforesaid Akihiko Yamaguchi is a Japanese citizen who was born in December 1954 and who, in approximately 1986, at the age of thirty-two (32), through his international trade business in Taiwan, was introduced to Mr. Sei Sasaki, who had devoted almost forty (40) years of his life and enjoyed a brotherly relationship with a person at the highest levels of the Dragon Family. Yamaguchi was considered a "son" by Mr. Sasaki, and he was ultimately introduced to the Head of the Dragon Family, General Haan, who, together with other high level members of the Dragon Family, educated him over the years about the accumulation and ownership of the assets held and controlled by the Dragon Family. Upon their meeting, Yamaguchi was appointed a formal member of the Dragon Family by the top person in the Organization, and thereafter began to devote his entire professional career to the Dragon Family from the time he was 35 years old until the present. Mr. Sasaki died when Yamaguchi was 40 years old.

38.    Eventually, Yamaguchi became a legal signatory and Controller of the Dragon Family Organization, with full signing authority to enter into all transactions relating to Dragon

Family Assets and Financial Instruments, including cash, Private Trading/Investment Programs

with the leading financial institutions throughout the world such as UBS, Bank of Japan and the

Federal Reserve Bank.  As stated, he was introduced to KEENAN in or about August 2008.

39.     Upon information and belief, after decades of inactivity by agreement among the

several factions or sects of the Dragon Family, in the last decade the Organization has

undertaken to attempt to contribute significant Billions of United States Dollars for the purpose

of aiding numerous global humanitarian purposes, such as relief aid during natural disasters to

countries throughout the world, including Hurricane Katrina in the United States, earthquakes in

Haiti, China and Indonesia, the Grenoble nuclear disaster, rebuilding the Republic of Georgia's

infrastructure, water and energy supply for the Cayman Islands, Bangladesh and more.

**B.      The Grant and Execution of Plaintiff Keenan's
         Special Powers of Attorney Relating to the DFFI**

40.     Ultimately, KEENAN was authorized to negotiate the final details and execute

and enter into a cash enhancement and/or project funding transaction relating to the Private

Placement of the DFFI.  This was to be accomplished, in the case of the Federal Reserve Notes

and Kennedy Bond, after verification by the United States Federal Reserve Bank or Treasury

Department, or in the case of the Japanese Bonds, after verification by the Bank of Japan.

KEENAN was authorized to invest the DFFI into a fully secured Investment Facility and, in fact,

was "empowered with all of my powers" by Yamaguchi.  It was the intent of the Dragon Family

to utilize the assets placed in the various Programs for global humanitarian purposes.

**1.      The 1934 United States Federal Reserve Notes**

41.     Among the assets accumulated by the Dragon Family are the above-described

Federal Reserve Notes ("the Federal Reserve Notes" or "FRNs") which were collected by

Yamaguchi from Mr. Sasaki and the Dragon Family for use for any world economic aid and

humanitarian projects. On October 5, 2008, Yamaguchi declared in writing that he desired to use

the Notes for any appropriate humanitarian investment program immediately by use of his

written authority and power as signatory of the Dragon Family.

      42.    KEENAN was authorized by Yamaguchi to coordinate the investment of 249 of

these United States 1934 Federal Reserve Notes, each with a face value of Five Hundred (500)

Million Dollars, with a total face value of One-Hundred Twenty-Four (124) Billion 500 Million

United States Dollars, and each bearing an interest coupon of 4% per annum since 1934.

      43.    For the services he was to provide in connection with the placement of the Federal

Reserve Notes, KEENAN was to receive at least 30 % of any profit sharing from the particular

PPP, such profits to be invested into infrastructural and economic development projects.

### 2. The "Japanese Bonds"

      44.    On or about February 25, 2010, replacing a similar instrument executed on

February 20, 2009, which had a six month term, KEENAN was granted a Special Power of

Attorney in a writing executed by Yamaguchi to act on Yamaguchi's behalf for the coordination

of investing certain assets of the Dragon Family, to wit, the above-referenced two (2) 57 Series

Japanese Government Bonds Nos. A 1306 and A 1310 (the above-described "Japanese Bonds")

The Special Power of Attorney was unlimited as to time.

      45.    Upon information and belief, in or about 1997, Ex-Japanese Finance Minister,

Mr. Hiroshi Mitsuzaka, and Ex-Japanese Prime Minister Keizo Obuchi, had delivered to their

Japanese Trustee Five-Hundred (500) 57th Series Japanese Government Bonds which had been

issued largely based upon Dragon Family Funds for future use in world economic aid and

humanitarian projects. After the deaths of Messrs Mitsuzaka and Obuchi, the Trustee delivered

27

many of these Japanese Bonds, including the aforesaid two (2) Japanese Bonds, to one of Yamaguchi's foundation associates, who was well aware of their history.  Thereafter, many of these Japanese Bonds were returned to Yamaguchi to be utilized for any appropriate humanitarian investment program under his authority and power as authorized signatory of the Dragon Family.  Yamaguchi had been in possession of these Bonds since at least October 18, 2006.  The person who was designated to handle the bonds by Yamaguchi was instructed to obtain validation of the bonds from the Bank of Japan or Mizuho Bank, as attested to by Yamaguchi on or about February 20, 2009.

46.     By the explicit terms of the Power of Attorney, Yamaguchi appointed KEENAN to act on his behalf for the coordination of the Japanese Bonds for investment with the appropriate parties in the United States, Asia and Europe in legally registered and chartered trading Programs, known as PPPs or for other funding purposes by use of the Bonds as collateral. KEENAN was further empowered to coordinate and proceed on any material conditions and terms he deemed proper and was further authorized to utilize Yamaguchi's bank account in his own designating banks and to sign any Private Program contract as Yamaguchi's agent. KEENAN was authorized as attorney-in-fact for authentication and due-diligence of the Japanese Bonds through KEENAN's bank to the Bank of Japan by using the two certified copy Japanese Bonds including any and all of the documents showing Yamaguchi's endorsements on the reverse side of those Bonds.

47.     For the services he was to provide in connection with the placement of the Japanese Bonds, KEENAN was to receive 30% of any net profit from the particular PPP.

28

### 3.    The Kennedy Bond

48.    KEENAN was also authorized by Mr. Yamaguchi to coordinate the investment of the one (1) Kennedy Bond entrusted to him with a face value of One (1) Billion United States Dollars. As attested to by Yamaguchi in his statement of the Kennedy Bond History dated September 6, 2008, the Kennedy Bond is good, clean, clear and free from any liens and encumbrances.

49.    For the services he was to provide in connection with the placement of the Kennedy Bond, KEENAN was to receive at least 30% of any profit sharing from the placement of the bond in a particular PPP for investment into infrastructural and economic development projects.

50.    KEENAN personally accepted the custodianship and income rights therefrom accorded to him in accepting responsibility for investment of the Federal Reserve Notes on January 22, 2009 in Zurich, Switzerland. He took possession of the Japanese Bonds and Kennedy Bond on May 5, 2009, at which time he acknowledged in writing the receipt of all of these instruments which comprise the DFFI. KEENAN remains the only legal custodian of the DFFI by virtue of the written authority granted by the Dragon Family through Yamaguchi.

### C.    Events in April-May 2009, Preceding the "Chiasso Incident"

51.    After receiving the DFFI, Yamaguchi, aided by KEENAN's connections in Europe, and with additional Dragon Family financial instruments, began to approach various international Governments, which were either in need of humanitarian aid or had provided the Dragon Family with assistance in the past. In turn, KEENAN proceeded to select individuals whom he knew and trusted to assist him in either finding or establishing a suitable PPP, or to work with the principals who would be involved in obtaining proper verification of the DFFI,

which would be used as collateral in furtherance of global humanitarian programs.
Alternatively, if the DFFI were not placed in a PPP, a suitable arrangement for concluding an
outright loan transaction would be sought.  During the spring of 2009, KEENAN was very active
on behalf of Yamaguchi and the Dragon Family meeting with traders and Bank representatives,
particularly in Zurich, Switzerland, in furtherance of these goals.

52.     In April 2009, KEENAN was approached by a group of Turkish investors (the
"Turkish Group") who were interested in establishing a relationship with the Dragon Family
through the Turkish Group's supposed traders in Zurich.  During the course of the ensuing
meetings and negotiations, Yamaguchi was present at various times when KEENAN would
display, upon request, certain Dragon Family financial instruments, which notably included the
very same 2 Japanese Bonds, Nos. A 1306 and A1310, and the same Kennedy Bond, which
comprise a portion of the DFFI that are the focus of this lawsuit.

53.     During this period of time, KEENAN and Yamaguchi were welcomed and
entertained in Zurich not only by several legitimate traders, lawyers and Bank representatives,
eager to do business with the Dragon Family and Yamaguchi as the Family's authorized
signatory.  At one meeting with Bank Julius Baer & Co. Ltd. ("Julius Baer"), attended by
KEENAN, Mr. Benny Guttman, Executive Director, went immediately to Yamaguchi and told
him that he had been waiting a long time to meet him.  Guttman hosted an elaborate buffet
luncheon in honor of Yamaguchi.  After discussions among the group, Guttman asked to review
the DFFI which Yamaguchi had with him.  After looking at the instruments, Guttman asked if he
could take them to another room and have copies made.  After approximately forty (40) minutes,
Guttman offered Yamaguchi the opportunity to deposit them in Julius Baer.  KEENAN was
aware that security was present and that in the event of any determination that the DFFI were not

30

genuine, he and Yamaguchi were subject to immediate incarceration. This was consistent with the expectation that The Bank selected by Yamaguchi was expected to act accordingly so that proper verification of the DFFI would be achieved. Only licensed financial traders would be considered to act with respect to the DFFI. However, KEENAN and Yamaguchi were also introduced to many individuals who were mere "brokers" who, as it happened, sought to take advantage of their exposure to the opportunities presented by the introduction to the Dragon Family and its significant assets.

54.    In connection with these various meetings and myriad other meetings with several people holding themselves out as traders and Banking representatives, particularly individuals connected with the Turkish Group, KEENAN and Yamaguchi were led to believe that all necessary arrangements and Bank verifications had been made in order to establish a PPP through a Credit Suisse branch in Alstatten, Switzerland. On or about May 18, 2009, Yamaguchi accurately confirmed to Credit Suisse through Assistant Vice President Andre Weishaupt that the 2 Japanese Bonds were cash backed instruments of the Dragon Family under his name. He represented that the bonds had a total value of $19 billion U.S. dollars, free of liens and encumbrances. He also requested a Safekeeping Receipt of the bonds that had been deposited on or about May 15, 2009, pending verification from The Bank of Japan and the U. S. Treasury Department which issued the Kennedy Bond and a joint account was opened for Yamaguchi.

55.    Additionally, accounts for the investment of the funds, which were expected to become available upon the establishment of the PPP and resultant trading profits were opened at DZ Privatabank in Zurich, as well as Coutts & Co., a private bank whose principal place of doing business is in London, United Kingdom. Arrangements were also made to set up an account at the Central Bank of Switzerland, the Swiss National Bank (aka Schweizerische Nationalbank),

which subsequently assisted in the verification process regarding the Dragon Family Bonds in May and early June 2009.

56.     During this period of time, which involved several waiting periods while various related contracts and trading programs were being approved, it was the practice of Yamaguchi and Watanabe to travel from Switzerland to Carimate, Italy, where they would visit and stay at the home of their longtime friend, Alessandro Santi ("Santi").  On such trips, the pair would often travel through the Chiasso railway station, in the canton of Ticino, Switzerland, which is owned by the Swiss Federal Railways, and serves as a border station between Switzerland and Italy.

57.     On approximately May 24, 2009, after one such trip, the pair had returned from Carimate, and was staying at the Hilton Hotel Airport in Zurich.  While there, they learned that there had been a major change in the personnel involved in completing the transaction with the Turkish Group that had approached KEENAN several weeks earlier.  That Group appeared to have been replaced as serious questions had arisen about the legitimacy of certain of its members.  However, a new group under the leadership of a Baron von Gise, appeared to be ready, willing and able to establish a legitimate PPP, or so-called "Sovereign Program."  Yamaguchi and Watanabe thus decided to return to Italy on May 27 to await the completion of preparations by Baron von Gise.

58.     On May 31, 2009, KEENAN and Yamaguchi received news of yet another setback in their plans and were awaiting confirmation that the details had been worked out in a satisfactory manner.  They were advised that everything would be in place and a Trading Agreement ready to be executed by Yamaguchi between June 3-5.

59.     On June 3, 2009, KEENAN was advised by Swiss lawyer Tobias Braegger, who had acted as the attorney for the Turkish Group, that all necessary preparations would be completed by the next day and the transaction would be completed within the next week.  On the same day, Yamaguchi advised KEENAN that he would be leaving Italy for a meeting in Madrid on other business matters.

60.     Although KEENAN had been advised during this time period that the Swiss Central Bank had verified the Kennedy Bond, he was ultimately informed (following the Chiasso Incident described *infra*) that both Banca Intesa and the Swiss Reinsurance Company declined to engage in further transactions regarding it "for political reasons."

61.     Despite the failed negotiations with the Turkish Group, and which might have caused Yamaguchi to exercise more care, Yamaguchi, after receiving a telephone call while having lunch with Santi and Watanabe in Carimate, suddenly left for the train station and headed for Spain.

62.     On June 4, 2009 Yamaguchi sent an email to KEENAN from Barcelona advising that he was well, but was otherwise silent as to the events that had transpired upon his departure from Carimate.

**D.     The Chiasso Incident**

63.     In fact, unbeknownst to KEENAN until days later, upon their arrival at Chiasso on this particular trip, both Yamaguchi and Watanabe were approached directly by the ITALIAN FINANCIAL POLICE and their bags were searched.  The pair was found to be carrying Dragon Family Instruments (hereinafter, the "DF Chiasso Instruments") virtually identical in content to a portion of the DFFI, which are the focus of this litigation-in an amount approximating $134.5 Billion U. S. Dollars.  Ironically, this was the exact amount that the United States Treasury

33

Department had announced on or about March 30, 2009 remained in its Troubled Asset Relief
Program ("TARP"). These instruments included 249 1934 Series Federal Reserve Notes.
(similar to the 249 FRNs entrusted to KEENAN by the Dragon Family, except that they bore
serial nos. D 45183602A to D 45183850A), and 10 Kennedy Bonds issued in 1998 (Nos. AP11
025691 A to No. AP11 025700 A), each with a face value of One Billion U.S Dollars (as
compared to the 1 Kennedy Bond entrusted to KEENAN).

      64.    As reported by the Japanese and Italian press at the time, upon arriving at
Chiasso, Yamaguchi and Watanabe were detained by the ITALIAN FINANCIAL POLICE after
attempting to enter Switzerland with "undeclared United States Treasury Bonds concealed in a
suitcase with a false bottom." The Japanese Consulate General in Milan confirmed that the
"detention" had taken place while trying to confirm the men's identities. Eventually, neither
Yamaguchi nor Watanabe were arrested, although their computer and eight telephones were also
confiscated. Reportedly, Yamaguchi advised the authorities that the pair was in possession of
valid historic bonds and that a mistake was being made. According to Japanese press reports,
Yamaguchi and Watanabe were released as they "broke no laws." Upon information and belief,
it was Yamaguchi' s position that since there had been no verification in accordance with the
protocol required by the Federal Reserve system, and no negotiation with the Federal Reserve
concerning the actual value of the  financial instruments he was carrying, no laws had been
broken. Charges against the two were expected to be heard before the Procura Della Republica
in Como, Italy in May 2011. According to at least one Italian newspaper, "La Provincia," on or
about June 30, 2011, Yamaguchi and Watanabe were sentenced to three and a half years in
prison for trying to "smuggle" debt securities deemed to be false. The story also reported that
Mr. Santi had bargained in a preliminary hearing for a year and four-month probation on related

charges.  The Japanese were reportedly provided with an attorney named Campisani in Como. In March 2010, both Keenan and his attorney offered to assist Attorney Campisani but their offers to help went unheeded.  Upon information and belief, Campisani withdrew from the case without ever responding to Keenan or his attorney.

65.     Upon information and belief, approximately three years prior to this incident, the investment banking firm of Goldman Sachs in the United States had formally authenticated the FRNs entrusted to KEENAN and owned by the Dragon Family, virtually identical to and sharing the identical history of the FRNs seized at Chiasso.  KEENAN believes that all of the 1934 FRNs, including those seized by the Italian authorities at Chiasso, as well as the DFFI entrusted to KEENAN, were fully backed by United States gold bullion, authentic, and  subject to verification by the Federal Reserve when properly presented by the legitimate holder or their representative, i.e., plaintiff herein, KEENAN.

66.     At the time of the seizure, Colonel Rodolfo Mecarelli, GdF Commander in Como, Italy, was reported to have stated that the seized DF Chiasso Instruments were very genuine looking, "meticulous" work, and "indistinguishable" from authentic instruments and were waiting to be confirmed.  Yet, approximately two days after the seizure, the United States Treasury claimed that the Federal Reserve Notes, which had been seized at Chiasso, were counterfeit based solely upon its viewing of pictures of the Notes over the Internet.  Further, while confirmation of the DF Chiasso Instruments was still pending, on June 25, 2009, the New York Times reported on the story and included the statements of a United States Secret Service spokesman to the effect that the Secret Service had performed an inspection, as required by the Italian Judiciary, and found that the Instruments were fictitious and had never been issued by the Federal Reserve or the United States Treasury.  Upon information and belief, the assertions that

35

the FRNs seized at Chiasso are not genuine are inaccurate as will be determined through the verification process through the Federal Reserve System's black screen process.

67.     It had been reported that it remains unclear to the Italian authorities how any such inspections had been carried out and even whether the commission of American experts who were expected to travel to Italy to perform the inspection, had ever arrived.  Further confusing the facts from reported allegations, it was also reported that the DF Chiasso Instruments were accompanied by a recent and original bank record from Credit Suisse in Switzerland.

68.     Further upon information and belief, soon after the seizure at Chiasso, representatives of the ITALIAN REPUBLIC approached representatives of the Chinese Government regarding the possibility of paying the "penalty" (40 % of the value of the seized Instruments) for the alleged failure to declare the Instruments in crossing the Swiss/Italian border at Chiasso.  Further, upon information and belief, the negotiations were halted when it was suggested that the 40% penalty would be paid, but in return for such payment, the ITALIAN REPUBLIC would reimburse its debt to China, which debt greatly exceeded the amount of the penalty Italy demanded for the return of the Chiasso Instruments.  Upon information and belief, The ITALIAN REPUBLIC and the ITALIAN FINANCIAL POLICE have steadfastly declined to return the DF Chiasso instruments, but have actively and illegally sought to convert such Instruments for their own benefit, as more fully described herein.

