UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

NEIL F. KEENAN, Individually and as Agent for
THE DRAGON FAMILY, citizens of foreign states,

                         Plaintiff,

*-against-*

DANIELE DAL BOSCO, a citizen of a foreign state, Et al.

                         Defendants.

-------------------------------------------------------------------x

**11-cv-8500 (RJH)**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 1/25/12

**Christopher-Earl: Strunk In Esse**

**NOTICE OF MOTION TO INTERVENE AS AN INTERVENER-PLAINTIFF.**

**PLEASE TAKE NOTICE** that upon the annexed affidavit of Christopher-Earl: Strunk in esse, by Special-Appearance, affirmed January 22, 2010 will move this Court to intervene as an intervener-plaintiff before District Judge Richard J. Holwell at a time afforded by the Court if necessary at the United States Courthouse, at 500 Pearl Street New York New York, on the day and month in 2012, at a time and courtroom designated by the court, or as soon thereafter as counsel can be heard.

        **Dated: January 22, 2010**
           **Brooklyn New York**

                       593 Vanderbilt Avenue #281
                       Brooklyn, New York;
                       Email: chris@strunk.ws
                       Cell-845-901-6767
                       Christopher-Earl: Strunk ©in esse

**cc:** listing of service to follow

NEIL F. KEENAN, Individually and as Agent for
THE DRAGON FAMILY, citizens of foreign states,
By BLEAKLEY PLATT & SCHMIDT, LLP
William H. Mulligan, Jr. (WM 2945)
Justin M. Gardner (JMG 6169)
One North Lexington Avenue
White Plains, New York 10601

FEDERAL RESERVE BANK OF NEW YORK,
by LEE C. BOLLINGER, Chairman
33 Liberty St.
New York, NY 10045

FOREIGN BONDHOLDERS PROTECTIVE COUNCIL INC,
by JOHN R. PETTY principal;
90 Broad Street
New York, NY 10004-2205

GIANCARLO BRUNO, individually, and as Head of the
Banking Industry of WEF,
WORLD ECONOMIC FORUM USA INC.
3 EAST 54TH STREET 17TH FLOOR
NEW YORK, NEW YORK, 10022

DANIELE DAL BOSCO, a citizen of a foreign state,
THE OFFICE OF INTERNATIONAL TREASURY
CONTROL, a foreign corporation ("OITC"), RAY C.
DAM ("DAM"), individually, and as President of OITC,
DAVID A. SALE ("SALE"), individually, and as Deputy
Chief of the Council for the Cabinet of OITC

H.E. Ambassador Marcello Spatafora
Del Consolato Generale d'Italia a New York
690, Park Avenue
New York, NY 10065

Attention:
H.E. Ambassador CESARE MARIA
RAGAGLINI, Individually, and as Permanent
Representative of the Italian Mission to the UN in New
York, H.E. Ambassador LAURA MIRACHIAN,
Individually, and as Permanent Representative of the Italian
Mission to the UN in Geneva, the ITALIAN REPUBLIC,
the ITALIAN FINANCIAL POLICE, Former Prime
Minister of Italy, SILVIO BERLUSCONI,

BAN KI-moon, individually, and as Secretary
General of the UNITED NATIONS
United Nations Headquarters
Room GA-1B-57
New York - NY 10017

Consulate General-Switzerland
633 3rd Ave # 30,
New York, NY 10017

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

NEIL F. KEENAN, Individually and as Agent for
THE DRAGON FAMILY, citizens of foreign states,

**11-cv-8500 (RJH)**

Plaintiff,

-*against*-

DANIELE DAL BOSCO, a citizen of a foreign state,
THE OFFICE OF INTERNATIONAL TREASURY
CONTROL, a foreign corporation ("OITC"), RAY C.
DAM ("DAM"), individually, and as President of OITC,
DAVID A. SALE ("SALE"), individually, and as Deputy
Chief of the Council for the Cabinet of OITC, the UNITED
NATIONS, BAN KI-moon, individually, and as Secretary
General of the UN, H.E. Ambassador CESARE MARIA
RAGAGLINI, Individually, and as Permanent
Representative of the Italian Mission to the UN in New
York, H.E. Ambassador LAURA MIRACHIAN,
Individually, and as Permanent Representative of the Italian
Mission to the UN in Geneva, the ITALIAN REPUBLIC,
the ITALIAN FINANCIAL POLICE, Former Prime
Minister of Italy, SILVIO BERLUSCONI, THE WORLD
ECONOMIC FORUM ("WEF") a foreign corporation,
WORLD ECONOMIC FORUM U.S.A., INC.,
GIANCARLO BRUNO, individually, and as Head of the
Banking Industry of WEF, and various unknown individual
co-conspirators, JOHN DOES A-Z,

Defendants.

-------------------------------------------------------------------x

### Christopher-Earl Strunk in esse Affidavit

### in Support of the Notice of Motion to Intervene as of right

**STATE OF NEW YORK** )
) ss.
**COUNTY OF KINGS** )

Accordingly, I, Christopher Earl Strunk, being duly sworn, depose and say under
penalty of perjury:

1) Petitioner, Christopher-Earl: Strunk, in esse (hereinafter, "Strunk" "Petitioner"),
am self represented without an attorney, and make this affidavit in support of

intervention as of right with Federal Rules of Civil Procedure (FRCvP) Rule 24(a) as an American Chinese historic Bond holder Intervener-Plaintiff; and or

2)   That as an alternative this affidavit in support of intervention with permission with FRCvP Rule 24 (b) (1)(B) (2) (A) (B),  in that FEDERAL RESERVE BANK OF NEW YORK (FRBNY) by LEE C. BOLLINGER, its Chairman and President as well as the FOREIGN BONDHOLDERS PROTECTIVE COUNCIL INC (FBPC) by its principal JOHN R. PETTY are required supplemental Defendants, as shown and explained in the Proposed Supplement with three (3) supplemental causes of action added to the Complaint filed 11/23/11 annexed herewith, are necessary parties to clarify the transactions and injuries alleged by Plaintiffs that without same would infringe upon Petitioner's rights and property.

3)   That Strunk is the bearer of unredeemed "Historic" Chinese Bond property effected by the failure of the Mainland Peoples Republic of China (PRC ) to re-unite with the Republic of China (ROC) also known as Taiwan; and that Strunk owns ONE (1) £20 *CHINESE GOVERNMENT FIVE PER CENT REORGANIZATION GOLD LOAN OF 1913 FOR £25,000,000 STERLING* with serial number 411339 (see **Exhibit A**) (herein after known as "*£20  Bond*"), and ONE (1) $20 *NATIONAL GOVERNMENT OF THE REPUBLIC OF CHINA ALLIED VICTORY U.S DOLLAR LOAN* of 1942 with serial number 0064833 payable in accordance with the regulation of October 31, 1953 with semi-annual interest at 4% per annum (see **Exhibit B**) (herein after known as "*$20  Bond*"); and that as a point of valuation reference the combined accrued current $ 932,848.36 value of the obligations is estimated to be for:

a)   the ***£20  Bond*** *equal to 4.705882 troy ounces of gold or* $97.27 in 1913 Bond now valued at say 561.2966 troy ounces of gold or based upon the 1/10/12 London PM Gold Price Fixing of $1637 per ounce say $918,842.46; and then

b) the **$20 Bond** equal to 0.5714 troy ounces of gold or $20.00 in 1942 Bond now valued at say 8.5558 troy ounces of gold or based upon the 1/10/12 London PM Gold Price Fixing of $1637 per ounce say $14,005.90.

4)   That Strunk's historical bonds involve lawful money previously recorded and presently discoverable as part of a sinking fund under a double-bookkeeping regimen used by the Defendant FRBNY and auditable by the FBPC with fiduciary duties.

5)   That although Plaintiffs' DFFI property does not coincide with any £20 Bond or $20 Bond similar to Strunk's property, based upon information and belief the DFFI is nevertheless part of the *sinking fund* or reserve created to re-pay the £20 Bond or $20 Bond denomination similar to Strunk's property when the PRC and ROC re-unite; and therefore, the disposition of the DFFI is germane and a direct interest to Strunk.

6)   That Petitioner, with the intent not to duplicate matters already settled, searched for cases with details coinciding with the basis for intervention herein including those cases disposed in this District by the Honorable Richard J. Holwell; and that Petitioner found three cases: *BALANOS v ROC* SDNY 06-CIV-13221 (RJH), *MORRIS V ROC* SDNY 05 Civ. 4470 (RJH),  and a more current case filed in the Northern District of California,  *TAIWAN CIVIL RIGHTS LITIGATION ORGANIZATION v. KUOMINTANG BUSINESS MANAGEMENT COMMITTEE et al* NDCA 10-cv-00362- VRW.

7)   As to the three cases searched as germane other than important material facts and findings that would apply herein supporting intervention do not preclude Petitioner intervention as a matter of first impression before this Court.

8)   That in the case *TAIWAN CIVIL RIGHTS LITIGATION ORGANIZATION v. KUOMINTANG BUSINESS MANAGEMENT COMMITTEE et al* NDCA 10-cv-00362- VRW  I

found an affidavit of the Chinese – US Historical Bond Expert CHENG CHUNG-MO[1],

(see **Exhibit C**) that applies in support of Petitioner motion to intervene.

9)   That according to Chinese – US Historical Bond Expert CHENG CHUNG-MO,  in

the affidavit shown as Exhibit C, *Article 63 of the Act Governing Relations Between*

*Peoples Of The Taiwan Area And The Mainland Area* states:

> "To the extent not contrary to the public order or good morals of the Taiwan Area, it shall be upheld the legal effects of any civil matter together with any right or obligation thereof created in the Mainland Area, prior to the coming into force of this Act, between any people of the Taiwan Area and Mainland Area, or between any two or more of the people of the Mainland Area, or between any of the people of the Mainland Area and any foreign national. The provisions of the preceding paragraph shall not apply provided that there had been laws or regulations in effect, prior to the coming into force of this Act, restricting the exercise or transfer of the rights referred to therein.

> The following debts shall not be repaid prior to national unification:

> Outstanding foreign currency bonds issued in the mainland prior to 1949 and the short-term Gold Bonds of 1949.

> Various debts owed by any government bank as well as any other financial institution accepting deposits before their retreat from the Mainland."

10)   That according to the Chinese – US Historical Bond Expert CHENG CHUNG-MO

regarding to *Article 63 of the Act Governing Relations Between Peoples Of The Taiwan*

*Area And The Mainland Area shown as Exhibit C*:

> "This act was promulgated and amended as stated above by Presidential Order on October 29, 2003 and implemented from March 1,2004 by the Order of the Executive Yuan during my term of office as Vice President of the Republic of China Judicial Yuan.

> "The intent of this Act in regards to pre 1950 Chinese bonds was to reaffirm their Existence as defaulted foreign debt obligations of the Republic of China owed in the United States and elsewhere and to defer their resolution until

---

[1]  Grand Justice and Vice President of the Republic of China Judicial Yuan 1999-2006, Minister of Justice of the Republic of China 1998-1999,  and as a law professor in Taiwan and as a visiting professor at the University of Vienna and Wisconsin. Judicial Yuan is the Republic of China's highest judicial organ tasked with interpreting the Constitution of the Republic of China. Holds LL.D. from the University of Vienna and worked many years as a Law Professor including the position of Chairman of the Law Department of National Chung-Hsing University.

national unification,

"These bonds referred to in Article 63 were all issued by the former Kuomintang Government of the Republic of China or were ratified by the Kuomintang government.

"Kuomintang business holdings are worth billions of US dollars as part of the "black gold" system of Kuomintang nepotism corruption and cronyism.

"The issue of defaulted pre 1950 bonds is inexorably tied to the Kuomintang and its Assets in that the Kuomintang has been the main beneficiary of that default.

"Until approximately I99I , the Kuomintang and the Government of the Republic of China were one and the same entity. With the election o f Chen Shui-bian as President of the republic of China in 2000, for the first time the Republic of China was governed by a party other than the Kuomintang and the Kuomintang entirely ceased to be an organ or agent of the state. However, the Kuomintang apparatus typified by the Kuomintang Business Management Committee retained billions of dollars of assets accumulated while the Kuomintang was an organ of the Republic of China from 1926 to 1991. It is entirely plausible that the proceeds, sinking funds, and other benefits of the pre 1950 defaulted bonds referenced in Article 63 have been retained by the Kuomintang Business Management Committee to this day.