69.     Despite the La Provincia newspaper article, an extensive search for the file related to the seizure at Chiasso by Keenan and his representatives, no such file has been located.  Such representatives were told in August 2011 that the file in Como could not be found because of the holiday season.  In September, although they were told that the file had been transferred to the centralized system in Rome, they were ultimately advised that "there is no such file."  In early

36

October, a telephone call was made to the Justice Department in Rome and direct contact made with a gentleman who identified himself as Giorgio Divincenzo, Chief Inspector from the GdF. Mr. Divincenzo was described to appear to be very helpful and reported that he would run the complete database on Alessandro Santi, Akihiko Yamaguchi and Mitsu Watanabee, all three men charged at Chiasso. He confirmed that it would have been normal procedure for the Como file to have been transferred to Rome because two of the defendants were foreigners and translations would be required. Yet, he reported that nothing could be found on the matter. He further responded, when asked if there could be any hidden or highly classified files, that he had full authorization and, as his responsibilities required him to have full and complete access because of his rank as Chief Inspector, he was also the Interpol liaison officer. He made it eminently clear that there was no file to be found. Further, there has been no known report or record of the destruction of the instruments seized at Chiasso which, upon information and belief, would have been expected given the reported decision of the Court.

**E.     The Events of July 2009 and the Introduction of DAL BOSCO to KEENAN**

70.     Upon information and belief, on or about July 9, 2009, following a long period of emails between the two, Mr. Leo Zagami, a self-described 33rd degree Free Mason, who, as of April 2008, had reportedly claimed to be the leader of a breakaway faction of the Knights Templar and high-level Freemasons centered around the elite of the Masonic P2 (Propaganda Due) Lodge in Monte Carlo, arrived in Japan to speak with Fulford. According to Fulford, Zagami had claimed to be a representative of the Vatican Illuminati and other European sect societies and had been looking to make contact with certain Asian Secret Societies. After the July 2009 meeting, Zagami informed Fulford that he had information that Yamaguchi and Watanabe had been "set up" at Chiasso and further that he had "inside information" concerning

37

the seizure of the DF Chiasso Instruments. Zagami immediately put Fulford in touch with the Italian Financial Police who confirmed the authenticity of the seized Instruments.

71.     Upon his return to Italy, Zagami contacted Fulford to arrange for a meeting in Rome where, among other things, they again discussed the Chiasso Incident. At that time, Zagami introduced Fulford through SKYPE conversations to DAL BOSCO whom Zagami represented was a trustworthy Vatican Banker and also associated with the P2 Masonic Lodge. Zagami told Fulford that DAL BOSCO would be able to help "cash the bonds seized by the Italian Treasury Police."

72.     Upon information and belief, Fulford passed this information along to a member of the British Royal Family who then passed it on to a "group of Asians of royal blood known as the Dragon Family." On or about February 9, 2010, Zagami sent Fulford another email, on behalf of an acquaintance, inviting him to Italy and Switzerland to discuss the transfer in custodianship of the DFFI from KEENAN to DAL BOSCO and other issues.

73.     As a result of the Fulford/Zagami discussions in or about July 2009, KEENAN received a request for a meeting from DAL BOSCO, who used Zagami's name as a reference. KEENAN and DAL BOSCO spoke via Skype conversations on an almost daily basis for approximately six weeks thereafter until they arranged to meet in Italy in September. During the course of those discussions, DAL BOSCO represented to KEENAN not only that he was the financial advisor to Zagami, but also to the Vatican, Vatican City, Rome as well as the Treasurer of the P2 Masonic P2 Lodge in Rome and Monte Carlo working directly with Zagami.

74.     Since the time he took possession of the DFFI, and during the course of his travels throughout Europe and crossing of international borders, it had been KEENAN's practice to maintain personal possession of all DFFI in order to avoid possible confiscation or other loss. In

the normal course, KEENAN would place the DFFI with hotel security before traveling, for instance, throughout Italy, Switzerland and Austria, while on his various business ventures. Over time, and throughout his discussions with DAL BOSCO, KEENAN became convinced that it was in his best interests and safety, and that of his principal, the Dragon Family, to entrust DAL BOSCO with custodianship of the DFFI for safekeeping, most especially in light of the representations DAL BOSCO had made about his own credentials.

      75.    In early September 2009, KEENAN offered such custodianship to DAL BOSCO, and by electronic transmission dated September 2, 2009, DAL BOSCO acknowledged to KEENAN his "**ACCEPTANCE**" as "Custodian of the Dragon Family Financial Instruments" and noted, among other things:

> (a)    I can assure you that you will never regret making this decision. You are aware of the fact I am well trusted and a financial advisor within the Vatican and Mason circles and would never jeopardize my position with them for anything.

> (b)    My word is my bond and my word is Gold.

> (c)    I will be waiting for your Zurich arrival so that we can do great things for the world. I understand clearly that I am not to discuss these bonds with anyone outside the immediate circle and my privacy is integral to the success of many nations.

> (d)    I further understand you are the authorized representative and Power of Attorney for said bonds and I will entrust them believe me as though it was my life depending on it. Therefore I humbly accept the custodianship of said Bonds in which I am only to return them to either you or Mr. Yamaguchi. Not any other!

> (e)    Although electronic this email is to be considered my legal binding acceptance of the following bonds:

>> 1.    250 Federal Reserve Notes, Series 1934, Numbers D 45184101 A to 45184350 A, with each having a face value of 500 Million USD each totaling 125 Billion USD.

    2.      Japanese Bonds 57 Series numbers 1306 and 1310 with a value of 19 Billion USD including the interest.

    3.      1 Kennedy Bond with a value of $1 Billion USD.

(f)      Will be ready when called upon to deliver said notes to you. Thank you once again for your kindness.

Yours truly, Daniele Dal Bosco

Italian Passport C 165124

76.    On or about September 8, 2009, KEENAN flew to Italy to meet with his very close friend, Alessandro Santi, with whom Yamaguchi had met prior to the seizure at Chiasso in June. It was arranged that DAL BOSCO would meet KEENAN and Santi in Milan, as DAL BOSCO wanted to speak with Santi about his knowledge of the Chiasso Incident.

77.    On September 9, 2009 DAL BOSCO took a train into Carimate and KEENAN and Santi picked him up at the train station. This was the first time KEENAN had met DAL BOSCO personally. At this time, the Milan Fashion Show was taking place which was being attended by DAL BOSCO's girlfriend, Alessia. After the Fashion Show ended, the group traveled to Rome where DAL BOSCO offered to intercede on behalf of Santi with people he claimed to know were associated with the ITALIAN FINANCIAL POLICE and the Italian Government, including former Italian Prime Minister, Silvio BERLUSCONI.

78.    Upon information and belief, thereafter, according to DAL BOSCO, he visited with the ITALIAN FINANCIAL POLICE who advised him that the financial instruments that had been confiscated at Chiasso were authentic, but that Santi had been charged with illegal possession of certain bonds. DAL BOSCO further reported that the Italian Government, through BERLUSCONI, was demanding 40% of the instruments' face value for their return. KEENAN was already aware of that information.

40

79.     Throughout this period of time, KEENAN was working on coordinating efforts to carry out his instructions regarding the intended proper placement of the DFFI with which he had been entrusted for the benefit of certain European countries and business entities for investment in recognized PPPs.  For instance, on or about September 13, 2009, Mr. Stanley Somberg (hereinafter "Somberg"), a personal friend of KEENAN, flew into Rome to spend a few days with KEENAN and for a planned trip with KEENAN to Vienna, Austria.

80.     DAL BOSCO joined KEENAN and Somberg on the trip to Austria.  On that trip, KEENAN closely observed DAL BOSCO, whose words and actions appeared to justify KEENAN's decision to entrust the DFFI to DAL BOSCO and corroborated his representations that he was associated with the Monte Carlo P2 Masonic Lodge and a financial advisor to the Vatican.  DAL BOSCO spoke freely to Somberg and KEENAN about his connections with the Vatican and the Italian Government.  However, it was also during that trip that DAL BOSCO told KEENAN that he had "good news" for him.  Upon inquiry, DAL BOSCO explained that he had received a call from a friend inside The ITALIAN POLICE (GdF) who had informed DAL BOSCO that the GdF was willing to sell back the DF Chiasso Instruments for 10% of their face value.  KEENAN responded that he doubted that the Dragon Family would be interested in buying back its own Bonds and reminded DAL BOSCO that he had no power of attorney to act on behalf of the Dragon Family with regard to those Instruments and that his designated mission and authority was to place only the DFFI with which he had been entrusted into a legally recognized PPP.

81.     Upon their return to Switzerland, on or about September 18, 2009, prior to KEENAN's departure for the Zurich airport and return home to Bulgaria, KEENAN physically entrusted the DFFI to DAL BOSCO, as had been planned and acknowledged by DAL BOSCO.

82.     On subsequent and frequent trips to Zurich, DAL BOSCO would meet KEENAN at the Hilton Hotel Airport and place the DFFI in KEENAN's possession until KEENAN's departure at which time KEENAN would again entrust the DFFI to DAL BOSCO.

F.     **Negotiation for Placement of the DFFI into a Private Program**

    1.     **The Introduction to H. Edward Wales**

83.     KEENAN subsequently traveled to Zurich on or about January 16, 2010 for meetings with people whom he believed could help in the placement of the Federal Reserve Notes or the Kennedy Bond, which comprised part of the DFFI, into a qualified PPP.  KEENAN remained in Zurich until February 13, 2010.  On or about January 29, 2010, KEENAN took DAL BOSCO with him to meet with financial trade arranger H. Edward Wales (hereinafter "Wales") in Geneva, Switzerland at the Intercontinental Hotel.

84.     The meeting with Wales was arranged through a telephone call and email communication to Wales from Sonya Nikolova Alexieva, a citizen and resident of Bulgaria. Also attending the meeting was Javad Moharr, an Iranian citizen, and a resident of Switzerland. The purpose of the meeting originally was to discuss the placement of the two (2) Japanese Bonds into international trade through a qualified and legal PPP.  However, at the meeting, KEENAN requested DAL BOSCO, who was physically holding the entire DFFI portfolio for KEENAN, to show the portfolio, including the Federal Reserve Notes and the Kennedy Bond, to Wales.  KEENAN inquired of Wales whether he could also arrange for a trading program which would include these instruments as well.  This was the first time Wales had seen an original Kennedy Bond, and he informed KEENAN that he would like to concentrate on the Japanese Bonds, but would be interested in further examination of the FRNs and Kennedy Bond for potential use in a PPP.  Wales gave the portfolio back to KEENAN, who then gave them to DAL

42

BOSCO, and instructed DAL BOSCO to send copies via email to Wales for his further review and recommendations. DAL BOSCO was in possession of the instruments when everyone left the hotel.

85.     In accordance with KEENAN's instruction, on or about February 3, 2010, DAL BOSCO forwarded copies of the documents of the DFFI via e-mail to Wales. On at least two other occasions, DAL BOSCO also brought the DFFI to additional meetings in Zurich, Switzerland in line with his role as Custodian, and in order to facilitate KEENAN's plan of placing the DFFI into a PPP.

**G.     Doubts Concerning DAL BOSCO**

86.     Upon information and belief, unbeknownst to KEENAN, after considerable publicity throughout Europe and Asia following the Chiasso Incident, DAL BOSCO became intent not only on learning more about the Dragon Family and, in particular, the nature and value of the various Financial Instruments owned by the Dragon Family, but diligently began to research how such Instruments were utilized in the international global finance system. DAL BOSCO's interest intensified when he learned through his contacts in the ITALIAN GOVERNMENT and THE ITALIAN FINANCIAL POLICE that the Federal Reserve Notes and Kennedy Bonds owned by the Dragon Family and seized at Chiasso were genuine. Further, cognizant of the fact that he was legally unauthorized and thus unable to negotiate in any lawful transaction regarding the DFFI entrusted to him by KEENAN, without the authority of KEENAN and/or Yamaguchi on behalf of the Dragon Family, DAL BOSCO sought assistance from various other sources and contacts, in order to act upon and perpetrate a fraud in connection with the sale or placement of the DFFI in the global marketplace through stealth, conversion and bribery.

43

87.     DAL·BOSCO's research and connections ultimately led to his introduction to defendants SALE and OITC.  As revealed by an OITC spokesman and published to the world at large on or about January 3, 2011, on Fulford's Internet website, the assertion that, following initial communications from DAL BOSCO on February 2, 2010, defendant DAM executed a written agreement with DAL BOSCO on March 16, 2010.  This agreement acknowledged that OITC was fully aware of DAL BOSCO's intentions to steal the DFFI from KEENAN and place them in the possession of OITC which would claim ownership pursuant to its alleged authority under the provisions of its claimed U.N. Charter and the U.N.'s "sovereign immunity" protections.

88.     Upon information and belief, DAL BOSCO's connections in Europe included defendant BRUNO and the WEF who, in turn, had direct contacts with defendant the UNITED NATIONS.  Thereafter, as set forth in more detail below, the various defendants entered into various criminal schemes and enterprises whereby DAL BOSCO would knowingly betray, violate and breach all of his previously acknowledged fiduciary duties to KEENAN and thereby the Dragon Family, by stealing the DFFI and converting possession of the DFFI for their own selfish, criminal and personal financial gain.

89.     During KEENAN's stay in Zurich in the January-February 2010 time period, DAL BOSCO suddenly and surprisingly advised KEENAN that he had made contact with high level UNITED NATIONS officials, through the assistance of BRUNO and the WEF, whereby DAL BOSCO and KEENAN could receive One-Hundred ($100,000,000.00) Million U. S. Dollars for all of the United States Federal Reserve Notes contained in the DFFI.  The offer did

44

not include the Japanese Bonds or the Kennedy Bond which, as described, form a portion of the DFFI.

90.     DAL BOSCO asked KEENAN if he wanted to pursue this offer but stated that, as a condition, neither Yamaguchi nor the Dragon Family could be involved and that the UN did not want Yamaguchi involved. KEENAN emphatically rejected any interest, noting further that the Federal Reserve Notes were not his to sell.

91.     DAL BOSCO told KEENAN that "I assure you this is our best deal and my friend Giancarlo from the Economic Forum stands behind it. He went to see our friends in the UNITED NATIONS and this is very delicate but can be done but nothing for Yamaguchi or the Dragon Family." DAL BOSCO further stated that Yamaguchi would not only never know the DFFI had been stolen but that the rightful owners, the Dragon Family, would "never be able to receive ONE CENT" from the transaction. Further, upon information and belief, the DFFI would be invested directly through the UN and its Sovereign Program and that the transaction "was all set up" and "no questions would be asked." DAL BOSCO also expressed a great reluctance to discuss the UN or BRUNO's involvement and stated that no one would ever get to speak to BRUNO or his ITALIAN FINANCIAL POLICE or Vatican connections.

**H.     The Speaker Telephone Conference Call between DAL BOSCO and BRUNO**

92.     Following Dal Bosco's report to KEENAN of the offer from the UN and BRUNO, and while still in Zurich in early February 2010, KEENAN had gathered several close business associates and friends for a routine meeting/luncheon in the VIP Room on the 5th floor at the Hilton Zurich Airport Hotel in which he stayed regularly while on business in Zurich. KEENAN was accompanied by DAL BOSCO, with whom he was working on the aforesaid potential transaction involving the Japanese Bonds with Wales. Other guests of KEENAN

45

included Nikolai Raykov, a Canadian citizen (hereinafter, "Raykov"), Vasil Ganov, a Bulgarian

citizen (hereinafter, "Ganov"), Ognyan Marinov, (hereinafter, "Marinov"), also a Bulgarian

citizen and retired Intelligence officer, as well as Walter Berens (hereinafter, "Berens"), a citizen

of Germany.  At one point, DAL BOSCO arranged to place a telephone call via speaker phone to

a man whom he identified as Giancarlo BRUNO.  DAL BOSCO indicated to those present that

the call was intended for KEENAN's ears only but that they could listen to the call.  During the

course of the call, the man who was identified as BRUNO stated that he could arrange to "put

$100 Million USD into KEENAN's hands if KEENAN agreed to it."  KEENAN, who has

always been told that any involvement participation by BRUNO must be kept a secret, was thus

caught off guard when a call of this nature was to take place, was disgusted with the call and

walked away from the table while DAL BOSCO continued the call with the man he identified as

BRUNO.

        1.    **Recollections of Mr. Raykov**

       93.    In a private discussion with DAL BOSCO in a hallway outside the meeting room,

Raykov expressed concern and doubt that the man whose voice was heard on the speaker phone

was actually BRUNO.  DAL BOSCO asked Raykov if he had any idea who BRUNO was and

Raykov responded in the negative.  DAL BOSCO then repeated that BRUNO could arrange for a

$100 Million USD payment to KEENAN, if KEENAN agreed to it.

       94.    Further, after the advice he received from DAL BOSCO, Raykov asked DAL

BOSCO if he could speak with BRUNO and was told that he could, but only from a pay phone

and not a cell phone.  Raykov proceeded to drive with DAL BOSCO to the airport in a taxi and

DAL BOSCO then placed a call to BRUNO who spoke directly with Raykov.  BRUNO told

Raykov that if he could convince KEENAN to take the money, he would make sure that Raykov's family would be set for life.

95.    During this telephone conversation, BRUNO said that the DFFI would "be placed into a federal program using the UN as protection" along with "his company" which would "generate unlimited capital for everyone involved." BRUNO assured Raykov that "there would be no problems and that this was being blessed by the UNITED NATIONS" which "would protect everyone" as the DFFI would be "placed into a Sovereign Program" after which the DFFI "would disappear" and "there would be no questions asked."

96.    Remaining somewhat skeptical that the person he had just spoken with was actually BRUNO, Raykov told DAL BOSCO that he did not believe him. DAL BOSCO thereupon called the number again and told Raykov to listen. The person speaking identified himself as Giancarlo BRUNO. DAL BOSCO also gave Raykov a telephone number in New York to call when Raykov was in the United States. Raykov, in fact, called the telephone number he was given while in New York in July and the call was answered by BRUNO. Raykov told BRUNO he was just checking the telephone number he had been provided by DAL BOSCO. BRUNO then advised Raykov that DAL BOSCO had taken the DFFI which had been entrusted to him by KEENAN and "now more than ever" Raykov was needed to speak with KEENAN to try to convince him to cooperate with DAL BOSCO and BRUNO.

97.    Raykov subsequently told KEENAN to be careful and that "the wolves are surrounding him." KEENAN told Raykov not to get involved. Raykov spoke again with DAL BOSCO and told him "to forget" about persuading KEENAN to cooperate with him. DAL BOSCO responded that KEENAN would regret that as he "was no longer in possession" of the DFFI.

47

2.     **Recollections of Mr. Ganov**

98.     Ganov recalls that following the telephone call, he inquired of DAL BOSCO what

he would receive from this "transaction" and DAL BOSCO responded that he would receive

50% of KEENAN's $100 Million USD, the total amount of which would be placed into a

Sovereign Program by the UN and that they would each receive 200% monthly returns minimum

from the total "investment" of $100 Million USD. DAL BOSCO was then asked how much the

UN, WEF, BRUNO and OITC would receive, and he responded that this was not KEENAN's

business and not to ask because "it can only cause trouble." DAL BOSCO stated that the Notes

would be placed into the "Sovereign Program by the UN" and then, after a completed program,

that the Notes would be returned to their "owners," the OITC. DAL BOSCO also urged Ganov

to help him convince KEENAN to participate in his scheme.

99.     DAL BOSCO informed Ganov that "everyone was also protected by the Italian

Financial Police and the Italian Government itself." DAL BOSCO boasted about his position as

Financial Advisor to the Vatican and Treasurer of the Masons and that "nothing could go

wrong."