"While Article 63 defers overall settlement of the bonds until the issue of Mainland China is dealt with, it does not preclude legal actions for unjust enrichment against the Kuomintang which is now a non sovereign juridical entity."

11)  That Strunk contends that in light of the facts in the Complaint associated with the DFFI and FRN, FRBNY policy and procedure as well as the Foreign Securities Act of 1933 under which FBPC has fiduciary duties and *Article 63 of the Act Governing Relations Between Peoples Of The Taiwan Area And The Mainland Area*, the £20 Bond or $20 Bond denomination similarly include Strunk's property and are part of the assets secured by Plaintiffs' claim against Defendants that involve money of exchange also involve "*the proceeds, sinking funds, and other benefits of the pre 1950 defaulted bonds referenced in Article 63 have been retained by the Kuomintang Business Management Committee to this day*" that reasonably would include Plaintiffs as well in such private transaction(s) with subject securities to form a two-sided market platform

to monetize debt in Switzerland as a transaction defined under what would be a pendant action with New York State's "Blue Sky Law" in New York as well as effecting eventual repayment and or the guarantee here in New York.

12) That according to the Complaint during the course of its existence over the last century, the Dragon Family has accumulated great wealth by having provided the Federal Reserve Bank and the United States Government with asset assignments of gold and silver via certain accounts held in Switzerland, for which it has received consideration in the form of a variety of Notes, Bonds and Certificates such as those described in Complaint paragraph 2 that are an Obligation of Defendant FRBNY and Federal Reserve System.

13) That according to the Complaint upon information and belief, these Bonds have values ranging in the many Thousands of Trillions of United States Dollars, a relatively small portion of which is involved in the claims giving rise to this action. Each of these currencies, such as the DFFI / FRN involved in this action, was and remains duly registered within the Federal Reserve System and are directly verifiable by the Federal Reserve through its efficient verification system and screening process.

14) That Petitioner contends that Plaintiff Keenan as Disclosed Principal of the Dragon Family admit that their relationship is identical with the Kuomintang Business Management Committee as

> "the Kuomintang appointed guardians of this Gold and the securities issued by the United States who came to be known euphemistically as the Dragon Family. The Dragon Family is, in fact, a highly secretive and informal organization that operates between old families within China and Taiwan, above the political divide of the two independent Chinese Governments."

15) Petitioner contends that based upon information and belief, The Dragon Family and Defendants seek a Two-side Market Platform in Switzerland to monetize debt obligations in association with interests of SMOM, CFR and Vatican that effects

Strunk's historic bond assets.

16) That Petitioner contends that Defendants are attempting to comingle DFFI and FRN in a Two-side market platform in Switzerland to monetize EU ECB obligations with Strunk's asset.

17) That Petitioner contends that based upon information and belief there is a *Memorandum of Understanding* of August 31, 1982 (see **Exhibit D**) between the Securities Exchange Commission of the United States and the Swiss Government regarding non-public securities trading that would investigate a Two-side market platform in Switzerland to monetize EU ECB debt obligations and or transact risk based investments effecting Strunk's assets.

18) Petitioner contends based upon the Complaint that named Defendants have proffered an effort to utilize Plaintiffs' DFFI / FRN asset by such action involve supplement defendants thereby effecting Strunk's assets.

19) That Petitioner contend based upon the Complaint that in light of the facts associated with the DFFI and FRN as well as FRBNY policy and procedures, Plaintiffs' claim against Defendants involve money of exchange not credit involving money of account means that lawful money was and is or probably would be disbursed by either side in a covered transaction even using a platform of a two-side market transactions to monetize the DFFI / FRN would be a covered transaction to be accounted for to preserve Strunk's historic Bond sinking fund as the reserve for re-payment.

20) That Petitioner contends based upon the Complaint that the FRBNY and Lee C. Bollinger by mis-administration and neglect have placed Strunk's repayment at risk.

21) That Petitioner contends he has a direct interest in the DFFI, FRN and related funds.

22) That Petitioner contends that the International Operations of the FRBNY

represents the Federal Reserve System and the U.S. Treasury, also is responsible for intervening in foreign exchange markets to achieve dollar exchange rate policy objectives and to counter disorderly conditions in foreign exchange markets. Such transactions are made in close coordination with the U.S. Treasury and Board of Governors, and most often are coordinated with the foreign exchange operations of other central banks. Dollars are sold in exchange for foreign currency if the goal is to counter upward pressure on the dollar. If the objective is to counter downward pressure, dollars are purchased through the sale of foreign currency.

23) Petitioner contends based upon the public record that the responsibility of the FRBNY, as a private entity, is to serve as fiscal agent in the United States for foreign central banks and official international financial organizations. It acts as the primary contact with other foreign central banks. The services provided for these institutions include the receipt and payment of funds in U.S. dollars; purchase and sale of foreign exchange and Treasury securities; and the storage of monetary gold.

24) That Petitioner contends based upon the Complaint that the FRBNY and Lee C. Bollinger, FBPC and John R. Petty by nonfeasance are parties to fraud, breach of contract and replevin action in that the Expropriation and Conversion under Federal Common Law and international law are under there auspice.

25) That Petitioner contends based upon the Complain that failure of  FRBNY and Lee C. Bollinger, FBPC and John R. Petty to perform duties and obligations would take Strunk's property.

26) That Petitioner contends based upon the Complaint that FBPC is an essential party herein because the FBPC was formed under the Foreign Bondholders Act of 1933 (15 USC §77bb through §77hh with law) at the request of the United States Secretary of State, the Secretary of the Treasury and the Chairman of the Federal

Trade Commission under President Franklin Roosevelt as a private, non-profit corporation to protect the rights and interests of American holders of foreign defaulted bonds. The FBPC has been involved in over 40 settlements between American bondholders and defaulted foreign governments, the most recent being Poland (1975), Hungary (1975), Bulgaria (1978), and Czechoslovakia (1984). The FBPC records are maintained in the Library Archives of Stanford University.

27) That Petitioner contends based upon the Complaint that FRBNY and Bollinger duties and responsibilities are in part to safeguard the use of the Federal Reserve Notes (FRNs) issued as a result of the transfer of the Gold from the ROC; and

28) That Petitioner contends based upon the Complaint and public record that the FRBNY and its agents are active interveners into the financial matters of the European Union (EU) and the European Central Bank (ECB) in that Defendants have expropriated and attempt to convert the DFFI and FRNs thereby effecting both the degree of financial intervention by Defendant FRBNY and the safety of Strunk's direct interest in the disposition of the sinking fund and or reserve from which to re-pay the historical bonds.

29) That Petitioner contends that the historical bonds involve lawful money previously recorded and presently discoverable as part of a sinking fund under a double-bookkeeping regimen used by the Defendant FRBNY and auditable by the FBPC with fiduciary duties.

30) Furthermore, that according to a mutually acceptable Federal Reserve Bank expert on double bookkeeping standards and procedures of the Defendant FRBNY.

31) That Petitioner contends based upon the history and ongoing facts detailed in the Complaint that Defendants activities are associated and coordinated with the Aragon Templars, Society of Jesus, Jesuit General Nicholas control over transactions

and directed outcomes of members of the SMOM, CFR, and FRBNY pose a threat to the repayment of Strunk's assets; and in that regard

32) Petitioner provides herein the supporting Affidavit of Eric Jon Phelps who as an expert on the Society of Jesus before and after the 1540 Council of Trent in their activities globally (see **Exhibit E**) that presents allegations to warrant that members of the SMOM and CFR involved in the matter herein be restrained from a direct involvement in the relief fashioned herein.

33) That in support of restraint of members of the SMOM and CFR under the Aragon Templars having shaped events and transactions complained of herein effecting China and Asia with and that now effect the events and outcome of this instant action were an accounting not conducted of the sinking fund and reserves, Mr. Phelps affirms an abbreviated history of the Jesuit Company involvement in Asia since no later than the bull *Dominus ac Redemptor  Noster*, was to forever suppress and extinguish the Society of Jesus starting at paragraph 22 of  the Supporting Affidavit for Intervention shown as Exhibit E quote:

22..In 1773 Pope Clement XIV issued his infamous bull *Dominus ac Redemptor Noster*, forever suppressing and extinguishing the Society of Jesus.  As did Pope Clement V with the crusading Order of the Knights Templars, so did Pope Clement XIV with the crusading Order of the Society of Jesus---the New Knights Templars.  At about this time, the Manchu dynasty (1644-1912) expelled the Company from China.  In the future, the Manchus would pay dearly for this, Jesuit vengeance to result in the termination of the dynasty and the destruction of patriotic Chinese nationalism.

23. The Order fled for protection to non-Catholic nations.  Embraced by Catherine II "the Great" of "heretic" Orthodox Russia, by Frederick II "the Great" of "heretic" Lutheran Prussia and by George III of "heretic" Anglican England, the sons of Loyola launched their war on the Vatican.  Founding the Illuminati in 1776, they ignited the French Revolution leading to the Napoleonic Wars and the secret killing of Pope Pius VI while punishing the papacy and the Roman Catholic monarchs of Europe for suppressing the Society of Jesus.  Roman Catholic Freemason Napoleon Bonaparte I was the Company's "Great Avenger."

24. In 1798 Napoleon invaded Malta.  Advised by Jesuit Abby Sieyes, he  confiscated all the weapons and treasures of the Knights of Malta to be used for his invasion of Egypt in the punishment of the Mamluks for driving the Knights Templars from Acre in 1291.  Napoleon then drove the Knights of Malta to Russia, there to submit to terms of the

acting Jesuit General. From then on, the Knights of Malta would never again resist the Society of Jesus. Today, the Knights of Malta control the central banks of the world along with the cartel-capitalist private banks, such as Bank of America, JPMorgan/Chase and Citibank.

26..Upon the Order's international restoration in 1814 by Pope Pius VII, the Company began to regain its lost power. Directing the British Crown and influencing the American presidency, the Jesuits sought to create a united Anglo-American alliance to be used to conquer first Japan and then China. At this time both Japan and China had expelled the Company and vowed never to readmit their traitorous oppressors.

27. In 1841, via British influence of the First Opium War (1839-1842), the Chinese Manchus were forced to readmit the Jesuits into the Empire. In 1854 the Jesuits used the American Navy with Commodore Perry finally to open up Japan to the White Protestant nations of the West---especially Jesuit-ruled Great Britain. The Jesuit General's old plan was still inexistence: Conquer China through Japan using her Emperor and military power now to be backed by the British Crown under Jesuit rule.

28..The Jesuits were legally readmitted into Japan in 1865. Emperor Komei stoutly resisted lifting "the Christian Ban" for which he was poisoned in 1867 at the young age of thirty-six. That same year Tokugawa Shogon Yoshinobu resigned giving his office to the new Emperor Meiji then only fourteen years of age. Meiji "the Great" would serve his Jesuit masters for over forty-five years, centralizing all power in Tokyo and creating the Japanese Imperial Empire---for the use of the Jesuit Order. Japanese nationalists opposing the Meiji regime would be finally defeated in battle, massacred with American gatling guns in 1877.

30..The Society of Jesus began to use its "Japanese Sword of the Church" against the Qing/Manchu dynasty of China also ruling Korea.  In 1894 Japan launched and, in 1895, won the first Sino-Japanese War taking Korea and Taiwan away from China while forcing the Qing/Manchu government to pay 13,600 tons of silver to Japan for war reparations. That same year Japanese agents of Jesuit-ruled Emperor Meiji brutally assassinated anti-Japanese, pro-Chinese Korean Empress Myeongseong. The surviving crown prince sought and received protection from the Russian legation in Soul, an act for which Russia would pay dearly.