100.     Ganov and Berens also told KEENAN that they thought DAL BOSCO's

placement of the call in a public, rather than a private setting was ill-advised and put BRUNO,

whom they considered to be an important man, in a very bad light. Ganov thought DAL BOSCO

was playing the role of a salesman trying to sell something to all present. Raykov told Ganov

that he thought DAL BOSCO was a thief and that he thought DAL BOSCO was hiding the truth

from KEENAN and was using BRUNO and the UN to assist him in his scheme. Ganov told

KEENAN that he did not trust DAL BOSCO and was assured by KEENAN that he had no

48

interest in DAL BOSCO's "offer" and that his goal was not only to protect the DFFI but also to get them placed into a proper PPP.

101. During KEENAN's trip to Zurich, Ganov asked if he could view the DFFI and DAL BOSCO retrieved them for viewing. Ganov inquired as to their authenticity and DAL BOSCO responded that the UN had verified their authenticity. Ganov also inquired about Yamaguchi, and DAL BOSCO stated that he was a powerful, but unpopular man and that the UN would not do business with him.

102. In discussions with DAL BOSCO, Ganov was informed that BRUNO was prepared to pay KEENAN "100 Million Dollars by Friday if things worked right" and should KEENAN consent to the transaction. When Ganov commented that he thought KEENAN would be jeopardized by any involvement in such a transaction, DAL BOSCO responded that "no one can get in trouble . . . it is perfect . . . the UN protects everyone under their shield." Ganov was also told by DAL BOSCO that most of the plans and communications were made between him, BRUNO and the UN, either through BRUNO's private New York cell phone or his New York office. DAL BOSCO also stated, in response to Ganov's questions about KEENAN's security, were the Dragon Family to learn of any possible involvement by KEENAN, that "they will not receive one cent so they will never know" and further that the DFFI "do not belong to the Dragon Family but to OITC."

103. During this trip, Ganov had also asked KEENAN if he thought DAL BOSCO could assist him and his business associates, who were present with him, on another project on which they were working in Italy. KEENAN responded that he thought DAL BOSCO might have the ability to help and arrangements and introductions were made.

49

104.    Ultimately, not only did Ganov become aware that DAL BOSCO had stolen the DFFI, but he also learned that DAL BOSCO had tried to swindle Ganov on his other business deal on which DAL BOSCO purported to assist his group.  KEENAN departed for Bulgaria on February 13, 2010.

### 3.    Recollections of Mr. Ognyan Marinov

105.    A highly respected retired Intelligence officer from the Country of Bulgaria, Marinov, corroborates much of the foregoing, as he was also in attendance at the February 2010 meeting with DAL BOSCO at the Hilton Airport Hotel in Zurich.  DAL BOSCO had apparently been made aware of Marinov's Intelligence background and approached him for a private conversation.  Believing KEENAN and DAL BOSCO were close friends, Marinov acceded to the request.  Marinov has stated that he shortly came to believe DAL BOSCO was engaged in a plot to steal the DFFI with which he had been entrusted.

### 4.    Raykov Meeting with BRUNO and DAL BOSCO in Geneva in May 2010

106.    Months later, while in Geneva on business with some of his associates, Raykov called DAL BOSCO for a social visit.  DAL BOSCO, upon answering the call, asked Raykov to meet him at the Balexert Mall in Switzerland and indicated that "he had to speak" with Raykov. Upon DAL BOSCO's arrival with his girlfriend, Alessia, Raykov asked DAL BOSCO what he wanted to speak about, and DAL BOSCO advised him to wait and he would see for himself.

107.    Approximately 15 minutes later, a man came to the table at which Raykov and the others were sitting, presented his business card, and introduced himself as Giancarlo BRUNO. DAL BOSCO asked Raykov for the card saying an exchange of business cards "was not necessary."  BRUNO asked DAL BOSCO if Raykov "was assisting them yet."  DAL BOSCO replied that he had asked Raykov to meet with BRUNO because he wanted BRUNO to speak

directly to Raykov. BRUNO, speaking freely, told Raykov that KEENAN "was stupid for not taking the 100 MILLION US DOLLARS" and that "things had been in the planning stages for awhile and were about to be completed with or without KEENAN." BRUNO again asked Raykov if he would help convince KEENAN to take the money that was offered and Raykov responded that he could not and that KEENAN would not listen to him. BRUNO responded: "Not even for 500 Million US Dollars?"

108.    Raykov continued to listen to BRUNO's description of the details of how the DFFI were received and were planned to be placed into a financial program and that "no one would know anything." BRUNO said that "it would be silent" and after the completion of the program, the DFFI would be given back to the owners, who DAL BOSCO identified as OITC. BRUNO told Raykov "there would be no chance of trouble" and that the UN "provided them with immunity as well did OITC."

109.    BRUNO then told Raykov that he would only speak with him, if Raykov "called his New York office" as New York was "protected" from eavesdropping, unlike Geneva. BRUNO asked if Raykov "was in or out" and Raykov responded that "I would see." Raykov has not spoken with BRUNO since this conversation.

5.    **Marinov Meeting with BRUNO and DAL BOSCO in Geneva in May 2010**

110.    In late May 2010, Marinov met DAL BOSCO at the Intercontinental Hotel in Geneva, who introduced him to a gentleman he identified as Giancarlo BRUNO from the World Economic Forum. Although Marinov extended his business card to BRUNO, DAL BOSCO discouraged such an exchange. It was the impression of Marinov that DAL BOSCO was deferential to BRUNO, whom Marinov considered being "highly intelligent" and who was clearly "running the show." BRUNO proceeded to explain how the Davos Program had

51

achieved such success and seemed to imply that Marinov would be welcome at future meetings at Davos. BRUNO proceeded to boast about various dignitaries with whom he had done business, such as former President Bill Clinton, Henry Kissinger and Alan Greenspan.

111.   BRUNO then began to speak about "what they wanted to do with the Bonds or Notes Mr. KEENAN was holding for the Dragon Family and who was involved." BRUNO specifically named RAGAGLINI, MIRACHIAN and BERLUSCONI, and the ITALIAN FINANCIAL POLICE and commented: "so you see there is no possible way we can have a problem. We can cloak ourselves with the immunity shield and everyone will go away. Just another day in the UN!"

112.   Marinov asked BRUNO to explain what he was talking about and BRUNO responded: "we want you to get KEENAN to give the bonds to us for 100 Million USD. We have better uses for the notes than KEENAN would ever dream of nor would he release them to us so readily. So we need your help."

113.   DAL BOSCO then explained that he had approached others for help but that KEENAN would not relinquish the bonds, although a "Sovereign Program" was all set up. It was evident to Marinov that his status as a Bulgarian Intelligence Officer might influence KEENAN's decision to cooperate in the scheme DAL BOSCO and BRUNO were openly discussing.

114.   As Marinov grew increasingly uncomfortable with the volume of telephone calls being made and received by BRUNO, after approximately 45 minutes, he was introduced by both BRUNO and DAL BOSCO to defendant MIRACHIAN, whom he found to be pleasant and intelligent. In response to questions posed to her by BRUNO, MIRACHIAN stated that:

(i).    "from the very top we were protected";

(ii).   "there was no reason for anyone, including KEENAN, to worry

about any sort of repercussions";

(iii).   "the Italian cohorts in New York had even approved the matter

with Secretary General BAN KI-moon 'but of course he will deny

any such matter if questioned!'"

115.   Marinov had the clear understanding that what was being discussed was an

"Italian conspiracy to steal the Bonds with approval being granted by the Secretary General,

BAN KI-moon himself." BRUNO proceeded to take the position that "this is not a very large

undertaking . . . in accordance to UN standards" and he then stated that the UN was "in the

process of confiscating Trillions and Trillions of Dollars in assets within the next couple of

months and no one could do anything about it." When Marinov inquired as to whether the

money being confiscated belonged to the UN, BRUNO responded "of course not!"

116.   Marinov was convinced that DAL BOSCO and BRUNO needed his help to try to

persuade KEENAN to cooperate with DAL BOSCO to accomplish what DAL BOSCO and

BRUNO were proposing, especially in light of KEENAN's transfer of the DFFI to DAL BOSCO

the previous September. DAL BOSCO indicated that he was considering taking the Bonds and

using them for undisclosed purposes without KEENAN's permission but that he was reluctant to

do so as KEENAN might ask for them to be produced and DAL BOSCO might "find himself in

a bad spot." DAL BOSCO, however, went on to volunteer that there were "future plans" for the

Bonds. This necessitated that KEENAN turn them over "so that no one could cause a ruckus

claiming they were stolen from them." According to BRUNO, "not anyone could withstand such

scrutiny" thus "they were trying to buy The Bank of Lugano in Switzerland to hide such things

as stolen instruments." When Marinov asked who was buying the Bank, he was told "the

53

ITALIAN FINANCIAL POLICE, BERLUSCONI and others" which would allow them to "trade the many instruments stolen over the years by the Italian Financial Police and trade them from the Swiss Bank and no one would be the wiser." It was apparent to Marinov that DAL BOSCO and BRUNO saw it most advantageous to their conspiracy to gain KEENAN's cooperation and participation "with the entire scheme already in motion," which KEENAN has steadfastly refused to do.

117.   In conclusion, Marinov witnessed the dialing of a New York City telephone exchange and placement of a telephone call by DAL BOSCO and BRUNO to RAGAGLINI in New York. Marinov heard them ask "if everyone was ready to do the Bond deal" and he confirms that RAGAGLINI stated that "the Powers that be in New York had no problems with the actions about to be taken so long as some candy was tossed to them." Further, RAGAGLINI acknowledged that BAN KI-moon "was on board and approved the plan so everything was in place but KEENAN." RAGAGLINI concluded by asking Marinov "to rope KEENAN in because it was necessary for success." Although compensation for Marinov's services was discussed, no exact amount was ever mentioned. Marinov took no actions attempting to persuade KEENAN to cooperate with the aforesaid scheme, and KEENAN has continuously refused all overtures from the Defendants to participate in their illegal actions.

**6.    Berens' Telephone Call from DAL BOSCO in August 2010**

118.   KEENAN has known and conducted business with Berens for several years. He is known to KEENAN to be highly respected and trustworthy. Berens was also present in February 2010 at the Hilton Zurich Airport Hotel for the business luncheon arranged by KEENAN. He was present when DAL BOSCO, whom he had met with KEENAN in the recent months prior thereto, placed a telephone call via speaker phone to BRUNO in New York. He

54

heard DAL BOSCO asking KEENAN if he wanted to do a "deal with the UN" which "involved

MR. BRUNO, very high ranking friends of Mr. BRUNO's and DAL BOSCO in the UN."

Berens heard DAL BOSCO tell KEENAN that they "could take the 100 Million Dollars as early

as Friday that week." KEENAN rejected the offer.

119.    Subsequently, in August 2010, Berens received a telephone call from DAL

BOSCO who asked him if he would make contact with KEENAN to "once again" offer the 100

Million USD that had been previously offered in February in Zurich. Berens responded that it

was his understanding that KEENAN no longer held the Bonds and that DAL BOSCO "had run

with them." DAL BOSCO replied that he did possess the Bonds and "would not give control of

them until he knew he was safe." DAL BOSCO added that "if KEENAN took the money

everything would be better" and stated that "he is a good Christian who might have made some

very bad mistakes that could hurt a lot of people." DAL BOSCO mentioned he was even having

trouble with his girlfriend because of the situation, including Internet reports of what he had

done. He again stated that "if KEENAN would take the money it makes everything go away and

everyone can go back to things the way they were."

120.    Berens inquired as to the authenticity of the Bonds and DAL BOSCO stated:

"Believe me, the UN has checked them out and they are very real. I gave them one bond to

check." Berens suggested to DAL BOSCO that he call KEENAN directly, to which he

responded that KEENAN would prefer to "hang him not speak with him." DAL BOSCO again

acknowledged his mistakes but that it was "impossible to take it all back seeing it had been

done." Berens ultimately asked DAL BOSCO precisely what he wanted him to inquire of

KEENAN so that he did not make any mistakes. DAL BOSCO responded that "100 Million

USD would be given to KEENAN immediately upon giving the Bonds to Mr. Giancarlo

BRUNO from the World Economic Forum who would then "take the Bonds and give them to BRUNO and DAL BOSCO's friends in the UNITED NATIONS to take into the Federal Sovereign Program for Trade," after which the bonds would be "given back to their rightful owners the Organization (sic) of International Treasury Control so everyone ended up happy." DAL BOSCO added that "taking part in this was Leo Zagami and the P2 Lodge in Rome."

121.    Berens contacted KEENAN in September 2010 to inquire about the status of the DAL BOSCO situation and asked about the bribe offer.  KEENAN responded that "this was an attempt at theft and nothing more."  KEENAN also confirmed what DAL BOSCO had previously told Berens, namely that the 100 Million USD would be split between KEENAN and DAL BOSCO which DAL BOSCO wanted to place in another trading program to generate capital and then enter into various programs and projects.  KEENAN said that the Bonds were "not his to give or sell" and that the UN had acknowledged their authenticity and that Yamaguchi was well known as the comptroller/signature of the Dragon Family.  KEENAN stated that the transaction he was working on was "to help countries not the UN, OITC, the WORLD ECONOMIC FORUM or BRUNO" and that "the returns would be greater for everyone involved and the Dragon Family would receive a great return for their humanitarian projects."

**I.    The Continuing Duplicity and Ultimate Betrayal by DAL BOSCO March-June 2010**

122.    In or about March 2010, DAL BOSCO, in conversations with KEENAN, began to intimate and suggest that he was continuing discussions within the UN about the negotiation of the Federal Reserve Notes, but erroneously noted that the Japanese Bonds and the Kennedy Bond were "government bonds" which could only be traded or negotiated between governments and that it was illegal for any individual to possess them or to attempt to trade them.  KEENAN

56

immediately rebuffed any suggestions that the Federal Reserve Notes be dealt with in any unlawful manner.

123.    KEENAN subsequently learned that Zagami had informed Fulford on or about June 19, 2010 that DAL BOSCO had gone into the Swiss mountains in the vicinity of Stein, Switzerland, with "some key members of the Swiss Illuminati" a year earlier to discuss, among other things, the destruction of the Papacy.  Thereafter, KEENAN was concerned that DAL BOSCO might disappear on a whim.

124.    In various conversations throughout April and May 2010, KEENAN reiterated to DAL BOSCO that he was currently working on placing the Japanese Bonds only in a legally recognized PPP through Mr. Wales in Geneva, Switzerland, and had no active plans for the investment or placement of the Federal Reserve Notes or the Kennedy Bond.  KEENAN kept DAL BOSCO abreast of his efforts regarding his working with his connections in China and Japan whereby the Bank of China would place 9.5 Billion Dollars as cash backing for the two (2) Japanese Bonds upon verification by the Bank of Japan.  KEENAN considered DAL BOSCO to be more than a mere custodian of the DFFI, but a confidante and friend.  However, KEENAN had also been sensing a change in DAL BOSCO's attitude and demeanor, such as increasingly frequent comments such as he "had to tell me something" but could never articulate what it was. KEENAN slowly sensed the DFFI were in jeopardy under DAL BOSCO's control.

125.    At the same time KEENAN was working to achieve the placement of the Japanese Bonds into a trading program, he was also attempting to place the Federal Reserve Notes into another program which would assist the United States and certain European countries. In connection therewith, on or about May 19, 2010, KEENAN reminded DAL BOSCO that he

would soon need the Japanese Bonds and that he might also have a deal for the Federal Reserve Notes.

126.    While DAL BOSCO continued to mention the "offer" from the UN, KEENAN reiterated that the purported proposal by the UN was not acceptable legally or ethically.  He told DAL BOSCO to "forget it" and that he was only going to transact business lawfully through Mr. Wales.  It was made clear that KEENAN and the Dragon Family had arranged for the DFFI to be used as collateral with the Bank of China, and that Wales had been requested to seek to invest the DFFI in a recognized PPP.

127.    At all relevant times leading up to the month of June 2010, KEENAN would advise DAL BOSCO whenever he needed the DFFI for presentation at a business meeting and at all times DAL BOSCO complied.  However, beginning in or about May 2010, KEENAN observed that DAL BOSCO had consciously decided to change apartments in Rome as if to confuse KEENAN as to his whereabouts and, as it transpired, in order to avoid contact and ultimately to disappear.

128.    In conversations in early June 2010, KEENAN indicated clearly to DAL BOSCO his hopes of coordinating a transaction involving three European countries and expressed his desire that DAL BOSCO participate in the venture.  DAL BOSCO again reiterated the aforesaid offer from the UN to buy the FRNs for $100 Million USD, but KEENAN again rejected the notion and warned that the UN was acting unlawfully with respect to its planned disposition of the DFFI.

129.   On or about June 8, 2010, KEENAN advised DAL BOSCO directly that his associate, Mr. Joseph Bendana (hereinafter "Bendana"), an American citizen, would be traveling to Geneva, Switzerland to retrieve the entire DFFI in order that they would be available for their intended purposes.

**J.     The OITC Cease and Desist Order of June 8, 2010 (the "OITC Order")**

130.   Oddly, at or about the time that DAL BOSCO was advised by KEENAN that Bendana would be flying to Geneva to retrieve the DFFI, or on or about June 8, 2010, the OITC "served electronically" a "Cease And Desist" Order (hereinafter, the "OITC Order") purportedly issued by "His Excellency, Dr. Ray C. Dam, International Treasury Controller 10-60847," representing, among other things, that DAM was appointed to that position under United Nations Charter Control No: 10-60847 and UN International Clearing Code:  UNRCD-ID006197.  The OITC order, among other things, stated that KEENAN, Yamaguchi and Watanabe "together with all associates, colleagues" were to "Cease and Desist" from "attempting to handle various Master Accounts and Assets of the Combined International Collateral Accounts of the Global Debt Facility, **which incorporates the Dragon Funds**, without any Official Authority or Approval whatsoever; which are legally owned under full Legal International Laws/International Treaty/ Convention Laws, as herein referred, by the aforementioned and referenced International Treasury Controller."  (**Emphasis added**)

131.   Further, the OITC Order, among other things, directed the individuals to "Immediately Surrender All" certificates, assets, or otherwise held in their possession on or before July 7, 2010.

132.   On the day after the OITC Order was published, DAL BOSCO, feigning fear, contacted KEENAN to advise that he had received a copy of the OITC Order by email and asked

59

KEENAN how OITC had obtained his email address. In fact, DAL BOSCO had aided in the orchestration of the OITC Order and was neither in fear nor surprised by its issuance. He had inquired about OITC from KEENAN as early as January 2010 and was told OITC was a fraudulent organization. Further, DAL BOSCO had referred to OITC as the "owners" of the FRNs in his discussions with Vasil Ganov in February 2010 in Zurich (see ¶ 102, *supra*) and with Nikolai Raykov in Geneva in May 2010 (see ¶ 108, *supra*). KEENAN responded that he had no idea and questioned how OITC even had his own email address.

133.   At various other times DAL BOSCO advised KEENAN and others that he was not returning the DFFI, but rather had placed the DFFI in the possession of his attorney (unidentified) until the situation had been clarified in order to take the time necessary to "decide what to do with them." Further, on June 22, 2010, in a conversation with Fulford, DAL BOSCO affirmatively stated that he was alternatively "working with the Police and the UN" as well as "with Interpol." Fulford asked for the name of DAL BOSCO's attorney or the names of the Interpol person with whom he was in contact so that Fulford could "get the Japanese security police to contact them on behalf of the Japanese government." DAL BOSCO responded that he should "contact OITC @ intl.finance@unoitc.org and explain what they want to do."