31..As a result of these loses of the Qing/Manchu Empress Dowager Cixi along with the continued invasion of foreigners, desperate Chinese nationalists began to resist. Therefore, the Jesuits incited and led the Boxer Rebellion in 1901 (during which many Protestant missionaries were murdered in according with the Jesuit Oath of the Fourth Vow). But the nationalists were betrayed, meeting the armies of eight nations under Jesuit rule or influence in battle. Five of those nations were Japan, America, Germany, Russia and Great Britain. With the foremost Chinese nationalists exterminated and the population weakened with opium addiction, the end of the hated , anti-Jesuit Qing/Manchu dynasty was approaching.

32..In 1904 Japan attacked Orthodox Russia ultimately destroying two of its three fleets. Termed "the first great war of the 20th century," Japan was victorious, furthering the Order's building of its Japanese Imperial Empire.  Conversely, the loss of Russia fueled unrest in Russia leading to the Order's first Russian Revolution against the Romanov dynasty in 1905. For the Jesuits had been formally expelled from Russia by Czar Alexander I in 1820, only to legally re-enter in 1922 with their successful

Bolshevik Revolution financed and promoted by Rome's Anglo-American, Apostate Protestant, International White Power Structure centered in Washington, D.C., and London.

33..In 1912 the Qing/Manchu dynasty was finally overthrown. China would undergo a series of socialist upheavals and would yet suffer a Second Sino-Japanese War beginning in 1937 to end in 1945. During this time Freemason Emperor Hirohito would do the bidding of his masters residing at Jesuit Sophia University in Tokyo, the Japanese invading twelve Asian countries for three reasons: to kill the nationalists, to kill all Protestant missionaries and to plunder the gold of the region much of it then buried in 175 "imperial" treasure vaults in the Philippines. After World War II (the second act of the Black Pope's Second Thirty Years' War, 1914-1945), much of that gold would find its way to American banks in New York, one of them being Citibank ruled by the Knights of Malta. Other knights facilitating the movement of the gold were OSS chief William Donovan and CIA chief Allen Dulles, a co-conspirator in the Kennedy Assassination.

34..China, now divided into pro-communist and anti-communist camps, would finally be conquered by the Jesuit Order. Suffering the loss of its gold to the Japanese and the loss of its honor via the Japanese Rape of Nanking, the Chinese people, driven to desperation, were ready for the "solution" to their "chaos." In 1949 the Order, using its Council on Foreign Relations (CFR) member Secretary of State Dean Acheson, facilitated the successful subjugation of China to socialist-communism perfected by the Order on its socialist-communist "reductions" in Paraguay as per above. All the nationalist, anti-communists fled to Taiwan under the leadership of Freemason Chang Kai-shek loyal to Francis Cardinal Spellman, the mastermind behind the Kennedy assassination. Meanwhile, Communist China was under the dictatorship of Freemason Mao Zedong. Rome controlled both factions via Freemasonry, her open-but-false policy being to support the Nationalist Chinese having fled to Taiwan. But her secret-but-true policy was to back the Communist Chinese on the mainland. It is for this reason the US Seventh Fleet blocked Taiwan's planned invasion of Communist China in 1950 with the excuse that the Fleet was to keep China from invading Taiwan. This blockade enabled Communist China to send one million troops into North Korea to kill American servicemen.

35..Hence, the Jesuit Order via its high-level Freemasons within its International Anglo-American White Power Structure, controls the governments of both Taiwan and China. The peace-meal policy of betrayal towards Taiwan by Jesuit-directed, CFR-ruled American government is intended to end with the martial unity of Taiwan with China. This secret policy of unification, including the re-uniting of Korea and the uniting of Japan with China is to create a Far Eastern coalition of Asian nations for the future invasion of North America. Japan has been used to conquer China, Japan now to be used both commercially and militarily with its Red Chinese ally in the future subjugation of the entire Far East (including Australia and New Zealand) to culminate in a massive Oriental Asian invasion of North America having been invaded with millions of "fifth column" of Red Chinese loyalists including the spy, nuclear scientist and CIA operative Wen Ho Lee.

36..The Knights of Malta rule the pope's Federal Reserve Bank through such men as Peter G. Peterson, former president of the Federal Reserve Bank of New York City, the bank holding both title and possession of America's gold in the form of 660,000 gold bars. The Jesuits employ the Knights of Malta in various academic positions, CFR-

member and Knight of Malta John J. DeGoia serving as president of Jesuit Georgetown University, it overseeing the policies of the White House through the Vatican's Vaginal Oval Office of the Virgin Mary.

37..The Jesuit Order, in complete control of London, Moscow, Washington, D.C., Beijing, Baghdad, Cairo, Istanbul, Paris, Rome, Berlin, Brussels, Tehran, etc., is therefore in total control of the pope's International Intelligence Community, including all sixteen American intelligence agencies, Britain's MI5/MI6, Germany's BND, Israel's Mossad, China's CSIS, Russia's FSB/SVR, and all other lesser intelligence services. These intelligence services control the government of their host nations and thus the military complexes of those nations for the benefit of the Jesuit Papacy intending to make the pope of Rome the universal monarch of the world.

38..The Jesuit Order, in complete control of all central banks, including the Federal Reserve Bank and Bank of England, rules all stock exchanges and dictates the value of all paper currencies for the benefit of the Jesuit Papacy, the pope presently calling for the establishment of a World Bank---under his secret rule via his Knights of Malta subject to the Jesuit Superior General.

39..Thus, the Jesuit Order, in seeking to destroy the last bastion of the Protestant Reformation here in the United States of America, is now pulling out its manufacturing base relocating it into Red China, Mexico and Europe. This is in preparation for the Sino-Soviet-Muslim-Hispanic invasion of the American Empire after US forces are betrayed by the Joint Chiefs of Staff and defeated on at least two war fronts. And the secret Japanese imperial gold horde has contributed to the financing of our plotted demise.

41.. To facilitate this "Final solution to the Protestant Question," the Order, via its Knights of Malta controlling international banking and commerce, has used its Japanese and Nazi secret gold horde to conduct the pope's Cold War in covertly building Far Eastern communist nations while weakening the Western free enterprise nations of America and Canada in preparation for the Sino-Soviet-Muslim-Hispanic invasion of North America.

42.. This design of using massive amounts of gold is in accordance with the Black Pope's statement at the secret meeting in Chieri, Italy, in 1825:

> "*For these purposes, it is not enough to have at our disposal men of talent and men of action---we must have gold to keep them fast to their work. Aye, give me gold---plenty of gold; and then, with such able heads and such resources as the church commands, I will undertake not only to master the whole world, but to reconstruct it entirely.*" Abbate Leone, *The Jesuit Conspiracy. The Secret Plan of the Order*, (London: Chapman and Hall, 1848), p. 134.

34) That were this Court not to take the precaution to protect Plaintiffs' assets from further degradation with admission of supplemental parties with authority to do the necessary accounting without the appearance of impropriety Strunk's asset would be in jeopardy along with that of the Plaintiffs' considerable interest involved herein

35) That Petitioner summary in support of intervention contends the supplemental parties and Strunk's intervention as of right with FRCP Rule 24 (a) is done on timely motion in, in which the court must permit anyone to intervene who claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede Strunk's ability to protect its interest, unless existing parties adequately represent that interest.; and

36) Further, even were FRCP Rule 24 (b) for PERMISSIVE INTERVENTION to apply instead then also Strunk is here by a timely motion, that the court may permit anyone to intervene who:  (B) has a claim or defense that shares with the main action a common question of law or fact; and as with the legal duty of the Defendant FBPC and it agents under the Foreign Bondholders Act of 1933 requires it as *a quasi governmental Agency to act on such* timely motion, as the court may permit a federal or state governmental officer or agency to intervene if a party's claim or defense is based on: (A) a statute or executive order administered by the officer or agency; or (B) any regulation, order, requirement, or agreement issued or made under the statute or executive order; and furthermore, were *Delay or Prejudice.* In exercising its discretion, the court must consider whether the Strunk intervention will unduly delay or prejudice the adjudication of the original parties' rights or in fact assist the court in the litigation.

37) Furthermore, that Strunk has received a copy of the Initial Scheduling Conference Notice and Order so ordered on January 10, 2012 by the Honorable Richard J. Holwell USDJ assigned to hear this case entered January 13, 2012 into the PACER electronic system along with the Judge's Chamber rules (see **Exhibit F**).

38) Petitioner intervention requirements satisfy the issue of supplement summons.

**WHEREFORE**, Petitioner Strunk wishes a decision of the Court to grant Intervener-Plaintiff status herein for the purpose of expediting a settlement by an order in assistance to Plaintiffs' demand for relief to include:

    A.  Assign a mutually acceptable special master for an accounting of the DFFI-FRN;

    B.  Assign the special master the task of an accounting of the sinking fund;

    C.  Assign the special master the task to scrutinize any or all Two-sided Market Platform(s).

    D.  Restrain any member of the SMOM and or CFR from interfering with the accounting including Lee C. Bollinger, John R. Petty and or their agents;

    E.  Such other and different relief the Court deems necessary herein.

       I have read the foregoing, and in which Petitioner as Intervener- Plaintiff requests a preliminary Injunction with restraint of Defendants and its agents as to the accounting of the sinking fund to safeguard the guaranteed reserve to repay Strunk's American Chinese historical Bonds; and know the contents thereof apply to me by misapplication and administration of laws as a continuing injury caused by the scheme to defraud with unjust enrichment that affects Plaintiffs' and Intervener-Plaintiff along with those similarly situated; the same is true to my own knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe it to be true. The grounds of my beliefs as to all matters not stated upon information and belief are as follows: 3rd parties, books and records, and personal knowledge.

_____

Christopher-Earl: Strunk

Sworn to before me
This __ day of January 2012

_____
Notary Public

ARNOLD I. TISHFIELD
Notary Public State Of New York
No.41-4611662
Qualified In Queens County
Certified In Kings County
Commission Expires March 30, 20 15

**NEIL F. KEENAN et al. v. DANIELE DAL BOSCO et al. 11-cv-8500 (RJH)**

**Strunk Affidavit in support of Motion to Intervene**

# Exhibit A



**NEIL F. KEENAN et al. v. DANIELE DAL BOSCO et al. 11-cv-8500 (RJH)**

**Strunk Affidavit in support of Motion to Intervene**

# Exhibit B







**NEIL F. KEENAN et al. v. DANIELE DAL BOSCO et al. 11-cv-8500 (RJH)**

**Strunk Affidavit in support of Motion to Intervene**

# Exhibit C

1   THOMAS EASTON CSB #109218
    LAW OFFICE OF THOMAS EASTON
2   967 Sunset Dr
    Springfield, Oregon 97477
3   Tel/Fax: 541-746-1335
    easton3535@gmail.com
4
    JONATHAN H. LEVY CSB #158032
5   37 Royale Pointe Dr
    Hilton Head, South Carolina 29926
6   Tel: 843-837-8413
    Fax: 202-318-2406
7   jonlevy@hargray.com
    Attorneys for Plaintiffs and the Class
8

9                    UNITED STATES DISTRICT COURT

10                  NORTHERN DISTRICT OF CALIFORNIA

11
    TAIWAN CIVIL RIGHTS              NO. CV 10-0362-VRW
12  LITIGATION ORGANIZATION
     et al,                         DECLARATION OF PROFESSOR CHENG
13                                  CHUNG-MO IN SUPPORT OF PLAINTIFFS'
             Plaintiffs,            MOTION FOR DEFAULT JUDGEMENT
14
        v.
15
    KUOMINTANG BUSINESS
16  MANAGEMENT COMMITTEE et
    al,
17           Defendants.

18
        I, CHENG CHUNG-MO , declare:
19
        1. I am not a party to this law suit and if called to testify in this matter will do so as
20
    follows below.
21
        2. I make this declaration from my own personal knowledge acquired while Grand Justice
22
    and Vice President of the Republic of China Judicial Yuan 1999-2006, Minister of Justice of the
23
    Republic of China 1998-1999, and as a law professor in Taiwan and as a visiting professor at
24
    the Universities of Vienna and Wisconsin.
25
        3. The Judicial Yuan is the Republic of China's highest judicial organ tasked with
26
    interpreting the Constitution of the Republic of China.
27
        4. I hold a LL.D. from the University of Vienna and worked many years as a Law
28

                                                                        Page 1 of 3

1   Professor including the position of Chairman of the Law Department of National Chung-Hsing

2   University..

3        5. I was also the Minister of Justice for the Republic of China from 1998 to 1999.