134.   DAL BOSCO also advised KEENAN that he was communicating with representatives from Interpol, but again refused to provide details of names or contact numbers. Ultimately, he told KEENAN: "Buddy, the Bonds do not belong to the Dragon Family. They belong to OITC."

135.   On June 9, 2010, KEENAN notified the OITC by e-mail that he was in receipt of the OITC Order and asked three questions, as follows:

1. What is your role or responsibility, or involvement in the bonds? Please be more descriptive.

2. Who is the party or persons that have provided you with our names?

3. What gives you the authority to issue such a Cease and Desist" document (PDF files?).

136. KEENAN further demanded detailed responses within 24 hours together with a reservation of rights regarding future civil or criminal actions.

137. On or about June 9, 2010, DAL BOSCO contacted KEENAN and expressed his own personal fear and his inability to make a decision regarding the DFFI. KEENAN assured DAL BOSCO that he had done nothing wrong, that the OITC was a fraudulent entity and that, despite its outward representations, enjoyed no protection, sanction, affiliation or approval from either the UN, the Federal Reserve Board, or the BIS, and that any licensing it might once have enjoyed had been nullified several years prior.

138. KEENAN told DAL BOSCO to ignore the OITC Order pointing out that DAL BOSCO was not even named in the document. KEENAN did inquire of DAL BOSCO how the OITC obtained his email address and DAL BOSCO denied any knowledge, although KEENAN was aware that DAL BOSCO had prior communications with OITC.

139. On June 10, 2010, OITC sent a letter via email to KEENAN wherein, *inter alia*, it "strongly advised" KEENAN not to ignore the OITC Order and to review "our Website (www.unoitc.org) and in particular the Video Presentation . . ." and further "adhere to the content of C&D Notice /Order . . . and comprehend what you are actually involved in." Additionally, purporting to answer the questions put forth by KEENAN in his letter, OITC stated, in part, that "The Bonds are issued against the Dragon Funds, whereby the Bonds are collateralized by the

61

Dragon Funds. The Dragon Funds are part of the Combined International Collateral Accounts of the Global Debt Facility of which H.E. Dr. R. C. Dam (of Royal family origin) is the Legal Heir, Owner, Sole Arbiter as appointed by the Nations of the World (January 20, 1995) to replace the Trilateral Trillenium Tripartite Gold Commission established January 1945 with a Fifty (50) year term, expiring in 1995."

140.    The OITC also responded to KEENAN's letter by stating, in response to the question as to who had provided OITC with the names in the OITC Order, that "This is privileged information and cannot be disclosed." As to the third question posed by KEENAN as to what gave the OITC the authority to issue its Order, OITC responded:

> Our ownership of the Dragon Funds, being part of the Combined International Collateral Accounts of the Global Debt Facility, and our international status combined with our International Authority as granted, attested to, and formally issued by the Nations of the World.

The OITC letter concluded with a warning that the "impertinent mannerisms" in which KEENAN had allegedly "approached this matter" would not be tolerated as it shows "**an insulting and arrogant attitude towards a Sovereign Entity which is legally chartered under the United Nations and recognized by all Nations. . ." (Emphasis added)** and was signed:

> Yours faithfully,
>
> D.A. Sale, F. LLA.
> Special Global Envoy, Senior Commercial Advisor to H.E. The Chairman
> The Office of International Treasury Control,
> UN Charter Control No: 10-60847

141.    On June 14, 2010, KEENAN responded with a letter addressed to Mr. Dam, sent via email in which he disputed that the BIS, UN or Federal Reserve recognized OITC, but urged Mr. Dam "to request Mr. Yamaguchi to work directly with you," noting that "if you can possibly

assist him with his bonds then I can provide the TRADER for you.  Then there will be money for

humanitarian causes in our hands."

142.    SALE responded the same day opening with the greeting that "Again your

arrogance and total lack of knowledge shows within the content of your communication."  After

disputing that either Yamaguchi, as Controller, or the Dragon Family itself are the "Legal

Owners" of the missing DFFI, SALE advised that the OITC Order "stands and is enforceable in

full" and that "appropriate action" would be undertaken in due course for failure to comply.

SALE also NOTED that "H.E. Dr. Dam does not respond to communications directly from

people, as he is far to [sic] busy on more important issues attending to Royal Families.  Neither

does H.E. Dam attend meetings with, nor have appointments with anyone other than Royal

Family members."

143.    On June 17, 2010, OITC sent KEENAN an email advising that, *inter alia*, (1)

since Monday, June 14, 2010, it had received several communications from a Swiss Law Firm

(unidentified) "relative to one of their clients"; (2) that Swiss Law Firm was "now in possession

of various Bonds and Certificates passed to their client by you"; (3) it had advised said Law Firm

"to ensure" that such instruments "are held totally secure at all times until they are able to verify

our status"; (4) it had "dispatched" to said Firm "details regarding the protocols that they must

apply, together with the relevant information reference to where and to whom they should apply

for verification of the OITC/H.E. Dr. Dam"; (5) it had made arrangements for the Swiss

Intelligence Services to visit the Law Firm "to ensure that the Law Firm is fully aware of what

they are handling and the seriousness of same"; (6) it had received from the Law Firm that

morning copies of threatening letters from "a Japanese person" and KEENAN and which it

would report to the Intelligence Services and Police; (7) that, as of that morning, H.E. Dr. R.C.

Dam had "agreed to cover the Law Firm, its Partners and employees, and the specific client

under International Security Clearance Level 3-5 and the Vienna Convention, whereby any

untoward act or actions . . . will now be handled accordingly. . ." and otherwise threatened to

issue a Warrant of Arrest which would be "enforceable internationally." The letter ended:

> It is therefore in your own interest, and that of your colleagues, associates
> or otherwise, not to under-estimate the Status and Power of H.E. Dr. Dam
> or the OITC.
>
> Faithfully,
>
> D.A. Sale, F. LLA.
> Deputy Chief of the Council for the Cabinet,
> Special Global Envoy, Senior Commercial Advisor to H.E. The Chairman The
> Office of International Treasury Control,
> UN Charter Control No: 10-60847

144.    KEENAN responded immediately, advising OITC, *inter alia*, that it was an

"ongoing publicity seeker and not much more" with "no standing in any court or organization

and not a protected entity."

145.    On June 20, 2010, KEENAN sent another email to DAL BOSCO advising that

"Apparently your attorney has made contact with OITC but still to this date your lawyer has not

made contact with our attorneys. Seeing it is the Dragon Family bonds that you have absconded

with, you have not given me to give to my attorneys any contact numbers for your attorney to

date which in itself is illegal. I see OITC has it and as previously mentioned you and your

attorneys are responsible for anything happening to those bonds outside a court of law. Your

attorney is speaking with OITC but not the owners of the bonds. This is very interesting and

illegal. Please forward attorney contact numbers immediately."

146.    Within hours, KEENAN received a response from OITC, through DAL BOSCO,

by which OITC advised DAL BOSCO:

64

Dear Daniele,

Take no notice and do not reply, because that will only provoke him.

Kindest regards,

D.A. Sale, F. LLA.
Special Global Envoy, Senior Commercial Advisor to H.E.  The Chairman
The Office of International Treasury Control,
UN Charter Control No: 10-60847

No response has ever been received by KEENAN from any person purporting to act as an attorney for DAL BOSCO.

## K.    Attempted Retrieval of the DFFI by Joseph Bendana

147.    Bendana had previously worked with KEENAN on PPPs initiated by the Dragon Family.  For instance, on or about September 23, 2008 Yamaguchi, "as the legal holder of the 10 Kennedy Bonds and the 415 metric Tons of AU (gold)" had executed an Authorization Letter in favor of Bendana whereby Bendana was authorized "to oversee all operations involved with the Private Placement Program for both the bonds and the AU and you are to insulate at all times the members of the Dragon Family by handling all issues that arise with Mr. Neil Keenan, project coordinator . . . to make sure that the programs are ready for us to enter upon authentication of the bonds or AU certificates . . ."

148.    On or about June 14, 2010, Bendana received a telephone call from DAL BOSCO and after discussing with him his authorizations, made specific arrangements to meet with DAL BOSCO in Geneva to retrieve the DFFI.

149.    On or about June 15, 2010, Bendana flew to Geneva for the sole purpose of retrieving the DFFI, including the Federal Reserve Notes and the Kennedy Bond, so that he could arrange their return to KEENAN.  On or about June 17, 2010, Yamaguchi executed a

65

Power of Attorney in favor of Bendana "to retrieve the bonds/notes from the hands of Mr.

Daniele Dal Bosco or from the legal safekeeping vault where Mr. Daniele Dal Bosco deposited

them," such written instrument also expressing the hope that Mr. DAL BOSCO would place

them in Mr. Bendana's hands "as he received them from Mr. Keenan." The instrument also

directed Mr. Bendana to make preparations to move the DFFI in accordance with KEENAN's

instructions after KEENAN has confirmed that the DFFI retrieved by Bendana are the same as

those turned over to DAL BOSCO.

  150. Ultimately, DAL BOSCO neither contacted nor met with Bendana at the

appointed time and location. Bendana did meet with Wales briefly at the Intercontinental Hotel,

and Wales also attempted to contact DAL BOSCO. Upon information and belief, Wales did

have conversations with DAL BOSCO in which he suggested that DAL BOSCO return the DFFI

to KEENAN and even provided a draft format of a safekeeping receipt for use by DAL

BOSCO's attorney to send to KEENAN. Wales' attempts to assist KEENAN were rebuffed

causing him to inform Bendana that DAL BOSCO would not be returning the Federal Reserve

Notes and Kennedy Bond, which comprised part of the DFFI, to him. After spending three days

in Geneva, Bendana left empty handed for Bulgaria where he saw KEENAN while harboring

hopes that DAL BOSCO would change his mind and Bendana could fulfill his assignment. This

did not occur and Bendana ultimately returned to the United States on July 4, 2010. It was not

until a few days after Bendana returned home that DAL BOSCO called him to state that he might

reconsider returning the DFFI and to "wait a little longer."

  151. During his trip, Bendana had dinner with KEENAN at Ganov's house in Bulgaria.

Bendana expressed his regret that he had divulged his itinerary to DAL BOSCO and that he was

sure DAL BOSCO was planning to steal the DFFI. Bendana also said that by revealing his

itinerary, DAL BOSCO might have been pressured to take action with the DFFI more quickly than he might originally have planned.

152.    Eventually, DAL BOSCO himself told KEENAN that he would never return the DFFI and that he "should get on with his life." DAL BOSCO's actions caused substantial economic harm to KEENAN as the European group KEENAN had been dealing with had made all the necessary financial arrangements in order to invest Fourteen Billion Dollars ($14,000,000,000.00) in the form of a cashier's check in return for the use of the FRNs which, as described, comprised a portion of the DFFI as well as a 50% participation in a PPP.

153.    At various and continuing times from June 2010 through the present, DAL BOSCO and OITC have threatened, harassed and attempted to intimidate KEENAN by stating, among other things, that the DFFI should be placed with the OITC and/or the Italian Government and has at all times refused to relinquish control of or return the DFFI to KEENAN, Yamaguchi or the Dragon Family.

**L.    Affirmative Actions Taken by KEENAN and/or his Principal to Retrieve the DFFI**

154.    Since the time it became clear that DAL BOSCO had utterly breached any and all fiduciary and legal obligations he owed to KEENAN under his agreement to act as temporary safe keeper and custodian of the DFFI, KEENAN has spared no effort to try to either reason with or persuade DAL BOSCO, and those with whom he has elected to conspire to steal and convert the DFFI for their own selfish and illegal purposes, to return the DFFI. These efforts have been entirely futile and DAL BOSCO, and those with whom he has conspired, has at all times refused to relinquish control of or return the DFFI to KEENAN, Yamaguchi or the Dragon Family.

155.    Among the actions taken or participated in by KEENAN to enforce his rights and to repudiate DAL BOSCO's actions, have been the following:

i.      The service of his own Cease and Desist Order upon DAL BOSCO on or about June 20, 2010, demanding the return of the DFFI, citing DAL BOSCO's broken trust and attempts to sell the DFFI to the UNITED NATIONS and the ITALIAN REPUBLIC or agencies thereof; his failure to turn the DFFI over to Bendana as had been arranged; DAL BOSCO's collaboration with OITC and participation in attempting to bribe KEENAN with the assistance of the UNITED NATIONS and its high ranking representatives, BRUNO, the WEF and/or WEF USA and others; DAL BOSCO's failure to advise of the identity of the "attorney" with whom he had allegedly deposited the DFFI, or the identity of the "police" with whom he had allegedly conferred about the DFFI

ii.      The issuance of another Cease and Desist Order upon DAL BOSCO by Yamaguchi on or about June 22, 1010, as well as his filing of a Criminal Complaint on or about June 24, 2010 with the Governments of France and Switzerland in their respective Ambassadors' offices in Tokyo. The Complaint noted DAL BOSCO's illegal possession of the DFFI, with an estimated value of 989 Billion USD for the past 3 weeks, as well as DAL BOSCO's expressed threats to transfer their possession to OITC.

iii.      The filing of another Criminal Complaint on or about July 2, 2010, by Yamaguchi against DAL BOSCO with the Italian Embassy in Tokyo c/o Ambassador Vincenzo Petrone, charging DAL BOSCO with, *inter alia*, "grand theft, fraud, conspiracy, grand larceny, and conspiring acts of bodily harm against the papacy, [and] violence directed toward the Vatican . . ."; the Complaint charged that DAL BOSCO had been colluding with some members of the Italian Government in attempting to "extort extreme amounts of money from the Dragon Family." Yamaguchi urged that the DFFI be returned from DAL BOSCO and his lawyer through Mr. Keenan as soon as possible. He further requested the Italian Authorities to detain DAL BOSCO if he entered their jurisdiction and to launch a full investigation of said charges.

iv.      The filing of yet another Criminal Complaint by Yamaguchi with the Metropolitan Police Department in Tokyo on or about July 8, 2010 , alleging "the robbery damage" of DAL BOSCO by virtue of his stealing the DFFI in Geneva from KEENAN, to whom Yamaguchi had entrusted the DFFI in January and May 2009.

v.      The submission on or about July 21, 2010 of a sworn statement by Bendana to Interpol advising of his written authorization in June 2010 "to retrieve over a trillion dollars worth of bonds" from DAL BOSCO in Geneva, Switzerland and which were then in the possession of DAL BOSCO for safe keeping only.  Bendana also referenced his

68

exchange of contact information with DAL BOSCO prior to his trip to Geneva.

      vi.      The issuance by Wales on or about July 26, 2010, of his own "Cease and Desist Order Effective Immediately" against DAL BOSCO, based upon DAL BOSCO's misappropriation of the DFFI, which he knew were under the legal control of KEENAN, and DAL BOSCO's subsequent "slanderous and malicious attack" upon Wales' person or character.

      vii.      On or about July 27, 2010, KEENAN submitted a package of information to Interpol Headquarters in Lyon, France "revealing the theft of approximately 1 Trillion USD in Financial Instruments by Italian Daniele Dal Bosco . . ." Among other things, KEENAN advised Interpol that his enclosed package contained documentary evidence to support his claims against the actions taken by DAL BOSCO relating to the theft and (a) DAL BOSCO's refusal to return the Instruments "back to their rightful owners/custodians," (b) DAL BOSCO's attempted sale of the DFFI to the UNITED NATIONS "which offered him 100 Million USD for them" (c); DAL BOSCO's steadfast refusal to provide contact information for the individuals, including his lawyer, or law enforcement agencies, including Interpol itself, with whom he had allegedly conferred about depositing the DFFI; and (d) the closing by DAL BOSCO of his London office, his change of email address, and moving from his apartment. Included in the package was (e) an affidavit from Mr. Somberg in which Somberg described his understanding of the relationship between KEENAN and DAL BOSCO based upon the several conversations he had with DAL BOSCO while travelling with him in Switzerland, Germany and Austria during the September 2009 time period (see ¶¶ 77-82, *supra*). Somberg related his own observation that DAL BOSCO, during this period, "was very close by Mr. Keenan and was clearly the caretaker of the financial instruments that Mr. Keenan was authorized to use by the Dragon Family and their comptroller/signatore Mr. Yamaguchi." Somberg understood that KEENAN "was attempting to work an international transaction involving various governments to help them in their time of crisis." Somberg also quoted the response of DAL BOSCO, whom he had deemed at that point to be "a very sound and practical person" when queried by him as to why he was then custodian of the DFFI:

      Neil has to travel across borders and it is illegal to carry the bonds across said borders and if he gets stopped he will have an international scandal and this is what we are trying to avoid. I am a trusted financier not only in Switzerland but in France and Italy as well. I am the custodian of many

69

bonds and instruments so Neil's instruments that he
represents are in good hands.  Nothing will happen to them.

    viii.       On or about July 29, 2010, KEENAN sent a letter to His
Eminence Vatican Secretary of State Cardinal Bertone, whom he had met
previously at a Celebration for the Dominican Republic and President
Belaguer in October 1992.  He noted his regret to have to advise the
Cardinal that Italian Citizen DAL BOSCO, who had represented that he
was a resident of Vatican City, as well as Divonne-les-Bain, France, and
was the Financial Advisor to the Vatican and Treasurer of the Masons, had
"absconded with approximately 1 Trillion USD and Japanese Bonds in
June 2010 that were entrusted to me."  KEENAN noted that DAL BOSCO
"was a very nice young man who presented himself properly at all times
and of course I believed him."  KEENAN also advised Cardinal Bertone
that DAL BOSCO had told him he had been working with the Vatican
through its financial programs, or Platforms, and had been hopeful of
placing the DFFI into such a program.  Despite DAL BOSCO's stated
intentions of working with the Vatican, KEENAN also felt obliged to
report to Cardinal Bertone that he had received information (while
expressing reservations about its accuracy) to the effect that DAL BOSCO
had been involved with others in discussions concerning a plot to destroy
the Papacy

    ix.       In a letter dated July 31, 2010, which enclosed a package of
pertinent information, sent via certified mail return receipt requested by
Mr. Bendana from his residence in New Jersey, KEENAN advised BAN
KI-moon that DAL BOSCO, "an Italian citizen, passport number C165124
absconded with 1 Trillion Dollars in Bonds/Notes which had been
entrusted to me yet belonged to the Dragon Family."  He further stated
that the "sole reason" he was writing was that "it is the UNITED
NATIONS itself that set DAL BOSCO off on his quest to either Sell the
Bonds or place them in a Private Program."  KEENAN further advised
that "You have individuals inside the UN in Geneva who know "Mr. Dal
Bosco and who offered him One Hundred Million USD for them."
Further, DAL BOSCO's "UN friends advised him that Mr. Yamaguchi
was a very powerful member of the Dragon Family whose titles are indeed
Signature (sic)/Comptroller but that they at no cost wanted Mr.
Yamaguchi involved in this transaction.  He was not even to receive one
cent for the Dragon Family."  KEENAN also referenced DAL BOSCO's
illicit connections with OITC and SALE and the use of the UN "as a cover
for their illegal dealings" as well as the danger posed to the United States
by the UN's condoning such activities through the promises of "security
and secrecy" and called for a serious reprimand of any people within the
UN for their participation in the plot to steal the DFFI.  While KEENAN
never received a direct response to his letter to BAN KI-Moon, upon

70

information and belief, Mr. Bendana spoke on at least two occasions with him during the course of which BAN KI- moon stated, among other things, that "this goes much higher than me." Mr. Bendana relayed this information to KEENAN and added: "I cannot wait to see you buddy; wait until you hear the information I have." He also repeated this to his brother-in-law who was present during the conversation. Mr. Bendana, who received the return receipt requested from the UN on September 2, 2010, was found dead in his apartment in New Jersey on the morning of September 4, 2010, two days before he was to depart to visit with KEENAN and provide him with all the information he had received from his conversations with BAN KI-moon and days after he had received a telephone call from DAL BOSCO threatening his physical safety if he continued pursuing legal claims on behalf of KEENAN.

      x.     On August 30, 2010, KEENAN sent a personal letter to BRUNO, certified mail, addressed to WEF headquarters in Switzerland, by which he reminded BRUNO that he, KEENAN, was the person who had entrusted the DFFI to DAL BOSCO, who had informed him, *inter alia*, that (a) BRUNO had offered 100 Million USD as a cash payment with no questions asked; (b) a Stipulation of such payment was that Mr. Yamaguchi was never to receive anything for the bonds and that all or a portion of the bonds would have been placed into a FED investment program handled by you and your organization (World Economic Forum); (c) five (5) International Complaints were currently filed against DAL BOSCO and one with Interpol; (d) he was filing a civil complaint in the federal district court in Manhattan in which BRUNO and WEF would be named; (e) DAL BOSCO was reportedly claiming that the DFFI were in a Federal Trading program and in safe hands in the UN, which was what DAL BOSCO had claimed BRUNO had proposed more than two months prior thereto.