4        6. I am familiar with Article 63 of *the Act Governing Relations Between Peoples Of The*

5   *Taiwan Area And The Mainland Area* which states:

6   To the extent not contrary to the public order or good morals of the Taiwan Area, it shall be
upheld the legal effects of any civil matter together with any right or obligation thereof created
7   in the Mainland Area, prior to the coming into force of this Act, between any of the people of
the Taiwan Area and the Mainland Area, or between any two or more of the people of the
8   Mainland Area, or between any of the people of the Mainland Area and any foreign national.
The provisions of the preceding paragraph shall not apply provided that there had been laws or
9   regulations in effect, prior to the coming into force of this Act, restricting the exercise or transfer
of the rights referred to therein.

10
The following debts shall not be repaid prior to national unification:
11
1. Outstanding foreign currency bonds issued in the Mainland prior to 1949 and the short-term
12   Gold Bonds of 1949.

13   2. Various debts owed by any government bank as well as any other financial institution
accepting deposits before their retreat from the Mainland.
14

15        7. This act was promulgated and amended as stated above by Presidential Order on

16   October 29, 2003 and implemented from March 1, 2004 by the Order of the Executive Yuan

17   during my term of office as Vice President of the Republic of China Judicial Yuan.

18        8. The intent of this Act in regards to pre 1950 Chinese bonds was to reaffirm their

19   existence as defaulted foreign debt obligations of the Republic of China owed in the United

20   States and elsewhere and to defer their resolution until national unification.

21        9. These bonds referred to in Article 63 were all issued by the former Kuomintang

22   government of the Republic of China or were ratified by the Kuomintang government.

23        10. Kuomintang business holdings are worth billions of US dollars as part of the "black

24   gold" system of Kuomintang nepotism, corruption, and cronyism.

25        11. The issue of defaulted pre 1950 bonds is inexorably tied to the Kuomintang and its

26   assets in that the Kuomintang has been the main beneficiary of that default.

27        12. Until approximately 1991, the Kuomintang and the Government of the Republic of

28   China were one and the same entity. With the election of Chen Shui-bian as President of the

China in 2000, for the first time the Republic of China was governed by a party other than the Kuomintang and the Kuomintang entirely ceased to be an organ or agent of the state. However the Kuomintang apparatus typified by the Kuomintang Business Management Committee retained billions of dollars of assets accumulated while the Kuomintang was an organ of the Republic China from 1926 to 1991. It is entirely plausible that the proceeds, sinking funds, and other benefits of the pre 1950 defaulted bonds referenced in Article 63 have been retained by the Kuomintang Business Management Committee to this day.

13. While Article 63 defers overall settlement of the bonds until the issue of Mainland China is dealt with, it does not preclude legal actions for unjust enrichment against the Kuomintang which is now a non sovereign juridic entity.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and executed at Washington, DC  on

_____, 2010.

                                          Cheng Chung-Mo

**NEIL F. KEENAN et al. v. DANIELE DAL BOSCO et al. 11-cv-8500 (RJH)**

**Strunk Affidavit in support of Motion to Intervene**

# Exhibit D

# MEMORANDUM
# OF
# UNDERSTANDING




**The United States**
**Securities and Exchange Commission**

**The Government of**
**Switzerland**

*Washington, D.C.*
*August 31, 1982*

THE GOVERNMENT OF THE
UNITED STATES OF AMERICA

THE GOVERNMENT OF THE
SWITZERLAND

## MEMORANDUM OF UNDERSTANDING

### I.  Introduction

1.  This MOU is a statement of intent setting forth the under-
standings reached by the delegations of Switzerland and the
United States acting on behalf of their respective governments
("the parties") to establish mutually acceptable means for
improving international law enforcement cooperation in the
field of insider trading.  These understandings continue a long
tradition of law enforcement cooperation between Switzerland
and the United States and were reached in the course of
consultations between representatives of Switzerland and
the United States in Bern on March 1 and 2, 1982, and in
Washington, D.C. on August 30 and 31, 1982.  The Swiss delega-
tion was headed by Minister Jean Zwahlen, head of the Economic
and Financial Section of the Federal Department of Foreign
Affairs, and included other representatives of the said
department, Lutz Krauskopf, Deputy Chief of Division,
and Lionel Frei, Chief of Section, in the Federal Department
of Justice and Police, and representatives of the Federal
Banking Commission and the Swiss National Bank.  The delegation
of the United States included John M. Fedders, Director of
the Division of Enforcement of the Securities and Exchange
Commission ("SEC"), Edward F. Greene, General Counsel of the

-3-

whose behalf the transaction was effected and other relevant
information. However, Swiss law prohibits banks in principle
from disclosing information with respect to a customer utilizing
its services.

4.    The parties concluded that the conduct of persons who
utilize Swiss banks to effect securities transactions in the
United States, in order to take advantage of material non-
public information, is detrimental to the interests of both
nations.

5.    On the basis of the foregoing consultations, the parties
reaffirmed the two countries' interest in mutual assistance
in law enforcement matters in accordance with mutually
acceptable procedures and in conformity with international
and national law, in particular assistance with respect to
transactions effected by persons in possession of material
non-public information.

6.    During the consultations the parties engaged in an
exchange of opinions pursuant to Article 39, paragraph 1
of the Treaty Between the United States and the Swiss
Confederation on Mutual Assistance in Criminal Matters,
which became effective on January 23, 1977 (the "1977 Treaty").
Section II of this Memorandum of Understanding memorializes the
exchange of opinions and related understandings that the
parties have reached.

-5-

a.  Article 1, paragraph 1 of the 1977 Treaty
    provides that the Contracting Parties under-
    take to afford each other, in accordance with
    provisions of the Treaty, mutual assistance
    in "investigations or court proceedings in
    respect of offenses the punishment of which
    falls or would fall within the jurisdiction
    of the judicial authorities of the requesting
    State or a state or canton thereof." This means,
    for example, that an investigation by the SEC
    should be considered an investigation for which
    assistance could be furnished (if the other
    requirements of the Treaty are met) as long as
    the investigation relates to conduct which might
    be dealt with by the criminal courts.

b.  The 1977 Treaty requires that a particular
    offense be a crime under the laws of each
    nation in order for compulsory assistance to
    be required under the Treaty.  The parties
    understand that transactions effected by
    persons in possession of material non-public
    information could be an offense under Articles
    148 (fraud), 159 (unfaithful management) or 162

-7-

undertake to consider whether comparable diplomatic notes
should be exchanged with respect to other offenses relating
to securities transactions covered by the Treaty.

### III.  The Private Agreement Among Members of the Swiss Bankers' Association

1.   The parties recognize that there may be securities
transactions effected in the United States by Swiss banks
acting on behalf of persons who possess material non-public
information, for which compulsory measures would not be
available under the 1977 Treaty.  Such assistance could not
be ordered if available information did not indicate the
existence of an offense under the Swiss Penal Code.  As the
Swiss Federal Council will submit to the Parliament a bill
on the misuse of inside information, this lacuna could be
filled.  For cases in which the Treaty is not applicable, or
in which it is not possible to gather evidence by employing
compulsory process, pending the enactment of such legislation,
the parties discussed a proposed private Agreement under the
aegis of the Swiss Bankers' Association, which would permit
participating banks to disclose the identity of a customer
and certain other relevant information, under certain specified
circumstances, in response to a request made by the Department
of Justice on behalf of the SEC and processed through the

-9-

define the circumstances under which the Commission of
Enquiry "shall" be satisfied that the SEC has reasonable
grounds to make the request.  In all other cases in which
the criteria are not met, the parties understand that
the Commission of Enquiry will be required to review the
information submitted by the SEC to decide whether it is
reasonably satisfied that the SEC has reasonable grounds
to make a request.  Accordingly, the parties understand
that a failure by the SEC to meet the threshold criteria
specified in the private Agreement shall not result in any
presumption that the SEC does not have reasonable grounds
to make the request for assistance under the terms of the
private Agreement and this Memorandum of Understanding.

- The parties understand that the failure of a bank cus-
tomer to provide information which may demonstrate that
the transaction in question was not made in violation of
the United States securities laws, as provided for by the
private Agreement, shall not result in any presumption of
guilt.

- The parties understand that information obtained through
the mechanism established by this memorandum and the private
Agreement will be used or introduced as evidence only in

-11-

that a report submitted by a bank pursuant to the terms of
the private Agreement may not be transmitted to the SEC
without considerable harm either to the essential interests
of Switzerland or to third persons who appear to have no
relationship to the offense which gave rise to the request
for assistance.  In such cases, it is understood that the
Federal Office for Police Matters will use its best efforts
to adapt the report so that useful information may be
provided to the SEC without causing such harm to the interests
of third persons or to Switzerland.  In the same spirit, it
is understood that the SEC will judge this opinion as one
made in good faith and use moderation when considering
alternative measures.

IV.  Further Consultations

1.    In order to continue and improve international law
enforcement cooperation in a manner consistent with the
interests of both nations, the parties understand that the
SEC and the Federal Office for Police Matters will under-
take further contacts or consultations in the future when
the need to do so is recognized mutually.

2.    There will be contacts or consultations between the
parties concerning the following matters:

-13-

under the private Agreement and the 1977 Treaty
as well as the effect of such termination on
this memorandum.

c.  The parties agree that any questions or dis-
putes between them with respect to the inter-
pretation or application of this Memorandum of
Understanding, the exchange of opinions included
herein pursuant to Article 39, paragraph 1, of
the 1977 Treaty or the operation of the private
Agreement shall be settled by means of con-
sultations.

V. Other.

1.  Notwithstanding any other provision herein, the
parties agree that this Memorandum does not modify or supersede
any laws or regulations in force in the United States or
Switzerland.

2.  The parties agree that they do not intend to confer
any right on any customer of a bank which is a signatory of
the private Agreement to judicial review in the courts of the
the United States with respect to any decision to disclose
information to United States' authorities under the terms of
the private Agreement.

14th July, 1982

# AGREEMENT XVI

of the Swiss Bankers' Association with
regard to the handling of requests for
information from the Securities and
Exchange Commission of the United States
on the subject of misuse of inside
information

In consideration of the inquiries from the Securities and
Exchange Commission (hereafter : SEC) of the United States
on the misuse of inside information and so far as the banks
cannot be obliged to furnish information to the appropriate
Swiss authorities for submission to the SEC in a legal assist-
ance procedure, the member banks of the present Agreement
(hereafter : the banks) undertake to respect the following
stipulations :

## Article 2

1. The Board of Directors of the Swiss Bankers'
   Association shall appoint a Commission of inquiry
   (the "Commission") composed of three members and
   three deputies. Neither the members of the
   Commission nor their deputies may exercise an
   executive function in a company which is subject
   to the Federal Law on Banks and Savings Banks.

2. As selected representatives of the banks
   in accordance with Article 47, paragraph 1, of the
   Federal Law on Banks and Savings Banks, the members
   of the Commission, their deputies and staff are
   bound by the rule of banking secrecy for all the
   facts of which they are apprised in the course of
   the procedure set out by the present Agreement.

3. The Commission shall be domiciled at the offices
   of the Swiss Bankers' Association.

4. The Commission shall organize its own secretariat.

(ii) it has other material indications that the
transactions referred to in 3. above were made
in violation of U.S. insider trading laws. The
Commission shall be satisfied in all cases in
which the daily trading volume of such securities
increased 50 % or more at any time during the
25 trading days prior to such announcement above
the average daily trading volume of such secu-
rities during the period from the 90th trading
day to the 30th trading day prior to such
announcement or the price of such securities
varied at least 50 % or more during the 25 trading
days prior to such announcement. In all other cases,
the Commission shall review the information sub-
mitted by the SEC to decide whether it is reasonably
satisfied that the SEC has reasonable grounds
to make the Inquiry;

5. the Inquiry is accompanied by an undertaking by
the SEC not to disclose the information to be
provided pursuant to Article 4.3. to any person
except in connection with an SEC investigation or
a law enforcement action initiated by the SEC
against alleged purchasers or sellers of the
Company's securities or call options therefore for
violations of U.S. insider trading laws in connection
with the Acquisition or Business Combination.