      To date, KEENAN has not received a response to his August 30, 2010 letter from either BRUNO or WEF.

## M.    Recent Revelations Concerning the DAL BOSCO/ OITC Enterprise

    156.    On or about November 9, 2010, KEENAN received a written communication

from Keith F. Scott, formerly associated with the OITC as Chief of Cabinet of OITC, Special

Envoy and Executor for His Excellency Dr. Ray C. Dam and later, Chief of Council of the

Cabinet. Scott directly contradicted the June 2010 communications from SALE, and stated

clearly that the DFFI are the rightful property of the Dragon Family who are legally entitled to same.

157.   Scott also informed KEENAN that in late September or early October 2010, he had become aware of one of Fulford's internet blogs regarding "the theft of a series of Historical Bonds that with their accrued value with interest coupons was worth approximately One Trillion United States Dollars" and that such bonds "had been stolen from one Neil Keenan."

158.   According to Scott, he informed DAM about two weeks later and witnessed DAM's reaction in anger as DAM explained to Scott that he had been aware that SALE had access to the Bonds and had sent him scanned copies which DAM proceeded to showed to Scott. DAM advised Scott that he had determined that the Bonds were authentic based upon his experience and review of records which he had historically kept in his what he referred to as a "Book of Codes," which, upon information and belief, purports to be a detailed listing of all records and true owners of the International Combined Accounts, further blocked to the "IPRA" or International Parent Registration Accounts.

159.   According to Scott, the Dragon Family, through various secret arrangements, hold vast assets which he has substantiated to KEENAN by presenting "copies of official top secret bank documents that confirm the amount of gold delivered by the Dragon Family." Scott is clear and emphatic in stating that any alienation of the Bonds from the Dragon Family or their appointed Agents is illegal. Scott maintains that the Dragon Family are the known Depositors of gold as well as other bullions and other assets in private bank accounts held in Swiss Banks, and that the DFFI were in fact obligations of the Federal Reserve System against the assets blocked to the Federal Reserve System Accounts. Scott explained that these assets deposited in the Dragon Family owned accounts were part of the aforementioned "IPRA."

160.    In recent postings available to the world at large via the Internet, SALE has admitted that it is "verifiable" through OITC's own records that the "first ever written communication from Mr. Dal Bosco was within the first week of February 2010, in fact 2nd February 2010." Further SALE has published "a few relevant sections of the Agreement dated March 2010" between DAL BOSCO and OITC "duly executed by DAM." It has thus been admitted to a global audience by SALE, confirming KEENAN's worst suspicions, that DAL BOSCO had contacted OITC no later than February 2010, and entered into a written contract with OITC no later than March 2010, regarding the disposition of the DFFI with which he had been entrusted by KEENAN in September 2009. This further corroborates the conversations that DAL BOSCO had with Vasil Ganov in February 2010 in Zurich when trying to persuade Ganov to influence KEENAN to accept the $100 Million USD bribe and when DAL BOSCO alluded to OITC as the "owners" of the Notes which would be returned to OITC after having been placed in a UN "Sovereign Program." It also corroborates DAL BOSCO's discussions with Nikolai Raykov in May 2010 in Geneva (See ¶¶ 98-104; ¶¶ 106-117, *supra*).

161.    Further, it has become evident that during the period in the very months after KEENAN had entrusted DAL BOSCO with the DFFI, namely early 2010, DAL BOSCO, in total dereliction of his fiduciary duties, was, in fact, embarking simultaneously upon staggering schemes to steal and convert the DFFI through his illicit actions, including bribery, not only with BRUNO, THE WORLD ECONOMIC FORUM, the UNITED NATIONS, BAN KI-moon, RAGAGLINI, MIRACHIAN, BERLUSCONI, the ITALIAN FINANCIAL POLICE, the ITALIAN REPUBLIC and others but also with OITC, SALE and DAM. These schemes were plotted solely for the purpose of aggrandizing the various Defendants' personal wealth at the expense of the rightful Legal Holders of the DFFI and their designated agent KEENAN.

73

N.   **Recent Revelations Concerning the DAL BOSCO, BRUNO,
     ITALIAN REPUBLIC, ITALIAN FINANCIAL POLICE,
     BERLUSCONI Enterprise**

162.   In or about mid-December 2010, it was learned by KEENAN that, beginning in or

about September 2008, Brazilian financier, Carlo Alfredo Nascimento da Silva, with the

assistance of his attorney, Rubens Mariani, was planning to purchase Banca Commerciale

Lugano, Lugano CH (Switzerland) ("Banca Commerciale").  Upon information and belief, this

plan came to be aided and abetted by DAL BOSCO, BERLUSCONI and BRUNO, as well as

retired Colonel of the ITALIAN FINANCIAL POLICE, Mauricio Fanelli, Italian attorney, Pierre

Luigi Manzione, and others.  Further, upon information and belief, the plan included the deposit

of stolen bonds and notes into Banca Commerciale or any other Swiss bank to establish credit

lines and to enter into trading programs.  The stolen assets which were to be deposited included

not only all the DF Chiasso Instruments seized in June 2009, and still held by THE ITALIAN

FINANCIAL POLICE, but also the DFFI stolen by DAL BOSCO in June 2010, and

continuously held under his custody or control.  This information further confirms the

recollection of Ognyan Marinov's discussion with DAL BOSCO and BRUNO in Geneva in May

2010 (See Paragraph, *supra*).

O.   **Deed of Authorization and Agreement from Dr. Edy Soekanto**

163.   In November 2011, KEENAN was issued a deed of Authorization and Agreement

(the "Agreement") from Dr. Seno Edy Soekanto, who has sworn to be the "legal heir of record as

stated in the last will and testament of the late President Soekarno of Indonesia and heir son of

the late Kiyai Hadji Djawahir, as well as the legal holder of the Family Heritance Guarantee, as

attached to all the gold deposits as ordered by President Soekarno between 1948 and 1968 when

he was granted such Heritance Guarantee as payment for his services to the World." *See* ¶ 2(iii)(c).

164.     Dr. Soekanto swears that President Soekarno had designated to him the responsibility to collect all those funds known as the Family Heritance Guarantee and the accumulated interest thereon and that he has "been acknowledged by depository bank, as evidenced by the bank instruments, books, record and ledgers and codes in his possession, as the sole recognized heir to" the aforesaid fortune.  Further, under such Agreement, on account of his "severe and long term chronic illness," he granted to KEENAN the authority to act as one of his Attorneys in Fact "to act jointly and/or severably and to undertake all means and methods to recover the funds owing to me and the People of Indonesia."

165.     Dr. Soekanto has further agreed and has confirmed that he holds the "full secret Book of Codes (Maklumat Book) and Ledgers and all Records of the Accounts as delivered" to him and that, upon their request, he will "deliver or cause delivery of the originals of such books for presentment to any court determined to have such jurisdiction" and "for any other purpose" KEENAN may require or need the Books.  KEENAN and others under his direction are presently in custody of certified copies of said Book of Codes (Maklumat Book) and Ledgers with the authorizations to use them when needed.

166.     These Books and Ledgers define the information that is held in the Federal Reserve screen system.  They contain the secret code cyphers and data on legal decisions, treaties and other arrangements.  Upon information and belief, they provide information pertaining to all the accounts and sub-accounts that contain the gold and other assets, as well as information pertaining to the financial instruments issued against the gold.  Further, they specify and provide the factual information as to what is in the Global Accounts, such as who owns the

75

gold and the source of its ownership.  The protection and security of these Books is, therefore, of the utmost importance and central to the authentication and verification process.

## AS AND FOR A FIRST CAUSE OF ACTION AGAINST DEFENDANT DAL BOSCO
### [Expropriation and Conversion under Federal Common Law and International Law]

167.    Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 166 of the Complaint with the same force and effect as though fully set forth herein.

168.    Pursuant to a certain Special Power of Attorney executed by Yamaguchi on behalf of the Dragon Family, and with the approval of General Haan, the Head of the Dragon Family, which authorized Plaintiff KEENAN to act on behalf of Yamaguchi and the Dragon Family for the private placement of or legal return of the DFFI, KEENAN lawfully possessed the DFFI.

169.    KEENAN released custodianship of the DFFI to defendant DAL BOSCO pursuant to his written ACCEPTANCE of September 9, 2009, whereby DAL BOSCO would retain custody of the DFFI for safekeeping while KEENAN travelled throughout Europe in his effort to invest the DFFI in recognized PPPs.  DAL BOSCO agreed to only return custody of the DFFI over to KEENAN or Yamaguchi and "Not any other!"

170.    DAL BOSCO proceeded to engage in a course of conduct totally contrary to his oral and written agreement.  Such actions were taken intentionally and without authority by DAL BOSCO, who at all relevant times engaged in the unauthorized assumption and exercise of right of ownership of the DFFI, thus interfering with KEENAN's right of possession.  Such unauthorized assumption of control is evidenced, in part, by DAL BOSCO's following and unauthorized activities, alone and in conspiracy with others:

(1)     Exercised dominion and control over the DFFI totally outside of and beyond the scope of his acknowledged duties, and remains in custody and control of the DFFI, despite repeated demands for their return;

(2)     Further exercised his dominion and control over the DFFI by entering into a written agreement with defendant OITC for the purpose of proclaiming the DFFI as the lawful property of OITC, rather than KEENAN, and subsequently conspiring with OITC to issue a fraudulent Cease & Desist Order proclaiming such ownership;

(3)     Entered into an agreement with defendants BRUNO, the WEF and/or WEF USA, UNITED NATIONS, BAN KI-moon, the ITALIAN REPUBLIC, RAGAGLINI and MIRACHIAN whereby a bribe of $100 million USD would be offered to KEENAN for the release of the DFFI to BRUNO for the ultimate investment of the DFFI in a "Sovereign Program" under the control of defendant the UNITED NATIONS, at all times under the claimed umbrella of protection afforded by the "sovereign immunity" accorded the UN;

(4)     Entered into an illicit agreement with defendants the ITALIAN FINANCIAL POLICE, the ITALIAN REPUBLIC, BERLUSCONI, WEF, WEF USA, BRUNO and others whereby said defendants plotted to utilize the stolen the DFFI, which in combination with other various stolen or seized assets, would be placed into international commerce through the purchase of a Swiss Bank, Banco Commerciale di Lugano, or another Swiss bank for future credit and trading purposes.

171.     After rejecting numerous improper offers and bribes made by DAL BOSCO, as detailed *supra*, KEENAN demanded orally and in writing on multiple occasions that DAL BOSCO return the DFFI to KEENAN's possession.

172.     Despite these demands, DAL BOSCO unlawfully withheld possession of the DFFI from KEENAN and the Dragon Family in violation of their legal rights to the same.

173.     KEENAN has suffered serious financial detriment on account of the conversion of the DFFI by DAL BOSCO and, at a minimum, DAL BOSCO is required to pay the full value of the DFFI and all of its accumulated interest, with interest. DAL BOSCO is also required to

pay KEENAN's lost profits from the fees to which he was entitled for performing his services

for the Dragon Family with respect to coordinating the placement of the DFFI into an approved

trading program.

174.   Consequently, KEENAN has been damaged by the conversion of the DFFI by

defendant DAL BOSCO and has sustained damage in a sum to be determined at trial, but

believed to be in excess of One Trillion ($1,000,000,000,000.00) US dollars.

### AS AND FOR A SECOND CAUSE OF ACTION AGAINST DEFENDANTS DAL BOSCO, BERLUSCONI, RAGAGLINI, MIRACHIAN, ITALIAN FINANCIAL POLICE, ITALIAN REPUBLIC, BAN KI-moon, UNITED NATIONS, BRUNO, WEF and WEF USA, [Civil Conspiracy to Expropriate and Convert the DFFI under Federal Common Law and International Law]

175.   Plaintiff repeats and realleges each of the allegations contained in paragraphs 1

through 174 of the Complaint with the same force and effect as though fully set forth herein.

176.   Upon information and belief, defendants DAL BOSCO, BERLUSCONI, the

ITALIAN FINANCIAL POLICE, and the ITALIAN REPUBLIC entered into an agreement

whereby each party knowingly and voluntarily agreed to participate in a scheme to steal and

convert certain financial instruments for the purpose of profiting from this theft of financial

instruments, including the DFFI.  Among the prospective unlawful uses planned for the DFFI by

said defendants was the purchase of a Swiss Bank, such as Banco Commerciale di Lugano, or

any other Swiss Bank into which they could immediately move all stolen assets, including the

DFFI.

177.   Upon information and belief, defendants BRUNO and the WORLD ECONOMIC

FORUM and/or the WORLD ECONOMIC FORUM USA, INC. knowingly and voluntarily

agreed to participate in this scheme to convert various financial instruments, including the DFFI.

Defendants BRUNO and the WEF and/or WEF USA further knowingly and voluntarily agreed to utilize their connections within the defendant UNITED NATIONS to set up Sovereign Programs for the investment of the unlawfully obtained financial instruments that they knew to be either stolen or seized under color of police authority of the ITALIAN FINANCIAL POLICE or unlawfully obtained by others, and which included the DFFI, to the profit of all the co-conspirators.

178.   Upon information and belief, BRUNO, acting within his authority as the Director responsible for the Financial Services Industry Group of the defendant WEF and/or WEF USA in its New York City offices, and defendants BERLUSCONI, H.E. Ambassador CESARE MARIA RAGAGLINI, Permanent Representative of the Italian Mission to the UN in New York, H.E. Ambassador LAURA MIRACHIAN, Permanent Representative of the Italian Mission to the UN in Geneva, defendant BAN KI-moon, Secretary-General of the United Nations, and other unknown representatives of defendants the ITALIAN REPUBLIC, the ITALIAN FINANCIAL POLICE and the UNITED NATIONS procured an agreement entered into knowingly and voluntarily by the foregoing defendants whereby the unlawfully obtained financial instruments that said defendants knew to be either stolen or seized under color of police authority of the ITALIAN FINANCIAL POLICE or unlawfully obtained by others, and which included the DFFI, would be invested in a " Sovereign Program" wholly under the auspices, protection and umbrella of the "sovereign immunity" allegedly accorded to the UNITED NATIONS and the ITALIAN REPUBLIC.

179.   Upon information and belief, in furtherance of the aforesaid civil conspiracy, defendants the ITALIAN FINANCIAL POLICE and the ITALIAN REPUBLIC intentionally participated in the furtherance of the plan by seizing the DF Chiasso Instruments in an amount

approximating $134.5 Billion U.S. Dollars from Dragon Family representatives Yamaguchi and Watanabe.  This seizure of the DF Chiasso Instruments, which incident was described in detail *supra*, was then utilized by the defendant co-conspirators as a pretext for introducing DAL BOSCO to KEENAN for the purpose of convincing KEENAN that it would be wise to entrust custody of the DFFI to DAL BOSCO in order to avoid a similar incident from occurring with respect to the DFFI.

180.    Further upon information and belief, in furtherance of the aforesaid civil conspiracy, defendant DAL BOSCO intentionally participated in the furtherance of the plan by making knowingly false material representations to KEENAN for the purposes of inducing KEENAN to relinquish custody of the DFFI into DAL BOSCO's possession, orchestrating and participating in the numerous attempts to bribe KEENAN in an effort to induce KEENAN to participate in the theft of the DFFI from the Dragon Family as detailed *supra*, and ultimately absconding with the DFFI when the attempts to bribe KEENAN were unsuccessful.

181.    In furtherance of the aforesaid civil conspiracy, defendant BRUNO, acting within his capacity and authority as the Director responsible for the Financial Services Industry Group of the defendant WEF and/or WEF USA in its New York City offices, intentionally participated in the furtherance of the plan by offering KEENAN a $100 Million USD bribe to be split with DAL BOSCO in an effort to obtain his participation and cooperation in the theft of the DFFI from the Dragon Family and by speaking to and meeting with acquaintances of KEENAN, including Raykov and Marinov in an effort to obtain their assistance in convincing KEENAN to participate in the scheme to convert the DFFI.

182.    Upon information and belief, in furtherance of the aforesaid civil conspiracy, defendants BRUNO, acting within his capacity and authority as the Director responsible for the

80

Financial Services Industry Group of the defendant WEF and/or WEF USA in its New York City

offices, defendants RAGAGLINI, MARACHIAN, BERLUSCONI, the ITALIAN FINANCIAL

POLICE, the ITALIAN REPUBLIC, BAN KI-moon, the UNITED NATIONS and other

unknown individual co-conspirators acting on behalf of defendants the ITALIAN FINANCIAL

POLICE, the ITALIAN REPUBLIC and the UNITED NATIONS intentionally participated in

the furtherance of the conspiracy by planning, negotiating, developing and facilitating the

creation of a UN Sovereign Program for the investment of the stolen DFFI.  Said defendants'

actions in this regard also furthered the conspiracy in that said defendants, in an effort to obtain

KEENAN's cooperation in the conspiracy to convert the DFFI, repeatedly misrepresented to

KEENAN and his acquaintances as detailed *supra*, that by acting in conjunction with the WEF

and/or WEF USA, the ITALIAN FINANCIAL POLICE, the ITALIAN REPUBLIC  and the

UNITED NATIONS, all of the individual co-conspirators' illegal actions would be protected

under the umbrella of sovereign immunity.