4. Together with the report, the bank shall file with
   the Commission all materials received from the
   customer.

5. If the Commission needs further information for
   the sake of the Inquiry, it will approach the SEC
   through the Federal Office for Police Matters.

## Article 6

The customer, within the meaning of Articles 2 to 5
hereof, includes the beneficial owner of the assets
identified in accordance with the Articles 3 to 6 of
the Agreement dated July 1, 1982 on the observance of
care in accepting funds and on the practicing of
banking secrecy.

## Article 8

In the case of any doubt arising as to the material
accuracy of the report furnished by the bank, the
Commission by itself or the SEC, through the appro-
priate channels, may request the Federal Banking Com-
mission to examine whether the report given conforms
to the facts and to the present Agreement. The bank
shall provide all information needed for examination.
If any material inaccuracy is discovered, an amended-
report showing the correct information shall be
forwarded to the Federal Office for Police Matters,
to be forwarded to the SEC. Any other appropriate measures
of the Federal Banking Commission in accordance with
the provisions of the Federal Law on Banks and Savings
Banks are reserved.

to the SEC the Commission's report pursuant
to Article 7, or

(ii)   a request for review pursuant to Article 8
hereof is received, on the sixtieth day after
the date of receipt of such inquiry where no
amended report pursuant to Article 8 hereof
has been issued, or on the tenth day after
the date any amended report under Article 7
which has been issued is forwarded to the SEC,
whichever is earlier, or

b)   the proceedings in a U.S. court have terminated
in a final judgement, by consent or otherwise, not
adverse to the customer, or

c)   the SEC consents in writing.

4. The evidentiary proof concerning the conditions listed
under 2 a), b) and c) and 3 a), b) and c) hereof shall
be communicated through the Federal Office for Police
Matters.

## Article 11

The Agreement is in force for a fixed period of three
years as from ............... . It shall be thereafter
renewed on a year to year basis if not terminated by one
of its members by giving advance notice of at least
six months addressed to the Swiss Bankers' Association.
In the case of its being terminated, all parties to
the Agreement must be informed thereof without delay;
they then have the right, within a month from that date,
to become a party to such termination even when there is
no longer six months to run up to the expiration of the
termination term. The Agreement shall remain in force and
effect for those members who have not terminated it.

The Agreement will be abrogated in the case of the Swiss
legislature enacting legislation on the misuse of inside
information.

In the case of the Agreement   being abrogated, pro-
ceedings already instituted with the Federal Office
for Police Matters will be carried through to settlement.

MEMORANDUM OF UNDERSTANDING

BETWEEN THE GOVERNMENT OF THE UNITED STATES
OF AMERICA AND THE GOVERNMENT OF SWITZERLAND
ON MUTUAL ASSISTANCE IN CRIMINAL MATTERS AND
ANCILLARY ADMINISTRATIVE PROCEEDINGS

I.   Introduction

1.   This Memorandum of Understanding (MOU) is a statement
of intent setting forth the understandings reached by the
delegations of the United States and Switzerland acting on
behalf of their respective executive authorities (the Parties)
to improve their cooperation in the field of international law
enforcement.  These understandings continue a long tradition of
law enforcement cooperation between Switzerland and the United
States and were reached in the course of consultations between
representatives of Switzerland and the United States.

On the basis of the foregoing consultations, the Parties
reaffirmed the two countries' interest in mutual assistance in
criminal matters and ancillary administrative proceedings under
Article 1 of the Treaty between the Government of the United
States of America and the Government of Switzerland on Mutual

or tax fraud as defined under Swiss law. Such cooperation may include assistance in locating and hearing witnesses, producing and authenticating judicial or business records and serving judicial or administrative documents.

2. The Treaty, in particular, has been used on numerous occasions by the law enforcement authorities of both countries. The Parties understand that the procedures provided by the instruments should be used as a first resort whenever available and to the extent applicable. The Parties will use their best efforts to interpret and apply the instruments to provide assistance when requested by the Central Authority of the other Party and to streamline the implementation process of the instruments in order to improve their practical availability and effectiveness.

III. Early Warning/Consultations

1. In order to continue and improve international law enforcement cooperation in a manner consistent with the interests of both countries, the Parties understand that the appropriate authorities will undertake contacts or consultations in the future when the need to do so is recognized mutually.

may prejudice the successful completion of an investigation
or proceeding; and

(c) the Central Authorities have had 30 days, or other
mutually agreed period of time, within which to consult in
an effort to resolve the matter to their mutual
satisfaction.

Even where the above conditions have been met, the Parties will
continue to exercise moderation and restraint in undertaking to
enforce unilateral compulsory measures to which the other
objects or to block enforcement of such measures.

4.   The Parties understand further that they will use their
best efforts to insure that the information obtained in such
communications is handled with appropriate care to prevent it
from becoming public and, in particular, will not be disclosed
to any person except officials dealing with the case concerned
and, once an official request has been presented, parties
having a right of appeal in connection with the handling of the
request.

IV.   Moderation and Restraint

Where the above-mentioned mechanisms are not available to
obtain evidence in areas covered by this MOU the Central
Authorities will, with a view to avoiding or minimizing

counterfeiting, extortion, robbery or terrorism (which may also involve money laundering) can be circumstantial evidence of the existence of organized crime.

In view of these considerations, the Parties understand that the Central Authorities will continue their practice of using their best efforts to interpret and apply the instruments, in particular, such provisions that deal with organized crime and drug trafficking, in such a way as to provide assistance to the widest extent possible.

VI. Legal Status

This MOU is not intended to create legal obligations. It embodies statements of intent of the two Parties. The Parties further understand that this MOU does not modify or supersede any laws or regulations in force in Switzerland or in the United States. This MOU is not intended to create any rights enforceable by private parties and does not impose any obligations on the legislative and judicial branches of the Parties.

DEPARTMENT OF STATE
WASHINGTON

November 10, 1987

Excellency,

I have the honor to refer to the Treaty between the United States of America and the Swiss Confederation on Mutual Assistance in Criminal Matters, which was signed on May 25, 1973, and became effective on January 23, 1977 ("Treaty"), and in particular to Paragraph 3 of Article 1.  That provision provides that "the competent authorities of the Contracting Parties may agree that assistance as provided by this Treaty will also be granted in certain ancillary administrative proceedings in respect of measures which may be taken against the perpetrator of an offense falling within the purview of this Treaty."

In cases involving trading of securities by persons in possession of material non-public information, the offenders may not only be found guilty and sentenced in a criminal proceeding but also may be subject to other sanctions in order that the harm caused by the offense is repaired or that the offenders are deterred from similar conduct in the future.  It is therefore the understanding of the United States Government that, if assistance under

His Excellency
    Klaus Jacobi,
        Ambassador of Switzerland.

-3-

provisions of the United States securities laws or the
rules and regulations promulgated thereunder; and

(5) Enforcement proceedings conducted before the SEC or
an administrative law judge in which the revocation or
suspension of the registration of a regulated entity, or a
suspension or bar of a person from being associated with
such an entity, as a result of violative conduct is sought.

It is agreed that the Treaty provides an important
means of obtaining information needed to enforce the
criminal or penal laws of the United States and that the
Treaty should be used to the extent feasible.  It is
further understood that an investigation by the SEC is to
be considered an investigation for which assistance can be
furnished (if the other requirements of the Treaty are
met) as long as the investigation relates to conduct which
might be dealt with by the criminal courts of the United
States.

I have the further honor to state, on behalf of the
United States Government, that if assistance under the
Treaty could be granted with a view to possible criminal
proceedings in Switzerland, assistance will also be
granted in connection with the following investigations
and proceedings, including investigations that may lead to
such proceedings, that are conducted by competent Swiss

-5-

Article 1, Paragraph 3 of the Treaty, which shall enter
into force on the date of Your Excellency's note in reply.

Accept, Excellency, the renewed assurances of my
highest consideration.

For the Secretary of State:

*Rozanne L Ridgway*

**NEIL F. KEENAN et al. v. DANIELE DAL BOSCO et al. 11-cv-8500 (RJH)**

**Strunk Affidavit in support of Motion to Intervene**

# Exhibit E

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

NEIL F. KEENAN, Individually and as Agent for             **11-cv-8500 (RJH)**
THE DRAGON FAMILY, citizens of foreign states,

                                    Plaintiff,

-*against*-

DANIELE DAL BOSCO, a citizen of a foreign state, Et al.

                                    Defendants.

-------------------------------------------------------------------x

### Affidavit of Eric Jon Phelps in esse as Expert in support of

### Christopher-Earl Strunk in esse Motion to Intervene

| | | |
|---|---|---|
| **COMMONWEALTH OF PENNSYLVANIA** | ) | |
| | ) | **ss** |
| **COUNTY OF BERKS** | ) | |

I, Eric-Jon: Phelps© in esse, Affirmant, being duly sworn, depose and state under

penalty of perjury:

1. Am a natural born citizen of the Republic of California residing in the

    Commonwealth of Pennsylvania, am over 18 years of age and not a party to

    this instant action.

2. Affirmant's residence for service of process is 203 South Fort Zellers Road,

Apt. D, Newmanstown, PA, 17073; Email: eric@vaticanassassins.org; home phone

: 610-589-5300.

3. Affirmant makes this affidavit in support of Christopher-Earl: Strunk in esse

("Petitioner") motion to intervene  in the above captioned case in the United States

District Court for the Southern District of New York, and with due notice am available to testify accordingly.

4. That Petitioner has requested that Affirmant testify herein and or related proceedings as an expert witness on the Jesuit Order and related organizations in the following matters:

    **a.** The history of the Bible-based, Protestant Reformation as relates to the history of the Jesuit Aragon Templars, a.k.a. the Society of Jesus

    **b.** The Aragon Templar history in Asia from 1540 to the present including the events associated with the Open Door Policy in China leading to the over throw of the Emperor, Versailles treaty after World War I, and the rise of Mao Zedong to power on the Mainland against the Chinese Nationalist movement on Taiwan.

    **c.** Jesuit control inter alia over the Sovereign Military Order of Malta, New York Council on Foreign Relations and Federal Reserve Bank of New York.

    **d.** The Strategic outlook of the coming events involving the Jesuits.

5. Affirmant, author of Vatican *Assassins: "Wounded In The House Of My Friends,"* Third Edition (2006), solemnly states the following historical points of interest with regard to topics above **a-d**:

6. During the Dark Ages, when the pope of Rome was virtual master of Europe

and the Far East, the Knights of the Temple of Solomon (Knights Templars hereafter) were created to conduct the pope's Crusades for the purpose of taking Jerusalem from the Islamic Saracens after which the Temple of Solomon was to be rebuilt upon Jerusalem's holy Temple Mount. To effect this design, the Knights Templars would conduct ceaseless wars/crusades financed with an income tax upon European nobles as well as with an international commerce, including shipping and banking, squarely under the direction of the Order's Grand Master.

7. In 1291 the Templars were driven from Acre by the Islamic Egyptian Mamluks, the pope's Latin Kingdom of Jerusalem (revived today under the name of "Israel") ceasing to exist. Weakened, the Knights vowed to return, re-establish the kingdom (accomplished in 1948) and rebuild the temple.

8. But by the turn of the Fourteenth Century, the Order of the Knights Templars had become the virtual masters of all European finance and thus the real directors of Europe's divine right monarchs.

9. In putting an end to this magnificent monopoly, King Philip IV "the Fair" of France and Pope Clement V set out to suppress the Templars. This providential act in restraining Satan's "mystery of iniquity" (II Thessalonians 2:7), was Pope Clement V issuing his famous bull, *Vox in Excelsis*, in 1312, suppressing the Order, confiscating all its wealth to be

given over to the Sovereign Military Order of Malta (Knights of Malta, hereinafter).