      183.    KEENAN has suffered serious financial detriment on account of and as a direct

proximate result of the civil conspiracy to expropriate and convert the DFFI and, at a minimum,

defendants DAL BOSCO, BERLUSCONI, RAGAGLINI, MIRACHIAN, the ITALIAN

FINANCIAL POLICE, the ITALIAN REPUBLIC, BAN KI-moon, the UNITED NATIONS,

BRUNO, WEF and/or WEF USA are jointly and severally liable for the full value of the DFFI

and all of its accumulated interest, with interest.  Said defendants are also jointly and severally

liable for KEENAN's lost profits from the fees to which he was entitled for performing his

services for the Dragon Family with respect to coordinating the placement of the DFFI into an

approved trading program.

184.    Consequently, KEENAN has been damaged by the civil conspiracy to expropriate

and convert the DFFI by defendants DAL BOSCO, BERLUSCONI, RAGAGLINI,

MIRACHIAN, the ITALIAN FINANCIAL POLICE, the ITALIAN REPUBLIC, BAN KI-

moon, the UNITED NATIONS, BRUNO, WEF and/or WEF USA and has sustained damage in a

sum to be determined at trial, but believed to be in excess of One Trillion

($1,000,000,000,000.00) US dollars.

### AS AND FOR A THIRD CAUSE OF ACTION AGAINST DEFENDANTS DAL BOSCO, SALE, DAM AND OITC,
[Civil Conspiracy to Expropriate and Convert the DFFI under Federal Common Law and International Law]

185.    Plaintiff repeats and realleges each of the allegations contained in paragraphs 1

through 184 of the Complaint with the same force and effect as though fully set forth herein.

186.    Upon information and belief, DAL BOSCO, as early as January 2009, had

discussions with defendant OITC and its President, defendant SALE, who was acting with the

knowledge of and under the authority of defendant DAM, to discuss various fraudulent schemes,

options and/or alternative actions DAL BOSCO and the other defendants, including OITC,

SALE and DAM, would take with respect to bribing KEENAN or otherwise defrauding

KEENAN into relinquishing control of and ultimate defalcation of the DFFI, which were then to

be traded under DAM's Federal Reserve Master Commitment Holder Trading License.  As a

result of these discussions, defendants OITC, SALE and DAM knowingly and voluntarily agreed

to participate in this scheme to unlawfully steal and convert the DFFI from KEENAN.

According to recently published admissions by defendant SALE, DAL BOSCO admittedly

contacted OITC no later than February 2010, and entered into a written contract with OITC no

later than March 2010, whereby said parties agreed to steal and convert the DFFI, which had

been temporarily entrusted to DAL BOSCO, in complete contravention of DAL BOSCO's oral

and written representations, as well as all fiduciary duties concomitant with such representations.

187.    In furtherance of the aforesaid civil conspiracy defendants SALE and DAM,

acting on behalf of defendant OITC, intentionally participated in the furtherance of the plan by

taking the position that the DFFI stolen and converted by DAL BOSCO were, in fact, the

"property" of OITC rather than the Dragon Family, thereby enabling DAL BOSCO to perpetuate

his fraud and convert the DFFI.  Said acts in furtherance of the civil conspiracy include the

following statements and/or actions of OITC, through SALE and DAM:

> (1) Issuing the OITC Order of June 8, 2010, on behalf of DAM stating: (a) DAM was appointed as international Treasury Controller under United Nations Charter Control No: 10-60847; (b) that the DFFI were, in fact, the property of the International Collateral Accounts of the Global Debt Facility which are legally owned by His Excellency, Ray C. DAM, International Treasury Controller"; (c) directing KEENAN and Yamaguchi to surrender the DFFI on or before July 7, 2010;

> (2) Sending the June 10, 2010 letter via email to KEENAN "strongly advising" him not to ignore the OITC Order and to "adhere" to its content; and

> (3) Misrepresenting in writing to KEENAN that "Our ownership of the Dragon Funds being part of the Combined International Collateral Accounts of the Global Debt Facility, and our international status combined with our International Authority as granted, attested to, and formally issued by the Nations of the World" and warning that that the "impertinent mannerisms" in which KEENAN had allegedly "approached this matter" would not be tolerated as it shows "an insulting and arrogant attitude towards a Sovereign Entity which is legally chartered under the United Nations and recognized by all Nations. . ."; and

> (4) Advising DAL BASCO that all conspirators could rely upon the "immunity" enjoyed by OITC for many years in reliance upon the umbrella of protection afforded by its relationship with the UN.

188.    KEENAN has suffered serious financial detriment on account of and as a direct

proximate result of the civil conspiracy to expropriate and convert the DFFI and, at a minimum,

defendants DAL BOSCO, SALE, DAM and OITC are jointly and severally liable for the full

value of the DFFI and all of its accumulated interest, with interest.  Defendants DAL BOSCO,

SALE, DAM and OITC are also jointly and severally liable for KEENAN's lost profits from the

fees to which he was entitled for performing his services for the Dragon Family with respect to

coordinating the placement of the DFFI into an approved trading program.

189.    Consequently, KEENAN has been damaged by the civil conspiracy to expropriate

and convert the DFFI by defendants DAL BOSCO, SALE, DAM and OITC and has sustained

damage in a sum to be determined at trial, but believed to be in excess of One Trillion

($1,000,000,000,000.00) US dollars.

### AS AND FOR A FOURTH CAUSE OF ACTION AGAINST DEFENDANTS DAL BOSCO, BERLUSCONI, RAGAGLINI, MIRACHIAN, ITALIAN FINANCIAL POLICE, ITALIAN REPUBLIC, BAN KI-moon, UNITED NATIONS, BRUNO, WEF and WEF USA, [Aiding and Abetting the Expropriation and Conversion of the DFFI under Federal Common Law and International Law]

190.    Plaintiff repeats and realleges each of the allegations contained in paragraphs 1

through 189 of the Complaint with the same force and effect as though fully set forth herein.

191.    The actions of defendants DAL BOSCO, BERLUSCONI, RAGAGLINI,

MIRACHIAN, the ITALIAN FINANCIAL POLICE, the ITALIAN REPUBLIC, BAN KI-

moon, the UNITED NATIONS, BRUNO, WEF and/or WEF USA violate any and all notions of

*jus cogens*, a body of peremptory principles of customary and universal international law

recognized by civilized nations.  At a minimum, the actions of said defendants constitute a

knowing and willful participation to aid and abet the theft and conversion of the DFFI, valued at

approximately ONE TRILLION UNITED STATES DOLLARS, which theft and conversion was

carried out by defendant DAL BOSCO, who personally absconded with the DFFI.

84

192.    Upon information and belief, defendant BRUNO, acting within his capacity and authority as the Director responsible for the Financial Services Industry Group of the defendant WEF and/or WEF USA in its New York City offices, defendants RAGAGLINI, MARACHIAN, and BERLUSCONI, the ITALIAN FINANCIAL POLICE, the ITALIAN REPUBLIC, BAN KI-moon, the UNITED NATIONS and other unknown individual co-conspirators acting on behalf of and with the approval of defendants the ITALIAN FINANCIAL POLICE, the ITALIAN REPUBLIC and the UNITED NATIONS, with knowledge of the planned theft and conversion of the DFFI from its true and rightful owners, and for the express purpose of facilitating the conversion of the DFFI from its true and rightful owners, provided substantial assistance in the expropriation and conversion of the DFFI from KEENAN by planning, negotiating, developing and facilitating the creation of a UN Sovereign Program for the investment of the DFFI purportedly under the umbrella of the ITALIAN REPUBLIC's and the UNITED NATION's sovereign immunity.  In doing so, these defendants provided practical assistance, encouragement and moral support to the expropriation and conversion of the DFFI from KEENAN.

193.    The substantial assistance and complicity of defendants BRUNO, WEF and/or WEF USA, RAGAGLINI, MARACHIAN, BERLUSCONI, the ITALIAN FINANCIAL POLICE, the ITALIAN REPUBLIC, BAN KI-moon, the UNITED NATIONS and other unknown individual co-conspirators acting on behalf of and with the approval of defendants the WEF and/or WEF USA, the ITALIAN FINANCIAL POLICE, the ITALIAN REPUBLIC and the UNITED NATIONS in the theft and conversion of the DFFI is further illustrated by the following acts performed with knowledge of the planned theft and conversion of the DFFI from its true and rightful owners, and for the express purpose of providing substantial assistance in the conversion of the DFFI from its true and rightful owners:

85

(1)     Defendant UNITED NATIONS knowingly and actively participated in the conversion of the DFFI stolen by DAL BOSCO when it agreed to offer a bribe to KEENAN in the amount of $100 Million USD in an effort to obtain KEENAN's cooperation in the conversion of the DFFI, for its own benefit, those of its representatives, including defendants BAN KI-moon, for the benefit of defendants the  ITALIAN REPUBLIC and its representatives, including defendants BERLUSCONI, RAGAGLINI, MIRACHIAN and the ITALIAN FINANCIAL POLICE, and for the benefit of the WEF and/or WEF USA, and its representative, defendants BRUNO, and for the benefit of others presently unknown, who participated in and aided and abetted the criminal enterprise.

(2)     As part of the criminal enterprise and scheme, defendant DAL BOSCO made contact with high level UN officials through the assistance of defendants BRUNO and the WEF and/or WEF USA, and as a result defendants the UNITED NATIONS and BAN KI-moon knowingly and actively approved the purchase of the DFFI, which it knew had been stolen by DAL BOSCO, not only for the purpose of aiding and abetting the conspiracy, but entered into the scheme with the avowed purpose of further concealing the theft and actively engaging in the conversion of the DFFI by:  (1) purchasing the DFFI then in the possession of DAL BOSCO who had breached his fiduciary duties to KEENAN as temporary custodian of the DFFI by converting the DFFI; (2) offering to pay the sum of $100 Million USD for the release of the DFFI; (3) placing the stolen DFFI into a Sovereign Program for its own financial benefit; (4) all of the above to be accomplished without the knowledge of the Legal Holders of the DFFI, the Dragon Family.

(3)     The complicity of defendants the WEF and/or WEF USA, the UNITED NATIONS, the ITALIAN FINANCIAL POLICE and the ITALIAN REPUBLIC is apparent from the telephone conference call placed to BRUNO by DAL BOSCO on a speaker phone in the VIP Room of the Hotel Zurich in Switzerland in early February 2010.  Such call was made via international telephone communication between DAL BOSCO and defendant BRUNO, of the WEF and/or WEF USA, who, upon information and belief, participated from New York, New York wherein the participation and approval of the UNITED NATIONS was described in detail by BRUNO, who represented that he could "put 100 Million Dollars into KEENAN's hands if KEENAN agreed [to release the DFFI in contravention of the Dragon Family's rights in the same]." After this call, Vasil Ganov, who had been present for the call inquired of what DAL BOSCO would receive from the "transaction." DAL BOSCO stated that he would receive half of the $100 Million USD offered to KEENAN for his assistance, which he indicated would be placed into a Sovereign Program by the UN and that they would receive 200% monthly returns minimum from the total "investment." DAL BOSCO refused to comment on how much defendants the UN, WEF and/or WEF USA, BRUNO and OITC would receive from the transaction, indicating that such an inquiry "can only cause trouble." DAL

BOSCO did, however, indicate that the stolen Notes would be placed into a "Sovereign Program by the UN," and upon completion would be returned to their rightful "owners," which he indicated was the OITC.  DAL BOSCO further informed Ganov that "everyone was protected by the ITALIAN FINANCIAL POLICE and the Italian Government itself."

(4)     This complicity is also corroborated by the international telephone communication between DAL BOSCO and BRUNO, as overheard and described by Nikolay Raykov during his trip to the Zurich airport with DAL BOSCO following the telephone conference speaker call described above, and by Raykov's other interactions with DAL BOSCO and BRUNO.  In the telephone conversation, BRUNO represented to Raykov that the DFFI would "be placed into a federal program using the UN as protection" along with "his company" referring to the WEF and/or WEF USA, which would "generate unlimited capital for everyone involved."  According to BRUNO, "there would be no problems and that this was being blessed by the UNITED NATIONS" which "would protect everyone" as the DFFI would be "placed into a Sovereign Program" after which the DFFI "would disappear" and "there would be no questions asked."  In a subsequent telephone call between Raykov and BRUNO, which took place while both parties were in New York, BRUNO advised Raykov that DAL BOSCO had absconded with the DFFI and that "now more than ever" Raykov was needed to convince KEENAN to cooperate in the conspiracy to deprive the Dragon Family of its interest in the DFFI.  At a subsequent meeting between Raykov, BRUNO and DAL BOSCO at the Balexert Mall in Switzerland in May 2010, BRUNO commented that KEENAN "was stupid for not taking the 100 Million U.S. Dollars" and that "things had been in the planning stages for a while and were about to be completed with or without KEENAN."  BRUNO again requested Raykov's assistance in convincing KEENAN to participate in the scheme.  When Raykov indicated that KEENAN would not listen to him, BRUNO exclaimed, "Not even for 500 Million U.S. Dollars?"  BRUNO then encouraged Raykov to call him at his New York office of the WEF USA to speak about the matter further.

(5)     Defendants' complicity was further corroborated during the course of the meeting between DAL BOSCO, BRUNO and Miranov at the Balexert mall in Switzerland in May 2010.  At this meeting, defendant BRUNO explained who was involved in the conspiracy to convert the DFFI, specifically naming defendants RAGAGLINI, MIRACHIAN, BERLUSCONI, and the ITALIAN FINANCIAL POLICE, stating: "so you see there is no possible way we can have a problem.  We can cloak ourselves with the immunity shield and everyone will go away.  Just another day in the UN!"  During this meeting held for the purpose of convincing Miranov to assist the defendants in their theft, a telephone call was received from defendant H.E. Ambassador MIRACHIAN, Permanent Representative of the Italian Mission to the UN in Geneva, who confirmed the direct knowledge and approval of the UNITED NATIONS Secretary General,

87

BAN KI-moon stating:  (i) "from the very top we were protected"; (ii) "there is no reason for anyone, including KEENAN, to worry about any sort of repercussions"; (iii) "the Italian cohorts in New York had even approved the matter with Secretary General BANK KI-moon" whom she expressly acknowledged "would deny he knew anything about it."

194.    KEENAN has suffered serious financial detriment on account of and as a direct and proximate result of defendants' acts aiding and abetting the expropriation and conversion of the DFFI and, at a minimum, defendants DAL BOSCO, BERLUSCONI, RAGAGLINI, MIRACHIAN, the ITALIAN FINANCIAL POLICE, the ITALIAN REPUBLIC, BAN KI-moon, the UNITED NATIONS, BRUNO, WEF and/or WEF USA are jointly and severally liable for the full value of the DFFI and all of its accumulated interest, with interest.  Defendants DAL BOSCO, BERLUSCONI, RAGAGLINI, MIRACHIAN, the ITALIAN FINANCIAL POLICE, the ITALIAN REPUBLIC, BAN KI-moon, the UNITED NATIONS, BRUNO, WEF and/or WEF USA are also jointly and severally liable for KEENAN's lost profits from the fees to which he was entitled for performing his services for the Dragon Family with respect to coordinating the placement of the DFFI into an approved trading program.

195.    Consequently, KEENAN has been damaged by the actions of defendants DAL BOSCO, BERLUSCONI, RAGAGLINI, MIRACHIAN, the ITALIAN FINANCIAL POLICE, the ITALIAN REPUBLIC, BAN KI-moon, the UNITED NATIONS, BRUNO, WEF and/or WEF USA aiding and abetting the expropriation and conversion of the DFFI and has sustained damage in a sum to be determined at trial, but believed to be in excess of One Trillion ($1,000,000,000,000.00) US dollars.

**AS AND FOR A FIFTH CAUSE OF ACTION AGAINST DEFENDANTS**
**DAL BOSCO, SALE, DAM, OITC, and UNITED NATIONS,**
**[Aiding and Abetting the Expropriation and Conversion of the DFFI under Federal Common Law and International Law]**

88

196.    Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 195 of the Complaint with the same force and effect as though fully set forth herein.

197.    The actions of defendants DAL BOSCO, SALE, DAM, OITC and the UNITED NATIONS violate any and all notions of *jus cogens*, a body of peremptory principles of customary and universal international law recognized by civilized nations.  At a minimum, the actions of said defendants constitute a knowing and willful participation to aid and abet the theft and conversion of the DFFI, valued at approximately ONE TRILLION UNITED STATES DOLLARS, which theft and conversion was carried out by defendant DAL BOSCO, who personally absconded with the DFFI.

198.    Defendants SALE and DAM acting on behalf of defendant OITC, with knowledge of the planned theft and conversion of the DFFI from its true and rightful owners, and for the express purpose of facilitating the conversion of the DFFI from its true and rightful owners, provided substantial assistance in the expropriation and conversion of the DFFI from KEENAN by taking the position that the DFFI stolen and converted by DAL BOSCO were in fact the "property" of OITC rather than the Dragon Family, thereby enabling DAL BOSCO to perpetuate his fraud and convert the DFFI.  In doing so, these defendants provided practical assistance, encouragement and moral support to the expropriation and conversion of the DFFI from KEENAN.  Said acts in substantial assistance to the conversion of the DFFI from KEENAN, which were made with knowledge of and for the purpose of facilitating the conversion of the DFFI, include the following statements and/or actions of OITC, through SALE and DAM:

(1)    issuing the OITC Order of June 8, 2010, on behalf of DAM stating: (a) DAM was appointed as international Treasury Controller under United Nations Charter Control No: 10-60847; (b) that the DFFI were, in fact, the

89

property of the International Collateral Accounts of the Global Debt Facility which are legally owned by His Excellency, Ray C. DAM, International Treasury Controller; (c) directing KEENAN and Yamaguchi to surrender the DFFI on or before July 7, 2010.

(2    Sending the June 10, 2010 letter via email to KEENAN "strongly advising" him not to ignore the OITC Order and to "adhere" to its content; and

(3    Misrepresenting in writing to KEENAN that "Our ownership of the Dragon Funds being part of the Combined International Collateral Accounts of the Global Debt Facility, and our international status combined with our International Authority as granted, attested to, and formally issued by the Nations of the World" and warning that that the "impertinent mannerisms" in which KEENAN had allegedly "approached this matter" would not be tolerated as it shows "an insulting and arrogant attitude towards a Sovereign Entity which is legally chartered under the United Nations and recognized by all Nations. . ."; and

(4    Advising DAL BASCO that all conspirators could rely upon the "immunity" enjoyed by OITC for many years in reliance upon the umbrella of protection afforded by its relationship with the UN.

199.    The UNITED NATIONS has been complicit in the nefarious and fraudulent activities of OITC in that it has never formally denounced or disassociated itself from OITC, and has allowed OITC to hold itself out to the world community as protected by its umbrella of legitimacy and chartered by the UNITED NATIONS itself.  Upon information and belief, defendant the UNITED NATIONS, with knowledge of the planned theft and conversion of the DFFI from its true and rightful owners, and for the express purpose of facilitating the conversion of the DFFI from its true and rightful owners, provided substantial assistance in the expropriation and conversion of the DFFI from KEENAN by allowing and actively encouraging the OITC to represent itself as affiliated with and charted by the UNITED NATIONS in OITC's efforts to convince KEENAN to release the DFFI to defendants on the purported basis that the DFFI belonged to OITC rather than the Dragon Family.