10. The Knights Templars fled to several countries, primarily Scotland, where they devised their war on the papacy to ensue for over 200 years. Agents of the Order divided the papacy, resulting in the Babylonian Captivity of the Church (1309-1377) and the reign of two simultaneous popes, shattering the Spiritual and Temporal Power of "the Vicar of Christ." Agents of the Order released the bubonic plague across Europe, killing one third of the population most of which was loyal to the Roman Catholic papacy and despised the Knights. Agents of the Order incited the Peasants' War in England (1381) due to famine, plague and excessive taxation financing foreign wars, killing the Grand Master of the Knights of Malta thereby beginning the chastisement of the rival crusading Order of Malta, holder of all wealth of the Knights Templars.

11. With the dawn of the printing press (1450) followed by the beginning of Luther's Protestant Reformation (1517), the power of the papacy was shaken to its very core. Europeans were reading the Bible resulting in the loss of the pope's Spiritual and Temporal powers. People began to understand there is only one mediator between God and men, the man Christ Jesus (I Timothy 2:4-6). Whole nations broke away from the political/temporal power of the

"Holy See."   The commerce of Rome was suffering tremendous loss, De Medici Pope Leo X leaving a nearly bankrupt papacy at his death in 1521.

12. It was now time for the suppressed Templars to "strike while the iron is hot." Rome was in peril of Sunni Islam at the gates of Vienna, and now the Protestant Reformation further threatened her existence.  Ignatius Loyola, an Aragon Knights Templar came to the rescue.  A Spanish noble and soldier of dauntless courage coupled with fanatic devotion to the Virgin Mary, Loyola would revived the Knights Templars founding an even more diabolical and dangerous Order of warrior priests.

13. After a 1523 pilgrimage to Jerusalem in the attempt to establish the Jesuit headquarters of his future New World Order, Loyola created the Society of Jesus in Paris, France, in 1534.  In 1540 his New Order of the Knights of the Virgin Mary/Knights Templars was brought under the protection of the papacy, Farnese Pope Paul III issuing the bull of its establishment.

14. Created to first take Jerusalem from the Islamic Saracens and then to stop Martin Luther and William Tyndale's Protestant Reformation in Germany and England, the Order oversaw its "Counter Reformation" Council of Trent (1545-1563).  Therein contained all the doctrines to champion during the Order's military "Counter Reformation."  Ending the council with the unified cry "Accursed be all heretics," Jesuit Wars began in earnest against

all Protestants and Bible-believing Christians across Europe. These wars would also be directed against all religions and nationalists refusing to submit to the Spiritual and Temporal Power of the pope.

15. The Company specifically sought to overthrow the Protestant Reformation in England under Queen Elizabeth I and in Great Britain under King James I. Failing, due to rise of the Protectorate of Oliver Cromwell resulting from the Puritan Civil Wars initiated by the Scottish Presbyterian Covenaters, the Order plotted to restore the Roman Catholic Stuart dynasty. Succeeding in 1660, the Company ruled over Great Britain with its anti-Christian tyranny for twenty-eight years, when, in 1688, the bloodless Glorious Revolution drove James II from the throne into France. But all was not lost. Upon William III of Orange ascending the throne in London, the Order secretly gained control of "King Billy." For William refused to capture James II after the Battle of the Boyne (1690), enabling his father-in-law to again escape to France then to plot the overthrow of Protestant Great Britain directed by the Jesuits overseeing the Jacobites.

16. The Order, in seeking to use the developing British Protestant Empire to wage war on its enemies, needed a national bank for financing. In 1694 Scottish Freemason and Jesuit Temporal Coadjutor William Paterson founded the Bank of England. This national bank would be the great lender

to the British Crown extending credit and issuing notes of credit to wage British crusades of subjugation for the benefit of the Jesuit General. One of those crusades was its war on the White Protestant and Baptist American colonies having declared their independence in 1776.

17. The Society of Jesus, also called the Military Company of Jesus, plotted to conquer all the nations of the Far East. Francis Xavier set out for India and Japan while Matteo Ricci set out for China. The military design was to first conquer Japan, and then, using the superior military prowess of the Japanese, to conquer China. This design would never change for over four hundred years.

18. The Company of Jesus (after which "the Company" of the CIA is modeled) engaged in massive international commerce. Establishing 57 "reductions" in Paraguay, these were the first socialist-communist experiments of the Order spanning one hundred and fifty years (1609-1759). Over 200,000 native Guarani Indians were enslaved to produce a host of goods then to be placed in commerce and taken to European ports with the Order's massive fleet of "Blackships" overseen by the Jesuit General. The Order became so magnificently wealthy that it established banks throughout the world to facilitate its commerce. These revived Knights Templars were faithfully following in the footsteps of their forebears. War and Commerce conducted

by the Ignatians would be the keys to a total restoration of the pope's

Spiritual and Temporal Power over every nation on earth---including Japan

and China. For as Cicero declared, "Money is the sinew of war." This, the

Jesuits have proven and perpetually practice especially now in Red China.

19. The Jesuits were in need of supportive warriors in Protestant lands to further

the Counter Reformation/World government design of the Jesuit Superior

General. Hence, Scottish-Rite Freemasonry was created by the Jesuits in

their College of Clermont, Paris, in 1754. Therein, the first 25 rites of this

new Masonic order were authored by the Jesuits. Its purpose was to be the

tool to restore the Roman Catholic Stuart dynasty to the throne of England

while making a slain and risen Roman Papal Caesar of Jesuit rule "the

universal monarch of the world." After this design, the Masonic rite of the

slain and revived Hiram Abif was conceived.

20. By 1750 the Society of Jesus had nearly complete control of the world.

Every Roman Catholic European monarch was possessed of a Jesuit

confessor. Many Protestant monarchs were secretly "under the influence" of

the sons of Loyola. Japan had expelled the Order in 1614, later finalized and

termed "the Christian Ban." But the Jesuits were beloved in the court of

China's emperor, they being the masters of Peking. Bringing a vast array of

European science to the Chinese court, Loyola's Ignatians became the

foremost and favorite astronomers of the Ming Emperor. Matteo Ricci and Adam Schall were two of several.

21. But God would set back the power of the Knights Templars (now the Society of Jesus) once again. Portugal expelled the Jesuits in 1759; France in 1764, Spain in 1767 and the Grand Master of the Knights of Malta expelled the Order from Malta in 1768. This led to the Bourbon dynasties of Spain and France demanding the pope's suppression of this most dangerous, murdering and thieving Military Order of the Society of Jesus.

22. In 1773 Pope Clement XIV issued his infamous bull *Dominus ac Redemptor Noster*, forever suppressing and extinguishing the Society of Jesus. As did Pope Clement V with the crusading Order of the Knights Templars, so did Pope Clement XIV with the crusading Order of the Society of Jesus---the New Knights Templars. At about this time, the Manchu dynasty (1644-1912) expelled the Company from China. In the future, the Manchus would pay dearly for this, Jesuit vengeance to result in the termination of the dynasty and the destruction of patriotic Chinese nationalism.

23. The Order fled for protection to non-Catholic nations. Embraced by Catherine II "the Great" of "heretic" Orthodox Russia, by Frederick II "the Great" of "heretic" Lutheran Prussia and by George III of "heretic" Anglican England, the sons of Loyola launched their war on the Vatican. Founding

the Illuminati in 1776, they ignited the French Revolution leading to the

Napoleonic Wars and the secret killing of Pope Pius VI while punishing the

papacy and the Roman Catholic monarchs of Europe for suppressing the

Society of Jesus.  Roman Catholic Freemason Napoleon Bonaparte I was the

Company's "Great Avenger."

24. In 1798 Napoleon invaded Malta.  Advised by Jesuit Abby Sieyes, he

confiscated all the weapons and treasures of the Knights of Malta to be used

for his invasion of Egypt in the punishment of the Mamluks for driving the

Knights Templars from Acre in 1291.  Napoleon then drove the Knights of

Malta to Russia, there to submit to terms of the acting Jesuit General.  From

then on, the Knights of Malta would never again resist the Society of Jesus.

Today, the Knights of Malta control the central banks of the world along

with the cartel-capitalist private banks, such as Bank of America,

JPMorgan/Chase and Citibank.

25. During the Suppression of the Company of Jesus, the Order gained control

of Pope Pius VII.  In 1801 the Jesuit Order was formally restored in

Orthodox Russia and in 1805 the same occurred in Protestant America,

President Thomas Jefferson never raising an objection.

26. Upon the Order's international restoration in 1814 by Pope Pius VII, the

Company began to regain its lost power.  Directing the British Crown and

influencing the American presidency, the Jesuits sought to create a united Anglo-American alliance to be used to conquer first Japan and then China. At this time both Japan and China had expelled the Company and vowed never to readmit their traitorous oppressors.

27. In 1841, via British influence of the First Opium War (1839-1842), the Chinese Manchus were forced to readmit the Jesuits into the Empire. In 1854 the Jesuits used the American Navy with Commodore Perry to finally open up Japan to the White Protestant nations of the West---especially Jesuit-ruled Great Britain. The Jesuit General's old plan was still inexistence: Conquer China through Japan using her Emperor and military power now to be backed by the British Crown under Jesuit rule.

28. The Jesuits were legally readmitted into Japan in 1865. Emperor Komei stoutly resisted lifting "the Christian Ban" for which he was poisoned in 1867 at the young age of thirty-six. That same year Tokugawa Shogon Yoshinobu resigned, giving his office to the new Emperor Meiji then only fourteen years of age. Meiji "the Great" would serve his Jesuit masters for over forty-five years, centralizing all power in Tokyo and creating the Japanese Imperial Empire---for the use of the Jesuit Order. Japanese samurai nationalists opposing the Meiji regime would be finally defeated in battle, massacred with American gatling guns in 1877.

29. After fomenting the American Civil War, rightly termed by Southerners the War of Northern Aggression (1861-1865), the Order would establish an American Empire through the declared ratification of the Fourteenth Amendment.  All power would be centralized in Washington, D.C., the Order's Radical Red Republicans having created the Jesuit American Empire on the ruins of the Calvinist Federal Republic of these United Sovereign States of America.  By 1888 the Jesuit Superior General ("the Black Pope") now had five empires under his control: the Protestant British Empire (under Queen Victoria), the Japanese Imperial Empire (under Emperor Meiji), the Orthodox Russian Empire (under Czar Alexander III), the Protestant American Empire (under President Grover Cleveland) and the Protestant Second German Reich (under Kaiser Wilhelm II).  These powers would be used in tandem against China during her "century of humiliation" leading to the overthrow of the Manchu dynasty.

30. The Society of Jesus began to use its "Japanese Sword of the Church" against the Qing/Manchu dynasty of China also ruling Korea.  In 1894 Japan launched and, in 1895, won the first Sino-Japanese War taking Korea and Taiwan away from China while forcing the Qing/Manchu government to pay 13,600 tons of silver to Japan for war reparations.  That same year Japanese agents of Jesuit-ruled Emperor Meiji brutally assassinated anti-

Japanese, pro-Chinese Korean Empress Myeongseong. The surviving crown

prince sought and received protection from the Russian legation in Soul, an

act for which Russia would pay dearly.

31. As a result of these loses of the Qing/Manchu Empress Dowager Cixi along

with the continued invasion of foreigners, desperate Chinese nationalists

began to resist. Therefore, the Jesuits incited and led the Boxer Rebellion in

1901 (during which many Protestant missionaries were murdered in

according with the Jesuit Oath of the Fourth Vow). But the nationalists were

betrayed, meeting the armies of eight nations under Jesuit rule or influence

in battle. Five of those nations were Japan, America, Germany, Russia and

Great Britain. With the foremost Chinese nationalists exterminated and the

population weakened with opium addiction, the end of the hated , anti-Jesuit

Qing/Manchu dynasty was approaching.

32. In 1904 Japan attacked Orthodox Russia ultimately destroying two of its

three fleets. Termed "the first great war of the 20th century," Japan was

victorious, furthering the Order's building of its Japanese Imperial Empire.