90

200.    KEENAN has suffered serious financial detriment on account of and as a direct and proximate result of the action of defendants DAL BOSCO, SALE, DAM, OITC and the UNITED NATIONS aiding and abetting the expropriation and conversion of the DFFI and, at a minimum, said defendants are jointly and severally liable for the full value of the DFFI and all of its accumulated interest, with interest.  Defendants DAL BOSCO, SALE, DAM, OITC and the UNITED NATIONS are also jointly and severally liable for KEENAN's lost profits from the fees to which he was entitled for performing his services for the Dragon Family with respect to coordinating the placement of the DFFI into an approved trading program.

201.    Consequently, KEENAN has been damaged by the actions of defendants DAL BOSCO, SALE, DAM, OITC and the UNITED NATIONS aiding and abetting the expropriation and conversion of the DFFI and has sustained damage in a sum to be determined at trial, but believed to be in excess of One Trillion ($1,000,000,000,000.00) US dollars.

### AS AND FOR A SIXTH CAUSE OF ACTION AGAINST DEFENDANT DAL BOSCO
**[Fraud under Federal Common Law and International Law]**

202.    Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 201 of the Complaint with the same force and effect as though fully set forth herein.

203.    As described in more detail *supra*, DAL BOSCO arranged to meet with KEENAN in July 2009 for the conscious purpose of gaining his trust and confidence with the intention of fraudulently inducing KEENAN to transfer custodianship and control of the DFFI in order that DAL BOSCO and his co-conspirators could unjustly enrich themselves for their own personal benefit and utterly to the detriment of KEENAN and the Dragon Family.

204.    At all relevant times, DAL BOSCO's intention was to knowingly assume control and exercise ownership over the DFFI in contravention of the rights of KEENAN and the

Dragon Family and to utilize the DFFI in various selfish and unlawful ways, including the pronouncement by OITC through its unlawful Cease and Desist Order of its alleged legal ownership of the DFFI and further criminal actions as described herein

205.    Despite DAL BOSCO's knowledge and intent to abscond with the DFFI for his own personal benefit and the benefit of his co-conspirators, he falsely misrepresented to KEENAN, as set forth both orally and in his written ACCEPTANCE of September 9, 2009, made for the express purpose of inducing KEENAN to rely upon them, as follows:  (1) "I can assure you that you will never regret making this decision"; (2) "You are aware of the fact I am well trusted and a financial advisor within the Vatican and Mason circles and would never jeopardize my position with them for anything"; (3) "My word is my bond and my word is Gold"; (4) "I will be waiting for your Zurich arrival so that we can do great things for the world"; (5) "I understand clearly that I am not to discuss these bonds with anyone outside the immediate circle and my privacy is integral to the success of many nations"; (6) "I further understand you are the authorized representative and Power of Attorney for said bonds and I will entrust them believe me as though it was my life depending on it.  Therefore I humbly accept the custodianship of said Bonds in which I am only to return them to either you or Mr. Yamaguchi. Not any other !"; (7) "although electronic this email is to be considered my legal binding acceptance of the following bonds (bonds listed)"; (8) "Will be ready when called upon to deliver said notes to you."

206.    KEENAN reasonably and justifiably relied, to his severe personal detriment, on the knowingly false material misrepresentations of DAL BOSCO set forth above, as well as the numerous material oral misrepresentations of a similar or identical nature made by DAL BOSCO between July and September 2009 set forth in detail in the Complaint at paragraphs 70 through

82, and KEENAN transferred custody of the DFFI to DAL BOSCO on or about September 18, 2009 on the basis of said misrepresentations.

207.    Defendant DAL BOSCO deliberately made such misrepresentations in order to induce plaintiff KEENAN to rely on said misrepresentations and convince KEENAN to transfer custody of the DFFI to him. KEENAN has suffered serious financial detriment on account of and as a direct and proximate result of defendant DAL BOSCO's fraud and, at a minimum, DAL BOSCO is liable for the full value of the DFFI and all of its accumulated interest, with interest. DAL BOSCO is also liable for KEENAN's lost profits from the fees to which he was entitled for performing his services for the Dragon Family with respect to coordinating the placement of the DFFI into an approved trading program.

208.    Consequently, DAL BOSCO's intentional failure to return the DFFI, which were entrusted to him by KEENAN on the basis of his numerous misrepresentations, has caused severe financial detriment to KEENAN.  Consequently, KEENAN has sustained damage in a sum to be determined at trial, but believed to be in excess of One Trillion ($1,000,000,000,000.00) US dollars.

### AS AND FOR A SEVENTH CAUSE OF ACTION AGAINST DEFENDANTS DAL BOSCO, BERLUSCONI, RAGAGLINI, MIRACHIAN, ITALIAN FINANCIAL POLICE, ITALIAN REPUBLIC, BAN KI-moon, UNITED NATIONS, BRUNO, WEF and WEF USA,
### [Civil Conspiracy to Commit Fraud under Federal Common Law and International Law]

209.    Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 208 of the Complaint with the same force and effect as though fully set forth herein.

210.    Upon information and belief, defendants DAL BOSCO, BERLUSCONI, the ITALIAN FINANCIAL POLICE, and the ITALIAN REPUBLIC entered into an agreement whereby each party knowingly and voluntarily agreed to participate in a scheme to steal certain

financial instruments for the purpose of profiting from this theft of financial instruments.  As part

of this scheme, defendants DAL BOSCO, BERLUSCONI, the ITALIAN FINANCIAL POLICE,

and the ITALIAN REPUBLIC knowingly and voluntarily agreed to defraud KEENAN of the

DFFI.  Among the prospective unlawful uses planned for the DFFI by said defendants was the

purchase of a Swiss Bank, such as Banco Commerciale di Lugano, or any other Swiss Bank into

which they could immediately move all stolen assets, including the DFFI.

      211.    Upon information and belief, sometime thereafter, defendants BRUNO and the

WORLD ECONOMIC FORUM and/or the WORLD ECONOMIC FORUM USA, INC.

knowingly and voluntarily agreed to participate in this scheme to assist DAL BOSCO in his

effort to obtain the DFFI from KEENAN through various acts of fraud.  Defendants BRUNO and

the WEF and/or WEF USA further knowingly and voluntarily agreed to utilize their connections

within the defendant UNITED NATIONS to set up Sovereign Programs for the investment of the

unlawfully obtained financial instruments that they knew to be either stolen or seized under color

of police authority of the ITALIAN FINANCIAL POLICE or unlawfully obtained by others, and

which included the DFFI, to the profit of all the co-conspirators.  Among the prospective

unlawful uses planned for the DFFI by said defendants was the purchase of a Swiss Bank, such

as Banco Commerciale di Lugano, into which the DFFI, in combination with other stolen or

seized assets, could be deposited and traded for the profit of said co-conspirators.

      212.    Upon information and belief, thereafter BRUNO, acting within his authority as

the Director responsible for the Financial Services Industry Group of the defendant WEF and/or

WEF USA in its New York City offices, and defendants BERLUSCONI, H.E. Ambassador

CESARE MARIA RAGAGLINI, Permanent Representative of the Italian Mission to the UN in

New York, H.E. Ambassador LAURA MIRACHIAN, Permanent Representative of the Italian

Mission to the UN in Geneva, defendant BAN KI-moon, Secretary-General of the United

Nations, and other unknown representatives of defendants the ITALIAN REPUBLIC, the

ITALIAN FINANCIAL POLICE and the UNITED NATIONS procured an agreement entered

into knowingly and voluntarily by the foregoing defendants whereby the unlawfully obtained

financial instruments that said defendants knew to be either stolen or seized under color of police

authority of the ITALIAN FINANCIAL POLICE or unlawfully obtained by others, and which

included the DFFI to be obtained by DAL BOSCO's fraud, would be invested in a "Sovereign

Program" wholly under the auspices, protection and umbrella of the "sovereign immunity"

allegedly accorded to the UNITED NATIONS and the ITALIAN REPUBLIC.

213.    Upon information and belief, and in furtherance of the aforesaid civil conspiracy

to defraud, defendants the ITALIAN FINANCIAL POLICE and the ITALIAN REPUBLIC

intentionally participated in the furtherance of the plan by seizing the DF Chiasso Instruments in

an amount approximating $134.5 Billion U.S. Dollars from Dragon Family representatives

Yamaguchi and Watanabe.  This seizure of the DF Chiasso Instruments, which incident was

described in detail *supra*, was then utilized by the defendant co-conspirators as a pretext for

introducing DAL BOSCO to KEENAN for the purpose of convincing KEENAN, through

numerous misrepresentations detailed *supra* that it would be wise to entrust custody of the DFFI

to DAL BOSCO in order to avoid a similar incident from occurring with respect to the DFFI.

214.    Upon information and belief, and in furtherance of the aforesaid civil conspiracy

to defraud KEENAN, defendant DAL BOSCO intentionally participated in the furtherance of the

plan by making knowingly false material representations to KEENAN for the purposes of

inducing KEENAN to relinquish custody of the DFFI into DAL BOSCO's possession,

orchestrating and participating in the numerous attempts to bribe KEENAN in an effort to induce

95

KEENAN to participate in the fraudulent scheme as detailed *supra*, and ultimately by absconding with the DFFI when the attempts to bribe KEENAN were unsuccessful.

215.   In furtherance of the aforesaid civil conspiracy to defraud KEENAN, defendant BRUNO, acting within his capacity and authority as the Director responsible for the Financial Services Industry Group of the defendant WEF and/or WEF USA in its New York City offices, intentionally participated in the furtherance of the plan by offering KEENAN a $100 Million USD bribe to be split with DAL BOSCO in an effort to obtain his participation and cooperation in the fraudulent scheme and by speaking to and meeting with acquaintances of KEENAN, including Raykov and Marinov in an effort to obtain their assistance in convincing KEENAN to participate in their fraudulent scheme.

216.   Upon information and belief, in furtherance of the aforesaid civil conspiracy to defraud KEENAN, defendants BRUNO, acting within his capacity and authority as the Director responsible for the Financial Services Industry Group of the defendant WEF and/or WEF USA in its New York City offices, defendants RAGAGLINI, MARACHIAN, and BERLUSCONI, the ITALIAN FINANCIAL POLICE, the ITALIAN REPUBLIC, BAN KI-moon, the UNITED NATIONS and other unknown individual co-conspirators acting on behalf of defendants the ITALIAN FINANCIAL POLICE, the ITALIAN REPUBLIC and the UNITED NATIONS intentionally participated in the furtherance of the conspiracy by planning, negotiating, developing and facilitating the creation of a UN Sovereign Program for the investment of the DFFI to be fraudulently obtained from KEENAN.  Said defendants actions in this regard also furthered the conspiracy to defraud KEENAN in that said defendants, in an effort to obtain KEENAN's cooperation in the fraudulent scheme, repeatedly misrepresented to KEENAN and his acquaintances as detailed *supra*, that by acting in conjunction with the WEF, WEF USA, the

96

ITALIAN FINANCIAL POLICE, the ITALIAN REPUBLIC  and the UNITED NATIONS, all of the individual co-conspirators' illegal actions would be protected under the umbrella of sovereign immunity.

217.    KEENAN has suffered serious financial detriment on account of and as a direct proximate result of the civil conspiracy to defraud KEENAN of the DFFI and, at a minimum, defendants DAL BOSCO, BERLUSCONI, RAGAGLINI, MIRACHIAN, the ITALIAN FINANCIAL POLICE, the ITALIAN REPUBLIC, BAN KI-moon, the UNITED NATIONS, BRUNO, WEF and/or WEF USA are jointly and severally liable for the full value of the DFFI and all of its accumulated interest, with interest.  Defendants DAL BOSCO, BERLUSCONI, RAGAGLINI, MIRACHIAN, the ITALIAN FINANCIAL POLICE, the ITALIAN REPUBLIC, BAN KI-moon, the UNITED NATIONS, BRUNO, WEF and/or WEF USA are also jointly and severally liable for KEENAN's lost profits from the fees to which he was entitled for performing his services for the Dragon Family with respect to coordinating the placement of the DFFI into an approved trading program.

218.    Consequently, KEENAN has been damaged by the civil conspiracy to defraud him of the DFFI by defendants DAL BOSCO, BERLUSCONI, RAGAGLINI, MIRACHIAN, the ITALIAN FINANCIAL POLICE, the ITALIAN REPUBLIC, BAN KI-moon, the UNITED NATIONS, BRUNO, WEF and/or WEF USA and has sustained damage in a sum to be determined at trial, but believed to be in excess of One Trillion ($1,000,000,000,000.00) US dollars.

## AS AND FOR A EIGHTH CAUSE OF ACTION AGAINST
## DEFENDANTS DAL BOSCO, SALE, DAM AND OITC,
### [Civil Conspiracy to Commit Fraud under Federal Common Law and International Law]

219.   Plaintiff repeats and realleges each of the allegations contained in paragraphs 1

through 218 of the Complaint with the same force and effect as though fully set forth herein.

220.   Upon information and belief, DAL BOSCO, possibly as early as January 2009,

had discussions with defendant OITC and its President, defendant SALE, who was acting with

the knowledge of and under the authority of defendant DAM, to discuss various fraudulent

schemes, options and/or alternative actions DAL BOSCO and the other defendants, including

OITC, SALE and DAM, would take with respect to bribing KEENAN or otherwise defrauding

KEENAN into relinquishing control of and ultimate defalcation of the DFFI, which were then to

be traded under DAM's Federal Reserve Master Commitment Holder Trading License.  As a

result of these discussions, defendants OITC, SALE and DAM knowingly and voluntarily agreed

to participate in this scheme to participate in this scheme to obtain the DFFI from KEENAN by

fraud.  According to recently published admissions by defendant SALE, DAL BOSCO

admittedly contacted OITC no later than February 2010, and entered into a written contract with

OITC no later than March 2010, whereby said parties agreed to assist DAL BOSCO in the

fraudulent scheme to abscond with the DFFI for the enrichment of all co-conspirators.

221.   In furtherance of the aforesaid civil conspiracy to defraud KEENAN, defendants

SALE and DAM, acting on behalf of defendant OITC, intentionally participated in the

furtherance of the plan by taking the position that the DFFI stolen and converted by DAL

BOSCO were, in fact, the "property" of OITC rather than the Dragon Family, thereby enabling

DAL BOSCO to perpetuate his fraud and convert the DFFI.  Said acts in furtherance of the civil

conspiracy include the following statements and/or actions of OITC, through SALE and DAM:

98

(1)    Issuing the OITC Order of June 8, 2010, on behalf of DAM stating: (a) DAM was appointed as International Treasury Controller under United Nations Charter Control No: 10-60847; (b) that the DFFI were, in fact, the property of the International Collateral Accounts of the Global Debt Facility which are legally owned by His Excellency, Ray C. DAM, International Treasury Controller"; (c) directing KEENAN and Yamaguchi to surrender the DFFI on or before July 7, 2010;

(2)    Sending the June 10, 2010 letter via email to KEENAN "strongly advising" him not to ignore the OITC Order and to "adhere" to its content;

(3)    Misrepresenting in writing to KEENAN that "Our ownership of the Dragon Funds being part of the Combined International Collateral Accounts of the Global Debt Facility, and our international status combined with our International Authority as granted, attested to, and formally issued by the Nations of the World" and warning that that the "impertinent mannerisms" in which KEENAN had allegedly "approached this matter" would not be tolerated as it shows "an insulting and arrogant attitude towards a Sovereign Entity which is legally chartered under the United Nations and recognized by all Nations. . ."; and

(4)    Advising DAL BASCO that all conspirators could rely upon the "immunity" enjoyed by OITC for many years in reliance upon the umbrella of protection afforded by its relationship with the UN.

222.    KEENAN has suffered serious financial detriment on account of and as a direct proximate result of the civil conspiracy to defraud KEENAN of the DFFI and, at a minimum, defendants DAL BOSCO, SALE, DAM and OITC are jointly and severally liable for the full value of the DFFI and all of its accumulated interest, with interest.  Defendants DAL BOSCO, SALE, DAM and OITC are also jointly and severally liable for KEENAN's lost profits from the fees to which he was entitled for performing his services for the Dragon Family with respect to coordinating the placement of the DFFI into an approved trading program.

223.    Consequently, KEENAN has been damaged by the civil conspiracy to defraud him of the DFFI by defendants DAL BOSCO, SALE, DAM and OITC and has sustained damage in a sum to be determined at trial, but believed to be in excess of One Trillion ($1,000,000,000,000.00) US dollars.

**AS AND FOR A NINTH CAUSE OF ACTION AGAINST DEFENDANTS
DAL BOSCO, BERLUSCONI, RAGAGLINI, MIRACHIAN,
ITALIAN FINANCIAL POLICE, ITALIAN REPUBLIC,
BAN KI-moon, UNITED NATIONS, BRUNO, WEF and WEF USA,**
[Aiding and Abetting Dal Bosco's Fraud under Federal Common Law and International
Law]

224.    Plaintiff repeats and realleges each of the allegations contained in paragraphs 1

through 223 of the Complaint with the same force and effect as though fully set forth herein.

225.    The actions of Defendants DAL BOSCO, BERLUSCONI, RAGAGLINI,

MIRACHIAN, the ITALIAN FINANCIAL POLICE, the ITALIAN REPUBLIC, BAN KI-

moon, the UNITED NATIONS, BRUNO, WEF and WEF USA violate any and all notions of *jus*

*cogens*, a body of peremptory principles of customary and universal international law recognized

by civilized nations.  At a minimum, the actions of said defendants constitute a knowing and

willful participation to aid and abet the defrauding of KEENAN of the DFFI, valued at

approximately ONE TRILLION UNITED STATES DOLLARS, which fraud was completed by

defendant DAL BOSCO, who personally obtained the DFFI from KEENAN through fraudulent

misrepresentations.

226.    Upon information and belief, defendant BRUNO, acting within his capacity and

authority as the Director responsible for the Financial Services Industry Group of the defendant

WEF and/or WEF USA in its New York City offices, defendants RAGAGLINI, MARACHIAN,

and BERLUSCONI, the ITALIAN FINANCIAL POLICE, the ITALIAN REPUBLIC, BAN KI-

moon, the UNITED NATIONS and other unknown individual co-conspirators acting on behalf

of and with the approval of defendants the ITALIAN FINANCIAL POLICE, the ITALIAN

REPUBLIC and the UNITED NATIONS, with knowledge of the plan to fraudulently obtain the

DFFI, and for the express purpose of facilitating said fraud, provided substantial assistance to the

100

fraudulent scheme by planning, negotiating, developing and facilitating the creation of a UN

Sovereign Program for the investment of the DFFI to be fraudulently obtained from Keenan. In

further substantial assistance of the fraudulent scheme, said defendants, in an effort to obtain

KEENAN's cooperation, repeatedly misrepresented to KEENAN and his acquaintances as

detailed *supra*, that by acting in conjunction with the WEF and/or WEF USA, the ITALIAN

FINANCIAL POLICE, the ITALIAN REPUBLIC and the UNITED NATIONS, all of the

individual co-conspirators' illegal actions would be protected under the umbrella of sovereign

immunity. In doing so, these defendants provided practical assistance, encouragement and moral

support to the fraudulent deprivation of the DFFI from KEENAN and the Dragon Family.