Conversely, the loss of Russia fueled unrest in Russia leading to the Order's

first Russian Revolution against the Romanov dynasty in 1905. For the

Jesuits had been formally expelled from Russia by Czar Alexander I in 1820,

only to legally re-enter in 1922 with their successful Bolshevik Revolution

financed and promoted by Rome's Anglo-American, Apostate Protestant, International White Power Structure centered in Washington, D.C., and London.

33. In 1912 the Qing/Manchu dynasty was finally overthrown. China would undergo a series of socialist upheavals and would yet suffer a Second Sino-Japanese War beginning in 1937 to end in 1945. During this time Freemason Emperor Hirohito would do the bidding of his masters residing at Jesuit Sophia University in Tokyo, the Japanese invading twelve Asian countries for three reasons: to kill the nationalists, to kill all Protestant missionaries and to plunder the gold of the region much of it then buried in 175 "imperial" treasure vaults in the Philippines. After World War II (the second act of the Black Pope's Second Thirty Years' War, 1914-1945), much of that gold would find its way to American banks in New York, one of them being Citibank ruled by the Knights of Malta. Other knights facilitating the movement of the gold were OSS chief William Donovan and CIA chief Allen Dulles, a co-conspirator in the Kennedy Assassination.

34. China, now divided into pro-communist and anti-communist camps, would finally be conquered by the Jesuit Order. Suffering the loss of its gold to the Japanese and the loss of its honor via the Japanese Rape of Nanking, the Chinese people, driven to desperation, were ready for the "solution" to their

"chaos."  In 1949 the Order, using its Council on Foreign Relations (CFR) member Secretary of State Dean Acheson, facilitated the successful subjugation of China to socialist-communism perfected by the Order on its socialist-communist "reductions" in Paraguay as per above.  All the nationalist, anti-communists fled to Taiwan under the leadership of Freemason Chang kai-shek loyal to Francis Cardinal Spellman, the mastermind behind the Kennedy assassination.  Meanwhile, Communist China was under the dictatorship of Freemason Mao Zedong.  Rome controlled both factions via Freemasonry, her open-but-false policy being to support the Nationalist Chinese having fled to Taiwan.  But her secret-but-true policy was to back the Communist Chinese on the mainland.  It is for this reason the US Seventh Fleet blocked Taiwan's planned invasion of Communist China in 1950 with the excuse that the Fleet was to keep China from invading Taiwan.  This blockade enabled Communist China to send one million troops into North Korea to kill American servicemen.

35. Hence, the Jesuit Order via its high-level Freemasons within its International Anglo-American White Power Structure, controls the governments of both Taiwan and China.  The peace-meal policy of betrayal towards Taiwan by Jesuit-directed, CFR-ruled American government is intended to end with the martial unity of Taiwan with China.  This secret policy of unification,

including the re-uniting of Korea and the uniting of Japan with China, is to create a Far Eastern coalition of Asian nations for the future invasion of North America.  Japan has been used to conquer China, Japan now to be used both commercially and militarily with its Red Chinese ally in the future subjugation of the entire Far East (including Australia and New Zealand) to culminate in a massive Oriental Asian invasion of North America having been occupied with millions of "fifth column," Red Chinese loyalists including the spy, nuclear scientist, CIA operative Wen Ho Lee.

36. The Knights of Malta rule the pope's Federal Reserve Bank through such men as Peter G. Peterson, former president of the Federal Reserve Bank of New York City, the bank holding both title and possession of America's gold in the form of 660,000 gold bars.  The Jesuits employ the Knights of Malta in various academic positions, CFR-member and Knight of Malta John J. DeGoia serving as president of Jesuit Georgetown University, it overseeing the policies of the White House through the Vatican's Vaginal Oval Office of the Virgin Mary.

37. The Jesuit Order, in complete control of London, Moscow, Washington, D.C., Bejing, Baghdad, Cairo, Istanbul, Paris, Rome, Berlin, Brussels, Tehran, etc., is therefore in total control of the pope's International Intelligence Community, including all sixteen American intelligence

agencies, Britain's MI5/MI6, Germany's BND, Israel's Mossad, China's CSIS, Russia's FSB/SVR, and all other lesser intelligence services. These intelligence services control the governments of their host nations and thus the military complexes of those nations for the benefit of the Jesuit Papacy waging war to make the pope of Rome the universal monarch of the world.

38. The Jesuit Order, in complete control of all central banks, including the Federal Reserve Bank and Bank of England, rules all stock exchanges and dictates the value of all paper currencies for the benefit of the Jesuit Papacy, the pope presently calling for the establishment of a World Bank---under his secret rule via his Knights of Malta subject to the Jesuit Superior General.

39. Thus, the Jesuit Order, in seeking to destroy the last bastion of the Protestant Reformation here in the United States of America, is now pulling out its manufacturing base relocating it into Red China, Mexico and Europe. This is in preparation for the Sino-Soviet-Muslim-Hispanic invasion of the American Empire after US forces are betrayed by the Joint Chiefs of Staff and defeated on at least two war fronts. Further, the secret Japanese imperial gold horde has contributed to the financing of America's plotted demise.

40. Thus, the Jesuit Order has used its unified American military intelligence community to cause the 911 Crisis and subsequent invasion of Afghanistan, Iraq, Pakistan, and soon-to-be Shia Iran. This is a papal crusade against the

Shia Muslims, the enemies of Sunni Islam originally created by the Vatican having authored the Koran inciting Arab Muslims to kill true Christians and Jews.  Upon the destruction of the Shia Muslims, the Sunni World can then be united against America for our coming invasion, the Muslims to be transported from West African ports in Senegal and Mauritania to Cuba to North America by the Chinese Overseas Shipping Company (COSCO).

41. To facilitate this "Final solution to the Protestant Question," the Order, via its Knights of Malta controlling international banking and commerce, has used its Japanese and Nazi secret gold horde to conduct the pope's Cold War in covertly building Far Eastern communist nations while weakening the Western free enterprise nations of America and Canada in preparation for the Sino-Soviet-Muslim-Hispanic invasion of North America.

42. This design of using massive amounts of gold is in accordance with the Black Pope's statement at the secret meeting in Chieri, Italy, in 1825:

*"For these purposes, it is not enough to have at our disposal men of talent and men of action---we must have gold to keep them fast to their work.  Aye, give me gold---plenty of gold; and then, with such able heads and such resources as the church commands, I will undertake not only to master the whole world, but to reconstruct it entirely."* *

*Abbate Leone, *The Jesuit Conspiracy.  The Secret Plan of the Order*, (London: Chapman and Hall, 1848), p. 134.

43. That I, the Affirmant, have read the above and know its contents as an expert witness; the facts stated in the Petition are true to my own personal knowledge, except as to the matters therein stated to be alleged on information and belief.  The grounds of my beliefs as to all matters not stated upon information and belief are as follows: 3rd parties, histories, rare books, official records, and personal knowledge except as to those stated being logical conclusions premised upon undeniable facts unearthed over a period of thirty years.

Eric-Jon: Phelps in esse.

Sworn and so Stated before me this 23rd day of January 2012.

Notary Public

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Richard H. Bassler, Notary Public
Womelsdorf Boro, Berks County
My commission expires June 06, 2014

**NEIL F. KEENAN et al. v. DANIELE DAL BOSCO et al. 11-cv-8500 (RJH)**

**Strunk Affidavit in support of Motion to Intervene**

# Exhibit F

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Neil F. Keenan
*Individually and as Agent for The Dragon Family,*
*citizens of foreign states*

Plaintiff(s),

- against -                                     2011 Civ.  08500 (RJH )

Daniele Dal Bosco, et al,
*a citizen of a foreign state*

Defendant(s).

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**Initial Scheduling Conference Notice and Order**

This action has been assigned to Judge Richard J. Holwell for all purposes.

It is hereby ORDERED as follows:

1.  Counsel receiving this Order shall promptly mail or fax copies hereof to all other
    counsel of record or, in the case of parties for which no appearance has been
    made, to such parties.  Counsel for all parties should note their appearance as
    counsel in this matter by letter immediately.

2.  Counsel for all parties are directed to confer regarding an agreed scheduling order
    pursuant to Fed. R. Civ. P. 26(f).  If counsel are able to agree on a schedule **and
    the agreed schedule calls for filing of the pretrial order not more than nine
    (9) months from the date of this order,** counsel shall sign and email a PDF of
    the proposed schedule to the Orders and Judgment Clerk within fourteen (14)
    days from the date hereof, following the scheduling order requirements attached
    hereto.  Counsel should note, in submitting their consent scheduling order, that
    the otherwise scheduled conference should be adjourned.

3.  If such a consent order is not filed within the time provided, an initial scheduling
    conference will be held in this matter on **March 9, 2012 at 10:30 a.m.** in
    Courtroom 17B at the U.S. Courthouse, 500 Pearl Street, New York, New York
    10007.  A proposed scheduling order, following the scheduling order
    requirements attached hereto, should be submitted to Chambers three days before
    the initial scheduling conference.

4.  **Any requests for adjournments** must be made in writing and must be received in Chambers **not later than 48 hours** before the scheduled time.  Alternative dates that are mutually agreeable to all parties must be suggested when requesting to reschedule the initial scheduling conference.  Parties should consult the Individual Practices of Judge Holwell with respect to communications with Chambers and related matters.

5.  This case has been designated an electronic case. The parties are advised that **all orders  will be issued via the Electronic Case Filing ("ECF") system and parties will not be sent copies by mail or facsimile.**  It is the responsibility of counsel to become familiar with and follow ECF procedures. Judge Holwell's individual practices may be found at - **http://www.nysd.uscourts.gov/Individual_Practices/Holwell.pdf.**  Parties should direct questions regarding ECF to the ECF Help Desk at 212-805-0800.

**SO ORDERED**.

Dated: New York, New York
       January ___, 2012.

                                        Richard J. Holwell
                                        United States District Judge

2

## Scheduling Order Requirements

1. Description of the Case
   a. Identify the attorneys of record for each party, including lead trial attorney;
   b. State the basis for federal jurisdiction;
   c. Briefly describe the claims asserted in the complaint and any counterclaims;
   d. State the major legal and factual issues in the case; and
   e. Describe the relief sought.

2. Proposed Case Management Plan
   a. Identify all pending motions;
   b. Propose a cutoff date for joinder of additional parties;
   c. Propose a cutoff date for amendments to pleadings;
   d. Propose a schedule for completion of discovery, including:
       i. A date for Rule 26(a)(1) disclosures, if not previously completed;
       ii. A fact discovery completion date;
       iii. A date for Rule 26(a)(2) disclosures; and
       iv. An expert discovery completion date, including dates for delivery of expert reports;
   e. Propose a date for filing dispositive motions;
   f. Propose a date for filing a final pretrial order; and
   g. Propose a trial schedule, indicating:
       i. Whether a jury trial is requested;
       ii. The probable length of trial; and
       iii. When the case will be ready for trial.

3. Consent to Proceed Before a Magistrate Judge: Indicate whether the parties consent unanimously to proceed before a Magistrate Judge.

4. Status of Settlement Discussions
   a. Indicate whether any settlement discussions have occurred;
   b. Describe the status of any settlement discussions; and
   c. Whether parties request a settlement conference.

3

# INDIVIDUAL PRACTICES
## OF JUDGE RICHARD J. HOLWELL

**Chambers**

United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

**Courtroom 17B**

500 Pearl Street
William J. Donald
Courtroom Deputy Clerk
(212) 805-4634

     **Unless otherwise ordered by Judge Holwell, matters before Judge Holwell shall be conducted in accordance with the following practices:**

1. **Communications with Chambers**

   A. **Letters.** Except as otherwise provided below, communications with Chambers shall be by letter, with copies simultaneously delivered to all counsel. Copies of correspondence between counsels shall not be sent to the Court.

   B. **Telephone Calls.** Except as provided in Paragraph 1(D) below, telephone calls to Chambers are permitted <u>only</u> in emergency situations requiring immediate attention. In such situations only, call Chambers at (212) 805-0256.

   C. **Faxes.** Faxes to Chambers are permitted only if copies are also simultaneously faxed or delivered to all counsel. No document longer than 4 pages may be faxed without prior authorization. <u>Do not follow with hard copy</u>. The fax number is (212) 805-7948.