227.    The substantial assistance and complicity of defendants BRUNO, WEF, WEF

USA, RAGAGLINI, MARACHIAN, BERLUSCONI, the ITALIAN FINANCIAL POLICE, the

ITALIAN REPUBLIC, BAN KI-moon, the UNITED NATIONS and other unknown individual

co-conspirators acting on behalf of and with the approval of defendants the WEF and/or WEF

USA, the ITALIAN FINANCIAL POLICE, the ITALIAN REPUBLIC and the UNITED

NATIONS in the fraudulent scheme to deprive KEENAN and the Dragon Family of the DFFI is

further illustrated by the following acts performed with knowledge of the fraudulent and

unlawful nature of the scheme, and for the express purpose of providing substantial assistance

therein:

> (1)    Defendant UNITED NATIONS knowingly and actively
> participated in the fraud when it agreed to offer a bribe to KEENAN in the
> amount of $100 Million USD in an effort to obtain KEENAN's cooperation in the
> fraudulent scheme, for its own benefit, those of its representatives, including
> defendants BAN KI-moon, for the benefit of defendants, the ITALIAN
> REPUBLIC, and its representatives, including defendants BERLUSCONI,
> RAGAGLINI, MIRACHIAN and the ITALIAN FINANCIAL POLICE, and for
> the benefit of the WEF and/or WEF USA, and its representative, defendants

BRUNO, and for the benefit of others presently unknown, who participated in and aided and abetted the criminal enterprise.

(2)     As part of the criminal enterprise and scheme, defendant DAL BOSCO made contact with high level UN officials through the assistance of defendants BRUNO and the WEF and/or WEF USA, and as a result defendants the UNITED NATIONS and BAN KI-moon knowingly and actively approved the purchase of the DFFI, which it knew had been on the basis of fraudulent misrepresentations by DAL BOSCO, not only for the purpose of aiding and abetting the conspiracy, but entered into the scheme with the avowed purpose of further concealing the fraud and actively engaging in the conversion of the DFFI by: (1) purchasing the DFFI then in the possession of DAL BOSCO who had breached his fiduciary duties to KEENAN as temporary custodian of the DFFI by fraudulently obtaining and converting the DFFI; (2) offering to pay the sum of $100 Million USD for the release of the DFFI; (3) placing the stolen DFFI into a Sovereign Program for its own financial benefit; (4) all of the above to be accomplished without the knowledge of the Legal Holders of the DFFI, the Dragon Family.

(3)     The complicity of defendants the WEF, the WEF USA, the UNITED NATIONS, the ITALIAN FINANCIAL POLICE and the ITALIAN REPUBLIC is apparent from the telephone conference call placed to BRUNO by DAL BOSCO on a speaker phone in the VIP Room of the Hotel Zurich in Switzerland on or about February 2010.  Such call was made via international telephone communication between DAL BOSCO and defendant BRUNO, of the WEF and/or WEF USA, who participated from New York, New York wherein the participation and approval of the UNITED NATIONS was described in detail by BRUNO, who represented that he could "put 100 Million Dollars into KEENAN's hands if KEENAN agreed [to release the DFFI in contravention of the Dragon Family's rights in the same]."  After this call, Vasil Ganov, who had been present for the call inquired of what DAL BOSCO would receive from the "transaction."  DAL BOSCO stated that he would receive half of the $100 Million USD offered to KEENAN for his assistance, which he indicated would be placed into a Sovereign Program by the UN and that they would receive 200% monthly returns minimum from the total "investment."  DAL BOSCO refused to comment on how much defendants the UN, WEF and/or WEF USA, BRUNO and OITC would receive from the transaction, indicating that such an inquiry "can only cause trouble."  DAL BOSCO did, however, indicate that the stolen Notes would be placed into a "Sovereign Program by the UN," and upon completion would be returned to their rightful "owners," which he misrepresented was the OITC.  DAL BOSCO further informed Ganov that "everyone was protected by the ITALIAN FINANCIAL POLICE and the Italian Government itself."

102

(4)     This complicity is also corroborated by the international telephone communication between DAL BOSCO and BRUNO, as overheard and described by Nikolay Raykov during his trip to the Zurich airport with DAL BOSCO following the telephone conference speaker call described above, and by Raykov's other interactions with DAL BOSCO and BRUNO.  In the telephone conversation, BRUNO represented to Raykov that the DFFI would "be placed into a federal program using the UN as protection" along with "his company" referring to the WEF and/or WEF USA, which would "generate unlimited capital for everyone involved."  According to BRUNO, "there would be no problems and that this was being blessed by the UNITED NATIONS" which "would protect everyone" as the DFFI would be "placed into a Sovereign Program" after which the DFFI "would disappear" and "there would be no questions asked."  In a subsequent telephone call between Raykov and BRUNO, which took place while both parties were in New York, BRUNO advised Raykov that DAL BOSCO had absconded with the DFFI and that "now more than ever" Raykov was needed to convince KEENAN to cooperate in the conspiracy to deprive the Dragon Family of its interest in the DFFI.  At a subsequent meeting between Raykov, BRUNO and DAL BOSCO at the Balexert Mall in Switzerland in May 2010, BRUNO commented that KEENAN "was stupid for not taking the 100 Million U.S. Dollars" and that "things had been in the planning stages for a while and were about to be completed with or without KEENAN."  BRUNO again requested Raykov's assistance in convincing KEENAN to participate in the fraudulent scheme.  When Raykov indicated that KEENAN would not listen to him, BRUNO exclaimed, "Not even for 500 Million U.S. Dollars?"  BRUNO then encouraged Raykov to call him at his New York office of the WEF USA to speak about the matter further.

(5)     Defendants' complicity was further corroborated during the course of the meeting between DAL BOSCO, BRUNO and Miranov at the Balexert mall in Switzerland in May 2010.  At this meeting, defendant BRUNO explained who was involved in the fraudulent scheme to steal the DFFI, specifically naming defendants RAGAGLINI, MIRACHIAN, BERLUSCONI, and the ITALIAN FINANCIAL POLICE, stating: "so you see there is no possible way we can have a problem.  We can cloak ourselves with the immunity shield and everyone will go away.  Just another day in the UN!"  During this meeting held for the purpose of convincing Miranov to assist the defendants in their fraud, a telephone call was received from defendant  H.E. Ambassador MIRACHIAN, Permanent Representative of the Italian Mission to the UN in Geneva, who confirmed the direct knowledge and approval of the United Nations Secretary General, BAN KI-moon stating:  (i) "from the very top we were protected"; (ii) "there is no reason for anyone, including KEENAN, to worry about any sort of repercussions"; (iii) "the Italian cohorts in New York had even approved the matter with Secretary General BANK KI-moon" whom she expressly acknowledged "would deny he knew anything about it."

103

228.    KEENAN has suffered serious financial detriment on account of and as a direct and proximate result of defendants' acts aiding and abetting the fraudulent scheme and, at a minimum, defendants DAL BOSCO, BERLUSCONI, RAGAGLINI, MIRACHIAN, the ITALIAN FINANCIAL POLICE, the ITALIAN REPUBLIC, BAN KI-moon, the UNITED NATIONS, BRUNO, WEF and/or WEF USA are jointly and severally liable for the full value of the DFFI and all of its accumulated interest, with interest.  Defendants DAL BOSCO, BERLUSCONI, RAGAGLINI, MIRACHIAN, the ITALIAN FINANCIAL POLICE, the ITALIAN REPUBLIC, BAN KI-moon, the UNITED NATIONS, BRUNO, WEF and/or WEF USA are also jointly and severally liable for KEENAN's lost profits from the fees to which he was entitled for performing his services for the Dragon Family with respect to coordinating the placement of the DFFI into an approved trading program.

229.    Consequently, KEENAN has been damaged by the actions of defendants DAL BOSCO, BERLUSCONI, RAGAGLINI, MIRACHIAN, the ITALIAN FINANCIAL POLICE, the ITALIAN REPUBLIC, BAN KI-moon, the UNITED NATIONS, BRUNO, WEF and/or WEF USA aiding and abetting the effort to defraud KEENAN of the DFFI and has sustained damage in a sum to be determined at trial, but believed to be in excess of One Trillion ($1,000,000,000,000.00) US dollars.

### AS AND FOR A TENTH CAUSE OF ACTION AGAINST DEFENDANTS DAL BOSCO, SALE, DAM, OITC, and UNITED NATIONS,
[Aiding and Abetting Dal Bosco's Fraud under Federal Common Law and International Law]

230.    Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 229 of the Complaint with the same force and effect as though fully set forth herein.

231.    The actions of defendants DAL BOSCO, SALE, DAM, OITC and the UNITED

NATIONS violate any and all notions of *jus cogens*, a body of peremptory principles of

customary and universal international law recognized by civilized nations.  At a minimum, the

actions of said defendants constitute a knowing and willful participation to aid and abet the

defrauding of KEENAN of the DFFI, valued at approximately ONE TRILLION UNITED

STATES DOLLARS, which fraud was completed by defendant DAL BOSCO, who personally

obtained the DFFI from KEENAN through fraudulent misrepresentations and absconded with

the DFFI.

232.    Defendants SALE and DAM acting on behalf of defendant OITC, with

knowledge of the planned fraudulent scheme to obtain the DFFI in contravention of the rights of

its true and rightful owners, and for the express purpose of facilitating the said fraud, provided

substantial assistance in the fraud by taking the position that the DFFI stolen and converted by

DAL BOSCO were in fact the "property" of OITC rather than the Dragon Family, thereby

enabling DAL BOSCO to perpetuate his fraud and convert the DFFI.  In doing so, these

defendants provided practical assistance, encouragement and moral support to the fraud.  Said

acts in substantial assistance to the scheme to defraud KEENAN, which were made with

knowledge of and for the purpose of facilitating the fraud, include the following statements

and/or actions of OITC, through SALE and DAM:

> (1)    Issuing the OITC Order of June 8, 2010, on behalf of DAM
> stating: (a) DAM was appointed as international Treasury Controller under United
> Nations Charter Control No: 10-60847; (b) that the DFFI were, in fact, the
> property of the International Collateral Accounts of the Global Debt Facility
> which are legally owned by His Excellency, Ray C. DAM, International Treasury
> Controller"; (c) directing KEENAN and Yamaguchi to surrender the DFFI on or
> before July 7, 2010.

105

(2)     Sending the June 10, 2010 letter via email to KEENAN "strongly advising" him not to ignore the OITC Order and to "adhere" to its content;

(3)     Misrepresenting in writing to KEENAN that "Our ownership of the Dragon Funds being part of the Combined International Collateral Accounts of the Global Debt Facility, and our international status combined with our International Authority as granted, attested to, and formally issued by the Nations of the World" and warning that that the "impertinent mannerisms" in which KEENAN had allegedly "approached this matter" would not be tolerated as it shows "an insulting and arrogant attitude towards a Sovereign Entity which is legally chartered under the United Nations and recognized by all Nations. . ."; and

(4) Advising DAL BASCO that all conspirators could rely upon the "immunity" enjoyed by OITC for many years in reliance upon the umbrella of protection afforded by its relationship with the UN.

233.    The UNITED NATIONS has been complicit in the nefarious and fraudulent activities of OITC in that it has never formally denounced or disassociated itself from OITC, and has allowed OITC to hold itself out to the world community as protected by its umbrella of legitimacy and chartered by the UNITED NATIONS itself.  Upon information and belief, defendant the UNITED NATIONS, with knowledge of the planned fraudulent scheme, and for the express purpose of facilitating the defrauding of KEENAN and the Dragon Family, provided substantial assistance to said fraud by allowing and actively encouraging the OITC to represent itself as affiliated with and charted by the UNITED NATIONS in OITC's efforts to convince KEENAN to release the DFFI to defendants on the purported basis that the DFFI belonged to OITC rather than the Dragon Family.

234.    KEENAN has suffered serious financial detriment on account of and as a direct and proximate result of the action of defendants DAL BOSCO, SALE, DAM, OITC and the UNITED NATIONS aiding and abetting the fraudulent scheme and, at a minimum, said defendants are jointly and severally liable for the full value of the DFFI and all of its accumulated interest, with interest.  Defendants DAL BOSCO, SALE, DAM, OITC and the

UNITED NATIONS are also jointly and severally liable for KEENAN's lost profits from the

fees to which he was entitled for performing his services for the Dragon Family with respect to

coordinating the placement of the DFFI into an approved trading program.

235.    Consequently, KEENAN has been damaged by the actions of defendants DAL

BOSCO, SALE, DAM, OITC and the UNITED NATIONS aiding and abetting the effort to

defraud KEENAN of the DFFI and has sustained damage in a sum to be determined at trial, but

believed to be in excess of One Trillion ($1,000,000,000,000.00) US dollars.

**AS AND FOR A ELEVENTH CAUSE OF ACTION AGAINST
DEFENDANT DAL BOSCO**
**[Breach of Contract under Federal Common Law and International Law]**

236.    Plaintiff repeats and realleges each of the allegations contained in Paragraphs 1

through 235 with the same force and effect as though fully set forth herein.

237.    After months of meetings and discussions with KEENAN, DAL BOSCO, for

valuable consideration, entered into a written contract with plaintiff, KEENAN.

238.    The contract provided:  (1) "I can assure you that you will never regret making

this decision"; (2) "You are aware of the fact I am well trusted and a financial advisor within the

Vatican and Mason circles and would never jeopardize my position with them for anything"; (3)

"My word is my bond and my word is Gold"; (4) "I will be waiting for your Zurich arrival so

that we can do great things for the world"; (5) "I understand clearly that I am not to discuss these

bonds with anyone outside the immediate circle and my privacy is integral to the success of

many nations"; (6) "I further understand you are the authorized representative and Power of

Attorney for said bonds and I will entrust them believe me as though it was my life depending on

it.  Therefore I humbly accept the custodianship of said Bonds in which I am only to return them

107

to either you or Mr. Yamaguchi. Not any other!"; (7) "although electronic this email is to be considered my legal binding acceptance of the following bonds" (bonds listed); (8) "Will be ready when called upon to deliver said notes to you."

239.   DAL BOSCO has failed to perform his obligations under the contract and thereby breached the contact by failing to return and/or deliver the DFFI entrusted to him upon notwithstanding KEENAN's repeated requests made in accordance with the terms of the contract.

240.   KEENAN has suffered serious financial detriment on account of and as a direct and proximate result of DAL BOSCO's breach of contract and DAL BOSCO is consequently liable for the full value of the DFFI and all of its accumulated interest, with interest. DAL BOSCO is also liable for KEENAN's lost profits from the fees to which he was entitled for performing his services for the Dragon Family with respect to coordinating the placement of the DFFI into an approved trading program, which loss was a foreseeable result of DAL BOSCO's breach of contract.

241.   Consequently, KEENAN has been damaged by DAL BOSCO's breach of contract and has sustained damage in a sum to be determined at trial, but believed to be in excess of One Trillion ($1,000,000,000,000.00) US dollars.

## AS AND FOR A TWELFTH CAUSE OF ACTION AGAINST ALL DEFENDANTS
### [Replevin under Federal Common Law and International Law]

242.   Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 241 of the Complaint with the same force and effect as though fully set forth herein.

243.   Pursuant to a certain Special Power of Attorney executed by Yamaguchi on behalf of the Dragon Family, and with the approval of General Haan, the Head of the Dragon Family,

which authorized KEENAN to act on behalf of Yamaguchi and the Dragon Family for the private placement of or legal return of the DFFI, KEENAN lawfully possessed the DFFI.

244.   Defendant DAL BOSCO converted the DFFI from KEENAN and the Dragon Family.

245.   All Defendants engaged in a civil conspiracy to convert the DFFI from KEENAN and the Dragon Family.

246.   All Defendants aided and abetted the conversion of the DFFI from KEENAN and the Dragon Family.

247.   Despite repeated demands by KEENAN to return the DFFI, the Defendants have continued in their refusal to return the DFFI to KEENAN or the Dragon Family.

248.   Upon information and belief, defendant DAL BOSCO and/or alternatively all of some of the Defendants currently possess all or a portion of the DFFI.

249.   Plaintiff KEENAN therefore seeks a permanent Injunction ordering DAL BOSCO or any other Defendant or related entity to return the DFFI to plaintiff KEENAN.

**WHEREFORE**, Plaintiff NEIL F. KEENAN, Individually and as Agent for THE DRAGON FAMILY, requests judgment in his favor against Defendants as follows:

1.   As to Counts One and Six against defendant DANIELE DAL BOSCO, awarding KEENAN compensatory and consequential damages in a sum to be determined at trial, but believed to be in excess of One Trillion ($1,000,000,000,000.00) US dollars;

2.   As to Counts Two, Four, Seven and Nine against defendants DAL BOSCO, BERLUSCONI, RAGAGLINI, MIRACHIAN, the ITALIAN FINANCIAL POLICE, the ITALIAN REPUBLIC, BAN KI-moon, the UNITED NATIONS, BRUNO, WEF and/or WEF USA, jointly and severally, awarding KEENAN compensatory and consequential damages in a

109

sum to be determined at trial, but believed to be in excess of One Trillion

($1,000,000,000,000.00) US dollars;

    3.     As to Counts Three, Five, Eight and Ten against defendants DAL BOSCO,

SALE, DAM, OITC and the UNITED NATIONS, jointly and severally, awarding KEENAN

compensatory and consequential damages in a sum to be determined at trial, but believed to be in

excess of One Trillion ($1,000,000,000,000.00) US dollars;

    4.     As to Count Eleven, against defendant DANIELE DAL BOSCO, awarding

KEENAN contractual and liquidated damages, and for compensatory, consequential and

reasonably foreseeable damages in a sum to be determined at trial, but believed to be in excess of

One Trillion ($1,000,000,000,000.00) US dollars;

    5.     As to Count Twelve, against all Defendants, the entry of a permanent injunction

directing each Defendant found to be in possession of the DFFI or any portion thereof, to return

the said DFFI or portion thereof to plaintiff KEENAN, which DFFI consists of:

    (i)     Two-Hundred Forty-nine (249) United States 1934 Series Federal Reserve Notes which, according to a Federal Reserve System Inventory List (SC1226-71-D004—D45184101 A) prepared at the time of issuance, were contained in "Box No. D 45184101 A" bearing Bond Nos. "D 45184101 A- D 45184350 A" (one sheet No. D 45184349 A missing) each with a face value of $500 Million ($500,000,000.00) United States Dollars in the total amount of One Hundred Twenty-Four Billion Five-Hundred Million United States Dollars ($124,500,000,000.00);

    (ii)     Two (2) 57th Series Japanese Government Bearer Bonds, Nos. A 1306 and A 1310, which were issued on April 30, 1983 by the Ministry of Finance, Government of Japan, each having a face value of Japanese Yen Five Hundred (500) Billion, which is equivalent to an amount in excess of Nine and One-Half (9.5) Billion United States Dollars; and

    (iii)     One (1) United States Kennedy Bond with a face value of One (1) Billion United States Dollars, bearing registration number APII 024068 A.

6.       Awarding plaintiff KEENAN punitive damages and the costs of this action,

including reasonable attorneys' fees, assessed against all Defendants, jointly and severally;

7.       For such other and further relief as this Court may deem just and proper.

Dated: White Plains, New York
        November 23, 2011

                              BLEAKLEY PLATT & SCHMIDT, LLP

              By:   _____
                    William H. Mulligan, Jr. (WM 2945)
                    Justin M. Gardner (JMG 6169)
                    *Attorneys for Plaintiff*
                    One North Lexington Avenue
                    White Plains, New York 10601
                    (914) 949-2700

111