   D. **Electronic Case Filing.** Parties must provide hard copy by fax or mail of any document filed on ECF. For all motions other than pro hac vice motions, two courtesy copies, marked as such, shall be submitted to Chambers at the time the papers are served. For pro hac vice motions, one courtesy copy is sufficient. Parties should direct questions regarding ECF to the ECF Help Desk at 212-805-0800.

   E. **Docketing, Scheduling and Calendar Matters**. For docketing, scheduling and calendar matters, call the Deputy Clerk, William Donald, at (212) 805-4634.

   F. **Requests for Adjournments or Extensions of Time.** All requests for adjournments or extensions of time must state (1) the original date, (2) the number of previous requests for adjournment or extension, (3) whether these previous requests were granted or denied, and (4) whether the adversary consents, and, if not, the reasons given by the adversary for refusing to consent. If the requested adjournment or extension affects any other scheduled dates, a proposed Revised Scheduling Order (reflecting only business days) must be attached. If the request is for an adjournment of a court appearance, absent an emergency, it shall be made <u>at least 48 hours prior</u> to the scheduled appearance.

Forms-Scripts

Page 1 of 6

2. **Scheduling Order Requirements**

A. **Description of the Case**
   i.   Identify the attorneys of record for each party, including lead trial attorney;
   ii.  State the basis for federal jurisdiction;
   iii. Briefly describe the claims asserted in the complaint and any counterclaims;
   iv.  State the major legal and factual issues in the case; and
   v.   Describe the relief sought.

B. **Proposed Case Management Plan**
   i.   Identify all pending motions;
   ii.  Propose a cutoff date for joinder of additional parties;
   iii. Propose a cutoff date for amendments to pleadings;
   iv.  Propose a schedule for completion of discovery, including:
       a. A date for Rule 26(a)(1) disclosures, if not previously completed;
       b. A fact discovery completion date;
       c. A date for Rule 26(a)(2) disclosures; and
       d. An expert discovery completion date, including dates for delivery of expert reports;
   v.   Propose a date for filing dispositive motions;
   vi.  Propose a date for filing a final pretrial order; and
   vii. Propose a trial schedule, indicating:
       a. Whether a jury trial is requested;
       b. The probable length of trial; and
       c. When the case will be ready for trial.

C. **Consent to Proceed Before a Magistrate Judge.**  Indicate whether the parties consent unanimously to proceed before a Magistrate Judge.

D. **Status of Settlement Discussions**
   i.   Indicate whether any settlement discussions have occurred;
   ii.  Describe the status of any settlement discussions; and
   iii. Whether parties request a settlement conference.

3. **Motions**

A. **Pre-Motion Conferences in Civil Cases.**  For discovery motions, follow Local Civil Rule 37.2.  A pre-motion conference with the Court is required before making a motion for summary judgment or dismissal, including motions to dismiss filed in lieu of answer. To arrange a pre-motion conference, the moving party shall submit a letter not to exceed three pages in length setting forth the basis for the anticipated motion.  Pre-motion conferences are not required for other motions.  Service of a pre-motion conference letter within the time provided by Federal Rule of Civil Procedure 12(a) constitutes timely service of a motion made pursuant to Federal Rule of Civil Procedure 12(b).

**B. Courtesy Copies.** Two courtesy copies of all motion papers, marked as such, shall be submitted to Chambers at the time the papers are served. For motions for admission pro hac vice, only one courtesy copy shall be submitted, together with a proposed order form and the necessary supporting documents.

**C. Memoranda of Law.** Unless prior permission has been granted, memoranda of law in support of and in opposition to motions are limited to 25 pages, and reply memoranda are limited to 10 pages. Memoranda of 10 pages or more shall contain a table of contents. The memoranda shall be double-spaced and use 12-point font for text and footnotes. Citations to authority not available in Westlaw or Lexis/Nexis should be accompanied by copies of the cited materials.

**D. Exhibits.** If deposition testimony is submitted, four pages of testimony should, if possible, appear on a single page.

**E. Filing of Motion Papers.** Motion papers shall be filed promptly after service. For ECF filings, the Court prefers, but does not require, that parties upload text-searchable PDF documents.

**F. Oral Arguments on Motions.** Parties may request oral argument by letter at the time their moving or opposing or reply papers are filed. The Court will determine whether argument will be heard and, if so, will advise counsel of the argument date.

**G. Effect of a Motion on Notice of Appeal.** Paragraph A above does not apply to any of the motions described in Fed. R. App. P. 4(a)(4)(A). A pre-motion conference is not required before making such motions, which should be filed when served.

**4. Pretrial Procedures**

**A. Final Pretrial Orders in Civil Cases.** Unless otherwise ordered by the Court, within 30 days from the date of the completion of discovery in a civil case, the parties shall submit to the Court for its approval a joint final pretrial order that includes the information required by Fed. R. Civ. P. 26(a)(3), and the following:

i.   The names, addresses (including firm names), and telephone and fax numbers of trial counsel.

ii.  A brief statement by plaintiff as to the basis of subject matter jurisdiction, and a brief statement by each other party as to the presence or absence of subject matter jurisdiction. Such statements shall include citations to all statutes relied on and relevant facts as to citizenship and jurisdictional amount.

iii. A brief summary by each party of the claims and defenses that party has asserted which remain to be tried, without recital of evidentiary matter but including citations to all statutes relied on. Such summaries shall identify all claims and defenses previously asserted which are not to be tried.

    iv. A statement by each plaintiff setting forth and calculating with specificity each element of damages sought with respect to each claim that remains to be tried.

    v. A statement by each party as to whether the case is to be tried with or without a jury, and the number of trial days needed.

    vi. A statement as to whether or not all parties have consented to trial of the case by a magistrate judge (without identifying which parties have or have not so consented).

    vii. Any stipulations or agreed statements of fact or law, which have been agreed to by all parties.

    viii.   A list of all witnesses, with a brief summary of the substance of each witness's testimony and an indication whether such witnesses will testify in person or by deposition. No witness not identified herein shall be permitted to testify in either party's case in chief absent good cause shown.

    ix. A designation by each party of deposition testimony to be offered in its case in chief, with any cross-designations by any other party. Each party shall set forth any objections it has to deposition testimony designated by the other and the basis therefore. If deposition testimony is submitted, four pages of testimony should, if possible appear on a single page.

    x. A list by each party of exhibits to be offered in its case in chief, with one star indicating exhibits to which no party objects on grounds of authenticity, and two stars indicating exhibits to which no party objects on any ground. The list shall include a description of each exhibit. The grounds for the objection to the admissibility of any exhibit shall be stated in summary form. Any objections not set forth in the final pretrial order shall be considered waived absent good cause shown.

**B. Filings Prior to Trial in Civil Cases.** Unless otherwise ordered by the Court, each party shall file the following at the time of the filing of the final pretrial order:

    i. In jury cases, requests to charge and proposed *voir dire* questions. Joint proposed jury charges should also be submitted on a CD-ROM in Microsoft Word format, with a table of contents;

    ii. In all cases, motions addressing any evidentiary or other issues which should be resolved *in limine*;

    iii. In any case where such party believes it would be useful, a pretrial memorandum; and

    iv. In non-jury cases, Proposed Findings of Fact and Conclusions of Law. The Proposed Findings of Fact should be detailed; there may be no opportunity for post-trial

submissions.  The Proposed Findings shall address with specificity each element of damages claimed.

C. **Filings in Opposition.**  Any party may file the following documents within one week of the filing of the final pretrial order, but in no event less than three days before the scheduled trial date:

  i.  Objections to another party's requests to charge or proposed *voir dire* questions;

  ii.  Opposition to any motion *in limine*;

  iii.  Opposition to any legal argument in a pretrial memorandum.

D. **Courtesy Copies.**  Two courtesy copies of the final pretrial order and all documents filed or served with the final pretrial order should be submitted to Chambers on the date of filing or service.

5. **Conferences**

A. **Principal Trial Counsel.**  The attorney who will serve as principal trial counsel must appear at all conferences with the Court.

B. **Initial Scheduling Conference.**  The Initial Scheduling Conference Notice and Order will be mailed to plaintiff's counsel, who will be responsible for distributing copies to all parties.  If all counsel are able to agree on a schedule and the agreed schedule calls for filing of the final pretrial order not more than six (6) months from the date of the Initial Scheduling Conference Notice and Order, and such consent scheduling order is filed with the Orders and Judgment Clerk within fourteen (14) days from the date of the Initial Scheduling Conference Notice and Order, no initial scheduling conference shall be necessary.  **The scheduling order should conform to the requirements set forth in paragraph 2 above.**  Otherwise, the parties' report pursuant to Fed. R. Civ. P. 26(f) and two courtesy copies of the pleadings should be delivered by plaintiff's counsel to Chambers three days prior to the conference date.

Page 5 of 6

Attachment 1

## DEFAULT JUDGMENT PROCEDURE

A. **Applications.** Applications for default judgments must comply with Local Civil Rule 55.1 and 55.2 and <u>must</u> <u>provide</u> <u>reasonable</u> <u>notice</u> to the party against whom default shall be entered by:

     i.   First-class mail or courier, if the party is domestic;
     ii.   Courier, if the party is international; or
     iii.   Any method authorized by Rule 4 of the Federal Rules of Civil Procedure.

Applications will not be accepted absent the following:

     i.   An affidavit setting forth:
        a.  A description of the nature of the claim;
        b.  The basis for subject matter jurisdiction over the action;
        c.  The basis for personal jurisdiction over the defendant;
        d.  A representation that defendant is not an infant or an incompetent; and
        e.  A representation that notice has been provided in accordance with the requirements set forth above;
     ii.   A certificate of default stating that the defendant was properly served with the complaint and failed to answer/appear, signed and stamped by the Clerk of the Court.  (If the defendant did appear in the action, the plaintiff must submit an affidavit representing that the defendant has notice of the application for default);
     iii.   An affidavit setting forth reasonable attorneys' fees and showing that attorneys' fees are recoverable;
     iv.   A copy of the complaint; and
     v.   A proposed form of default judgment.

B. **Damages.** If the plaintiff seeks an award of damages in the motion for default judgment, the plaintiff must also include:

     i.   A request for an amount equal to or less than the principal amount demanded in the Complaint;
     ii.   Definitive information and documentation such that the amount provided for in the proposed judgment can be calculated.  (If this requirement cannot be satisfied, a default judgment may be granted as to liability, and damages will be determined by an inquest);
     iii.   An affidavit representing that no part of the judgment sought has been paid, other than as indicated in the motion;
     iv.   A request for interest on the principal amount not to exceed 9%, if interest is sought; and
     v.   The calculations made in arriving at the proposed judgment amount.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

NEIL F. KEENAN, Individually and as Agent for          **11-cv-8500 (RJH)**
THE DRAGON FAMILY, citizens of foreign states,

                                        Plaintiff,

-*against*-

DANIELE DAL BOSCO, a citizen of a foreign state, Et al.

                                        Defendants.

------------------------------------------------------------------x

## Christopher-Earl Strunk in esse Memorandum of Law in support of the Motion to Intervene

### PRELIMINARY STATEMENT

**1)**   Petitioner, Christopher Strunk, is self-represented without being an attorney, has a supporting affidavit with exhibits and a proposed supplement annexed; and as a non-party seeks to intervene as a Intervener-Plaintiff herein with both Federal Rules of Civil Procedure (FRCvP) Rule 24(a) as an American Chinese historic Bond holder, and or as an alternative with permission with FRCvP Rule 24 (b) (1)(B) (2) (A) (B),  in that FEDERAL RESERVE BANK OF NEW YORK (FRBNY) by LEE C. BOLLINGER, its Chairman and President as well as the FOREIGN BONDHOLDERS PROTECTIVE COUNCIL INC (FBPC) by its principal JOHN R. PETTY are required supplemental Defendants that have been left out from the Complaint.

### BACKGROUND

### 1. PROCEDURAL BACKGROUND

    That Plaintiffs' complaint filed November 23, 2011 has multiple allegations of wrongdoing in a conspiracy by foreign defendants including Italy its governmental